# Exhibit A

# AMENDED AND RESTATED
# THERANOS MASTER SERVICES AGREEMENT

Whereas the parties entered into the Theranos Master Purchase Agreement ("Original Agreement") dated July 30, 2010;

Whereas the parties agree that because of certain changes in circumstances, it is necessary to terminate the Original Agreement and replace it with this Agreement (as defined below;

This Amended and Restated Master Services Agreement ("Agreement") dated June _5_, 2012 ("Effective Date") is by and between:

| WALGREENS | | | |
|---|---|---|---|
| Full Legal Name | Walgreen Co. | Client Signatory | Wade Miquelon |
| Jurisdiction of Incorporation | Illinois | Title | Executive Vice President & Chief Financial Officer |
| Principal Business Address | 200 Wilmot Road Deerfield, IL 60015 | Telephone | 847.315.3090 |
| Company Phone Number | 847.914.2500 | Email | wade.miquelon@walgreens.com |
| Company Fax Number | 847.914.2804 | | |
| **THERANOS** | | | |
| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | 650-470-6111 |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:
Schedule A:  Program Overview
Schedule B:  Service Terms and Conditions
Schedule C:  Support and Maintenance Terms
Schedule D:  Walgreens Service Pricing
Schedule E:  Definitions
Schedule F:  Pilot
Schedule G: HIPAA Business Associate Agreement
Schedule H-1: Convertible Promissory Note
Schedule H-2: Certificate Evidencing Right to Purchase Convertible Promissory Note
Schedule I: Theranos Pharmaceutical Clinical Trials Infrastructure
Schedule J: Test Menu

The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference.  This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| _____ | _____ |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| _____ | _____ |
| (Authorized Representative -- Printed) | (Authorized Representative -- Printed) |
| _____ | Elizabeth Holmes |
| (Title) | (Title) CEO |

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| *U̶A̶C̶* | |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| WADE D. MIQUELON | |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| CFO | |
| (Title) | (Title) |

*ek-law*

Theranos and Walgreens Confidential and Proprietary

## SCHEDULE A

## PROGRAM OVERVIEW

This Schedule sets forth the Program, including the objectives of the Program and shall be used only for illustrative purposes.  The terms and conditions governing this Schedule are set forth in Schedule B, attached.  Schedule A is intended to be used for each parties understanding of the relationship and shall not govern nor bind either party's actions.  If and to the extent this Schedule provides additional terms and/or conflicting terms to the terms and conditions set forth in Schedule B, the terms of Schedule B will prevail.  The capitalized terms as used in this Agreement are defined in Schedule E, attached.

1. **Intentionally Deleted.**
2. **Program Objectives.**  The objectives of this Program include:

    a.   Make  testing less invasive, faster and far more accessible, effective, and actionable by introducing a more cost-effective, blood testing service at Walgreens stores and Walgreens' other clinical operations nationwide (which, by example, include, but are not limited to infusion centers and CSG/ESG clinics).  Other types of specimens collected will be nasal and throat swabs as well as urine samples.

    b.   Empower Walgreens to play a more active role in patient health management and well-being. Theranos Systems include a decision support system, which will be accessible through the touch screens on the devices, including any on-site interface provided by Theranos, or through the web browser.  This decision support system will deliver real-time, actionable information to the clinicians in the pharmacy and other Walgreens clinical locations by providing analysis, interpretations and recommendations based on patient test results.

    c.   Generate health care cost savings by reducing direct out-of-pocket costs of lab tests and visits.

    d.   Early intervention and reduced hospitalization through early detection of the onset of disease.

    e.   Introduce a new revenue stream for Walgreens through this disruptive technology and associated services.

3. **Phased Disruption.**  As Theranos continues to develop disruptive technology, the parties agree to discuss terms by which such innovations can be made commercially available through Walgreens.  Notwithstanding the previous, the parties acknowledge the mutual desire to bring Theranos' technology to market as quickly as is reasonably possible.  With that in mind, at the commencement of this Agreement, it is the parties' intention for Walgreens to act as a patient service center and collect blood samples via finger-stick technology, small samples of urine, saliva, feces, or swabs, with laboratory testing to be performed by Theranos at a CLIA certified offsite laboratory ("PSC Phase").  At such point that the Theranos System is approved for use in a retail setting by appropriate regulatory bodies, the parties will determine which Walgreens locations, if any, should deploy the Theranos System, with Theranos acting as the CLIA certified laboratory at the retail and/or employer setting ("Onsite Phase").

4. **Program Managers.**  Each party will assign a program manager to this Program.  The responsibilities of each party's program manager include:  (i) serve as the interface between the other party; (ii) develop a mutually agreed upon detailed business plan including milestones, projections/forecasts and deliverables, and success/acceptance criteria for each milestone (details of the business plan and any applicable schedule shall be memorialized in an amendment to this Agreement); (iii) ensure that Theranos and Walgreens have committed the necessary resources necessary to meet the objectives and timeline of the Program; (iv) prepare regularly-scheduled status reports on the Program, on an agreed-upon time-frame; (v) identify, schedule and confirm availability of resources, including management, to provide agreed-upon services and deliverables; and (vi) assist in resolving issues, and escalate, as appropriate, within the other party.  The parties acknowledge that the Program Plan is subject to change as the Program progresses.  Notwithstanding anything to the contrary in this Schedule A, all terms of the relationship shall be detailed in Schedules B through J or by an amendment to this Agreement.

5. **Reviews.**  The appropriate Program Managers and Representatives from each party will meet on at least a bi-weekly basis at least until the Pilot commences, to develop the project and review the entire status of the Program.

*[remainder of page intentionally left blank]*

## SCHEDULE B

## SERVICE TERMS AND CONDITIONS

1.  **Scope**. The terms and conditions set forth in this Schedule apply to this Agreement, including each attached Schedule or other attachment. To the extent a Schedule or other attachment provides additional terms and/or conflicting terms to the terms and conditions set forth in this Schedule B, the terms of this Schedule B will prevail.

2.  **Service Fee Guarantee.** During the PSC Phase, Theranos agrees that no other United States retail pharmacy, grocer, mass merchant, or physician office(s) will be able to procure the right to act as a PSC for Theranos or the right to obtain services from Theranos as they relate to the collection of specimens for service(s) for a compensation amount per Test that exceeds the compensation amount available to Walgreens for those services. Any promotional strategic contracts with thought leaders, physicians or charitable work shall not be subject to the Service Fee Guarantee, provided service fees paid for such services below the Walgreens fee, are not material to Theranos for any given twelve (12) month period.

    With respect to Predictive Tests, the parties agree that Theranos shall have an independent auditor, acceptable to Walgreens, certify to Walgreens that the service fee provided to Walgreens during the PSC Phase conforms with this Section 2. Should the results of such audit show that Walgreens was paid a lesser service fee than what is provided for in this Section, Theranos shall supplement such service fee within thirty (30) days of such certification. Said certification shall be made twice: Within sixty (60) days of the date that is six (6) months after the date Walgreens' exclusivity period on each new Predictive Test completes, and within sixty (60) days of the date that is twelve (12) months after the date Walgreens' exclusivity period on such Test completes.

3.  **Exclusivity**.

a.  **Central Labs and PBMs.** Theranos agrees not to make the Theranos System available for sale to, distribution to, or for use (through collection of blood samples, other specimens or otherwise) in delivering Tests to (a) any central lab company (including but not limited to Quest Diagnostics Inc., Laboratory Corporation of America Holdings, and all their related entities, as well as any other non-hospital company doing business as a centralized commercial laboratory), and (b) any pharmacy benefit manager (PBM) (including but not limited to Medco Health Solutions Inc., Express Scripts, Inc., and all their related entities, as well as any other company doing business as a pharmacy benefit manager). Notwithstanding the previous, the following exception shall apply: in geographic areas where Theranos has not yet launched through Walgreens stores, the above restriction around central lab companies shall not apply until Theranos launches through Walgreens stores in a given geography.

b.  **Retail Pharmacies, Grocers and Mass Merchants.** For all retail pharmacy companies (for purposes of this Agreement, the retail drug store division of CVS Caremark Corporation will be considered as a retail pharmacy), grocers, and retail mass merchants, including, but not limited to Wal-Mart Stores, Inc., and its related entities ("Wal-Mart"), Theranos may provide testing services as follows:

    i.   For Routine and Specialty Tests: For the PSC Phase, six (6) months after successful completion of the Pilot, and, if Walgreens commits to proceed with the Onsite Phase within sixty (60) days of notice by Theranos, along with written evidence that the FDA has no objections to the commercial use of the Theranos System in a retail pharmacy setting, six (6) months from that date of initiation of the Onsite Phase. Assuming Walgreens decides to proceed to the Onsite Phase, the parties shall work together to plan scale, provided that the parties agree that the initiation of the Onsite Phase shall take place at the end of the sixty (60) day notice period;

    ii.  For Theranos Predictive Tests: Twelve (12) months after the date that each of the following new Tests are available: diabetes/pre-diabetes, congestive heart failure, women's cancer and men's cancer. For purposes of this Section, available shall mean the date upon which Theranos secures a major payor's reimbursement for such Test, provided that such Test is not available on a direct to consumer basis. For purposes of this Agreement, the term "major payor" shall mean one of any of the following companies: UnitedHealth Group, WellPoint, Inc., Kaiser Foundation Group, Aetna Group, Humana Group, HCSC, Coventry Corp., Highmark Group, Independence Blue Cross Group, and Blue Shield of CA Group. To illustrate this exclusivity, assume a women's cancer test is made available to Walgreens on 1/1/2011. Walgreens' exclusivity right to

secure and offer said test would expire on 1/1/2012.  Then if a men's cancer test is introduced on 1/1/2012, Walgreens' exclusivity right to secure and offer said test would expire on 1/1/2013.

Any tests developed after the execution of this Agreement that are not specifically listed in the definitions of Specialty and Predictive Tests/Cartridges and are subject to development or licensing agreements with pharmaceutical companies and/or United States or foreign government agencies will not be subject to the exclusivity terms listed above.

For purposes of this Agreement, one other United States retail grocer, but specifically excluding any mass merchant, selected by Theranos in its discretion, and its related entities will not be subject to Schedule B, Section 3.b.  During the time of exclusivity, Theranos retains the right to pilot with other companies. Such pilots shall be no greater in number of stores or locations than as defined in Schedule F.

c.   **Walgreens Exclusivity**        Provided that Theranos is able to perform all Routine and Specialty Tests and any other predictive test that are commercially available in a given jurisdiction with equivalent test quality, pricing and patient service as compared to existing laboratory service providers, Walgreens agrees that it shall not offer laboratory services in Walgreens stores.   Notwithstanding the previous, the following exceptions shall apply:  (i) To the extent Theranos is not able to offer Routine and Specialty Tests, and/or other commercially available predictive tests in a given jurisdiction, then Theranos shall have a period of three (3) months to secure necessary regulatory agency approvals to provide such Routine and Specialty Tests and/or predictive tests; (ii) sale of over the counter/point of care tests which are available without a clinician order, shall not be applicable to the exclusivity provided in this subsection (c).   Should Theranos fail to obtain such regulatory agency approvals, Theranos shall contract with a local provider of laboratory services, such provider to have obtained all necessary regulatory approvals necessary to provide laboratory services, to provide such test(s) at Walgreens. Should Theranos not be able to reach an agreement with a local provider of laboratory services, Walgreens shall have the right to work with other providers of laboratory services for all tests in that jurisdiction.  Notwithstanding the previous sentence, to the extent that Theranos can provide laboratory services in a given jurisdiction, Walgreens shall still rely on Theranos to provide laboratory services for the tests it is authorized to perform.    At such time that Theranos obtains the ability to provide services in the jurisdiction at issue, at equivalent levels of quality, pricing and services as compared to the existing laboratory service providers and provides notice to Walgreens of the same, Walgreens agrees that it will not renew its contract with the alternate service provider and will transition its lab offerings back to Theranos in a period of not greater than ninety (90) days; and (iii) To the extent any of Walgreens' employer clients direct Walgreens to contract with another laboratory service provider, the above exclusive shall not apply to the patients that Walgreens serves under that contract. During the term, Walgreens agrees that it shall not operate as a laboratory.   Except as otherwise provided for in this Agreement as it relates to over the counter/point of care tests available without a clinician order, or in instances in which Theranos cannot provide services, Walgreens agrees that it shall not direct patients of the Theranos laboratory to non-Theranos laboratory services.

4.   **First Announcement Rights.** Theranos will not authorize any other  United States retail pharmacy, grocer, or mass merchant to announce availability of the newly Available Cartridges  and/or Tests before Walgreens, in accordance with and as applicable under the Exclusivity terms described more fully in Schedule B, Section 3.

5.   **Theranos Pharmaceutical Clinical Trials Infrastructure.** As part of its ongoing business partnerships with pharmaceutical companies, Theranos will extend its clinical trials infrastructure to include Walgreens stores so that pharmaceutical clinical trial patients will have the option to have their specimens collected  at a Walgreens location. Following execution of this Agreement, Theranos and Walgreens will negotiate the terms and conditions between Theranos and Walgreens for the clinical trial work which will then be described and agreed upon in writing in Schedule I.

6.   **Innovation Fee**.

(a) Walgreens agrees to pay to Theranos an Innovation Fee ("Innovation Fee") for up to $100 million dollars.  The Innovation fee is being paid to Theranos in exchange for the following terms granted to Walgreens in this Agreement: (i) exclusivity; (ii) price protection; (iii) first announcement rights; infrastructure costs associated with building out the Theranos laboratory structure to support Walgreens' scale; and other good and valuable consideration. Distribution of the Innovation Fee shall be as follows:

> (i)     $25 million shall be distributed to Theranos within five (5) days of the due diligence items/visits detailed in 6(b) below,  being completed;
> (ii)    $25 million shall be distributed to Theranos within five (5) days of reaching ten (10) patients per store per day on average during the pilot;

> (iii)    Upon successful Pilot completion and initiation of Program launch, Walgreens shall commit to a final distribution of $50 million.

(b)  Within thirty (30) days of the Effective Date for items (i-iii and vi), and seventy-five (75) days for items (iv-v), Theranos shall make available or provide access to the following due diligence items for Walgreens' review.  Upon receipt, and confirmation of these due diligence items, Walgreens will direct the escrow agent to release the initial $25 million distribution:

> (i)     <u>Covered Lives</u>-   Theranos shall provide written evidence of contracts with payors that provide coverage in the Pilot Market.  Such written evidence shall demonstrate Theranos' ability to process claims, bill and reimburse Walgreens for its services within the Pilot Market;
> (ii)    <u>Test Menu</u>-      Theranos will provide Walgreens with a copy of the Test Menu  (incorporated as Schedule J) and operations manual that the Theranos trained Walgreens technician will utilize during the PSC.
> (iii)   <u>Laboratory in Good Standing</u>-      Theranos shall provide to Walgreens copies of the CLIA inspection report and any interim exception reports, proficiency testing results for all tests on the Test Menu, and any correlation studies.
> (iv)    <u>PSC Expectations</u>-      Theranos shall provide Walgreens with a written copy of the standard operating procedures/protocol expectations for the PSC.  Additionally, Theranos shall provide to Walgreens the front end IT requirements consisting of screen shots PSC personnel will use and/or required fields for patient data entry.  After Walgreens' initial review of the materials, Walgreens shall provide its initial comments, and the parties shall work together to mutually revise the materials as is necessary.
> (v)     <u>Facilities Visit</u>-   Theranos shall permit Walgreens' staff to visit the following Theranos facilities:  lab operations, call center, IT and billing.  During the visit, Walgreens shall not have unfettered access to Theranos' facilities, but rather, the visit shall include opportunities for Walgreens to confirm for itself in a visual sense that Theranos has the capabilities to carry out its obligations under this Agreement.  For purposes of clarity, such visit will not be for purposes of an audit, but rather to see the Theranos operations in action.
> (vi)    <u>Pricing/Fee/Collectability</u>-  The parties shall confirm the Pricing detailed in Section 11 below and the Innovation Fee are consistent with the fair market values for such Pricing and Innovation Fee. Walgreens will engage a third party consultant to determine the fair market value of the services provided by Walgreens to Theranos and the Innovation Fee provided to Theranos ("FMV Study"). Further, the parties shall agree upon the appropriate measure in order to  measure collectability as it relates to the initial $25M payment.

(c)  If Theranos realizes at least $1.75 billion in net revenue domestically  from laboratory services it provides at all of its laboratory locations that utilize the Theranos System within twelve (12) months after the date that Theranos Tests are available in at least 1,000 Walgreens locations, Theranos will earn $50 million of the Innovation Fee. If the final $50 million distribution is made and Theranos realizes at least $2.5 billion in net revenue from laboratory locations

that utilize the Theranos System within eighteen (18) months after the date that Theranos Tests are available in at least 1,000 Walgreens locations, Theranos will earn the second $50 million of the Innovation Fee. If the aforementioned milestones are not realized, Theranos will refund the entire Innovation Fee dollar for dollar back to Walgreens on a per test consumed basis, with at least $50 million being credited in the first twelve (12) months after Program launch.  For purposes of clarity, the refund per patient shall be the Theranos Fee divided by the number of patients actually served during the applicable time period

7. **Ordering.**   All Theranos Tests will be ordered electronically using Theranos software and/or equipment in the stores or ESG location, and Theranos will be able to receive and process this electronic order.  As soon as is reasonably possible, and to the extent possible, the Walgreens' systems and Theranos' systems will be integrated in order to provide a seamless patient experience and optimizing operations by reduce dual entry for laboratory services as well as other Walgreens services (e.g. pharmacy, Take Care Clinics, etc.).

8. **Scheduling and Cancellation**.  Intentionally Deleted.

9. **Invoicing**.  Walgreens will issue invoices to Theranos as follows:

| Deliverable (as applicable) | Invoice |
|---|---|
| Services | At the beginning of each month, as may be amended from time to time based on mutual agreement of the parties in writing.  The invoice will specify by CPT code the number of successful Tests that generated a Result performed during prior calendar month, by store location, multiplied by the pricing for each such Test as set forth on Schedule D. |

10. **Payment**.  Commencing with the Pilot Phase through the first twelve (12) months post Pilot, Theranos shall compensate Walgreens Services as described in Section 15 of this Agreement, as follows: within seven (7) days of receipt of payment from the payor or patient.  After the first twelve (12) months post Pilot, Theranos shall compensate Walgreens for Walgreens Services no later than forty-five (45) days after Walgreens has collected said specimen.

If after ten (10) days written notice to Theranos that a payment is overdue and such Invoice remains unpaid,  late payments will be charged interest at 1% per month until paid in full (or, if less, the maximum allowed under applicable law).

11. **Pricing**.
The parties agree that Walgreens shall receive, a fair market value fee for the Walgreens Services, which the parties estimate will fall within a range of $10.00-$16.00/per patient ("the Pricing").  The price to be agreed upon by the parties will not include applicable taxes, or custom duties.  Based on the results of the FMV Study, Walgreens and Theranos shall amend this Agreement, upon terms to be mutually agreed upon, by including pricing based on the services provided by Walgreens in Schedule D, including a procedure to deal with any inability to realize pricing. Should the parties be unable to agree upon pricing, the parties shall engage in the process laid out in Section 24(b) of this Agreement.

12. **Discounts**.   The parties agree that any discounts or reductions in price offered or provided to Walgreens hereunder are intended to comply with all applicable federal, state and local laws, statutes, rules and regulations, as such are amended from time to time, including but not limited to the Federal Anti-Kickback Statute [42 U.S.C. 1320a-7b(b)], and specifically the Discount Safe Harbor under the Federal Anti-Kickback Statute and its implementing regulations (the "Discount Safe Harbor"), as well as similar State law exceptions.  Thus, with respect to the foregoing, the parties shall comply with all relevant obligations under the Discount Safe Harbor as well as all similar State law exceptions. The parties shall do nothing to impede the other party's ability to meet all of its obligations under the Discount Safe Harbor and any similar State law safe harbors and exceptions as contemplated herein.  The parties shall take all necessary steps to comply with the Discount Safe Harbor and any similar State law safe harbors and exceptions. The parties agree to timely produce any information or documentation requested or that is required for purposes of compliance with the Discount Safe Harbor and similar State law safe harbors and exceptions.

**13. Currency.** All prices and fees set forth in this Agreement are stated in U.S. dollars. Payment will be in U.S. dollars.

**14. Theranos Services.** Theranos shall provide Walgreens with the services set forth in this Section 14.

a. **Limitation.** Theranos will ensure that, with respect to Walgreens Customers, the Theranos System will only be utilized to perform Ordered Tests, provided that Theranos shall run calibration tests remotely on the Theranos System. At such time that direct to consumer testing is approved by the applicable regulatory body, Walgreens will collect samples ordered directly by patients and Theranos will provide laboratory services for such samples.

b. **Reports.**

   i. **Generation.** Theranos will use commercially reasonable efforts to generate a Result for each Ordered Test.

   ii. **Transmission.** Theranos will use commercially reasonable efforts to, within one (1) hour of generating a Result, transmit the Report to the Ordering Practitioner either by a secure website portal, secure electronic transmission or facsimile. In accordance with the relevant provisions in this Agreement, all Results provided to clinicians from samples collected at Walgreens, will be provided to Walgreens. Results from other Tests not performed at Walgreens Locations will only be provided to Walgreens upon receipt of patient consent and in compliance with HIPAA and all applicable federal and state regulations. Theranos agrees that any patient authorization or consent that it may seek to obtain from a potential Walgreens patient will not include any provision offering the patient the opportunity to block, prohibit or in any way restrict release of the Report to Walgreens. Theranos agrees that it will use commercially reasonable efforts to deliver Reports to authorized Ordering Practitioners within four (4) hours of the sample arriving at the laboratory.

   iii. **Critical Values.** In the event a Result reflects one or more values at such variance with normal as to be potentially life-threatening ("Critical Value"), Theranos will be solely responsible for notifying the appropriate personnel according to its obligations as a CLIA-certified lab under federal and state law and using commercially reasonable efforts to verify that the Ordering Practitioner received notification of the Critical Value. Should direct to consumer testing be made available under this Agreement, Theranos shall notify the patient directly of any Result that is classified as a Critical Value.

   iv. **Consultation.** Theranos will maintain a toll-free phone number and email address that Ordering Practitioners can contact with questions or requests for professional consultation regarding a Report. The toll-free number shall, at a minimum, be staffed 7 days per week from 5 am to 11 pm central. Theranos will ensure that all requests for professional consultation are responded to promptly by an appropriately licensed and qualified health care professional.

   v. **Public Health Reporting.** To the extent required by state or local law and/or regulations applicable to each Walgreens location utilizing the Theranos System, Theranos will prepare and submit any and all Reports, or other information or forms that may be required to disclose to a health department or other government agency as a result of performing certain Tests.

   vi. **Ownership and Retention.** For the duration of this Agreement and in accordance with: (a) the terms set forth in the HIPAA Business Associate Agreement attached hereto as Schedule G; (b) federal and state laws governing document retention by health care providers; and (c) Medicare, Medicaid and all other third-party payor document retention requirements, Theranos will electronically maintain and store all Reports.

   vii. **Walgreens' Retention Right:** Walgreens, without first obtaining patient consent, may maintain, use and disclose Reports for purposes of complying with applicable federal and state legal requirements including, but not limited, to: (i) licensure; (ii) record retention; (iii) patient privacy and confidentiality; (iv) Medicare, Medicaid and any other federal or state health care programs; (v) subpoena or court order.

c. **Billing.** The following shall apply during the PSC Phase. Should the parties agree to provide laboratory services in the Onsite Phase, the parties will agree on mutually acceptable billing terms.

   i. **Provider.** The parties acknowledge and agree that Theranos will be the provider of clinical laboratory services under this Agreement. Theranos acknowledges and agrees that Walgreens will be the provider of the specimen collection services performed at Walgreen's locations. As the provider of laboratory services, all claims for payment submitted to patients and/or third-party payors will be submitted by Theranos. Walgreens acknowledges and agrees that it will not submit under its name or tax id number any claims for

payment to any customers or third-party payors for Tests.  Walgreens shall look solely to Theranos for payment of the items and services it provides to patients pursuant to this Agreement.

   d.   **HIPAA.**  The parties acknowledge that as a result of providing the services described above in Sections 14.b and c, each party will be acting as a Business Associate of the other party and will contemporaneously with this Agreement execute the HIPAA Business Associate Agreement attached hereto as Schedule G.

15.  **Walgreens Services.**  Walgreens will assign to Theranos specifically trained technicians ("Walgreen Technicians") utilizing a training and certification program provided by Theranos. These technicians will provide laboratory patient services, as directed by Theranos during such times that Walgreens is interacting with a patient in order to provide patient services. Walgreen Technicians will professionally handle the patients needing laboratory services. Walgreen Technicians will draw blood using the finger stick technique; Walgreen Technicians will collect the proper other specimens according to the directions provided by Theranos.  Walgreen Technicians will also obtain the patient's demographic and insurance information, which will be entered into the system that is available.  If applicable, the Walgreen Technician will collect any co-pay. In addition the Walgreen Technician will take the order that came from the practitioner and enter the information from that form into the system. The Walgreen Technician will then provide information to the patient about how the patient can obtain results of the testing.  The Walgreen Technician will properly store and prepare the specimen for pick-up according to the directions provided by Theranos.  At the completion of the patient interaction, the Walgreen Technician will prepare the area for the next patient.
   i.   **Patient Service Centers.** Walgreens locations serving as Theranos Patient Service Centers will be patient service centers which provide for the collection and processing of human blood, urine, feces, or other matrices for analysis by Theranos' CLIA certified laboratory. The physical locations for Theranos Patient Service Centers must conform to Theranos standards, with the parties to agree upon any deviations on a site specific basis.  The parties agree that they shall memorialize such standards in writing. Theranos laboratory supervisors or designated supervisory qualified staff will oversee the sites and make monthly on-site visits to each Theranos Patient Service Center. Theranos laboratory personnel will perform on-site inspections of all Theranos Patient Service Centers on an ongoing basis.
   ii.   **Patient Service Center Personnel.** Walgreens technicians selected by Theranos and Walgreens will act as operators of the Theranos CLIA laboratory. Said technicians will be certified by the Theranos CLIA laboratory for the performance of sample collection and processing. All certifications must be complete prior to launch of the Theranos infrastructure in Walgreens Locations. All Theranos trained and certified technicians in Walgreens Locations will be trained in Theranos Procedure Manuals and Accession Records for specimen collection stations. Only certified Theranos technicians following approved Theranos protocols may collect samples and interact with patients in Theranos Patient Service Centers. The Theranos Patient Service Centers may not be used to collect samples for any non-Theranos laboratory tests.  For purposes of clarity, the parties acknowledge that as of the date of this Agreement, Walgreens is conducting health testing screening.  Such screening shall not violate this subsection, provided that the testing activities are performed in a matter such that the patient will not perceive the service to be a Theranos service.

The parties agree and acknowledge, that when required by law, clinicians working at Walgreens' ESG/CSG locations will give patients the option to have their laboratory services performed at a lab/PSC of their choosing.

16.  **Delivery.**
   Theranos shall deliver sample tubes, lancets/blood collecting devices (finger stick devices), bandages and all other necessary supplies to Walgreens locations on an as needed basis.  Walgreens will notify Theranos when it has 20% remaining stock of collection vessels/finger stick devices available for use.  Theranos shall deliver replacement supplies within 1days of receipt of such notice.

17.  **Shipment.**  Theranos shall arrange for specimens to be picked up at least once per day, and in locations that collect at least 50 specimens per day before Noon local time, there shall be at least two pick-ups per day

   With respect to the Onsite Phase, the following shall apply:  In the absence of specific shipping instructions from Walgreens, Theranos will ship by the method it deems most advantageous.  Transportation costs will be at Theranos' sole cost and expense, unless Walgreens requests special shipping instructions.  If Walgreens requests special shipment, the associated costs will be collect, or, if prepaid, will be subsequently invoiced to Walgreens.  Unless otherwise specified, the Cartridges will be shipped in Theranos' standard commercial packaging, with each cartridge and cartridge package properly labeled. When special packaging is, in the reasonable opinion of Theranos, required

under the circumstances, Theranos will issue an invoice to Walgreens for the cost of the same. In the event any of Theranos' production facilities are located in close proximity to Walgreens' distribution centers, special facilities can be provided for direct transfer of Cartridges into Walgreens' distribution centers.

**18. Devices.**

**a.** Any Devices, Cartridges and other Deliverable s provided by Theranos to Walgreens, including, but not limited to any finger stick collection devices, shall only be used by Walgreens' employees, contractors and/or agents for Walgreens' internal business purposes, solely for use at Walgreens' Locations. Walgreens agrees to take all reasonable steps to protect the Devices from theft or use contrary to the provisions of this Agreement. Walgreens agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Walgreens is not authorized to sell, rent, transfer, license, or distribute the Devices or Cartridges or any other Deliverable, unless specifically authorized by Theranos in writing.

**b.** Theranos shall at all times retain ownership of the Devices; provided however that Walgreens assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of Walgreens and shall pay the full cost of any Devices not returned in good condition (ordinary wear and tear excepted). Prior to the commencement of the Onsite Phase, Theranos will provide Walgreens with a statement certifying the cost component value of the Device for Walgreens' insurance purposes. As Theranos develops upgrades and enhancements to the Devices, the parties will agree on a deployment schedule for such next-generation Devices. Walgreens shall permit any authorized representative of Theranos to inspect the Devices, during normal business hours after first sending written notice of such inspection prior to the return of such Devices to Theranos, at Walgreens' facilities or any other location at which the particular Program is being conducted. If Walgreens is unable to return the Devices in accordance with this Agreement, Walgreens will permit Theranos, on dates and times to be agreed upon, to access Walgreens' premises for the purposes of repossessing such Devices.

**c.** If Walgreens experiences any problems with the deployed Devices, then, subject to Walgreens' responsibilities in Section 17.b, Theranos will repair or replace the Device as soon as reasonably possible after being notified of the problem, in accordance with Schedule C.

**d.** Upon expiration or termination of this Agreement, Walgreens shall ensure that all Walgreens employees, contractors and/or agents cease using the Devices and Client Accessible Software, and Walgreens shall return to Theranos all authorization codes allowing users to access the Software, TheranOS, and all Devices as set forth in Section 23.d.

**19. Warranty.**

**a.** During the Onsite Phase the following shall apply: All Cartridges provided to Walgreens will be new and will contain the functionality, and will operate in accordance with, and conform to, the applicable specifications with shelf life of at least 90% of useful life as further specified in the procurement documentation. Walgreens will maintain the Cartridges in the environment specified in the Documentation that ships with the Cartridges or is otherwise made available to Walgreens.

**b.** Each party warrants that: (i) it has the legal authority to enter into this Agreement; and (ii) the execution, delivery, and performance of this Agreement by it and its obligations hereunder do no conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

**c.** Each party will perform its obligations under this Agreement: (i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws.

**d. Disclaimer. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, THERANOS EXPRESSLY DISCLAIMS ALL OTHER EXPRESS, IMPLIED, OR OTHER WARRANTIES, INCLUDING THE WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

**20. Licenses.**

**a. Theranos License Grant.** Theranos hereby grants to Walgreens a non-exclusive, worldwide, multi-site, enterprise wide, royalty free, non-transferable license, without the right to sublicense, to use, in accordance with, and solely to perform its obligations in this Agreement and only for the term of this Agreement: (a) Software

installed on Ordering Devices, solely for use of the Device by Walgreens employees, contractors and agents who are obligated in writing by confidentiality obligation at least as protective of Theranos and its Confidential Information as this Agreement; and (b) Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").  In this Agreement, "Software" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto.  The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement. Without Walgreen's prior written approval, Theranos will not use in performing the Services, and the Deliverables will not incorporate, link to, call, or depend in any way upon, any software or other intellectual property that is subject to an Open Source or Copyleft license (including the GNU General Public License) or any other agreement that may give rise to any third party's right to use any Deliverables or to limit Walgreen's right to use, such software and other intellectual property in any respect.

b.   **Ownership**.  Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Theranos Confidential Information.  Walgreens shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Theranos promptly of any such unauthorized use.  Walgreens shall not:  (a) allow access to the Client Accessible Software by more than the number of concurrent users agreed upon in writing by the parties, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy (except for backup, archival, distribution of software to authorized users, disaster recovery, testing, training and other similar uses), sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Agreement, (d) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of Walgreens' content which forms part of the Software.  Walgreens shall at all times comply with terms and conditions applicable to third party software provided with the Software.  Theranos reserves all rights in the Software not expressly granted herein.

c.   **Walgreens License Grant**.  Walgreens hereby grants to Theranos a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in TheranOS Walgreens' data provided under, related to or generated in connection with this Agreement for use in TheranOS' analytical engine to the extent permitted by law, provided that where applicable under federal and state law, Theranos obtain patient consent to use such data and that Theranos does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individuals or any information identifying Walgreens or Walgreens compounds, except in connection with the provision of any Professional Services to Walgreens under this Agreement.

d.   **Lab Certifications.**        Prior to commencement of the Pilot, Theranos shall provide a copy of the full CLIA Inspection report and PT results to Walgreens for its review.  Only, In the event the report is not made available to Walgreens, or should Walgreens, in its reasonable discretion, determine that such report contains information which calls into question any significant quality issues with the Theranos methodology. then Walgreens, at its cost, shall have the right to conduct an internal correlation study to verify the Theranos platform sensitivity and specificity with respect to the Test Menu offered by Theranos.  A copy of the Test Menu is attached to this Agreement as Schedule J.  Walgreens and Theranos will mutually agree upon the third party/research institution to assist Walgreens with this study if necessary.  Prior to commencement of any work on Walgreens' behalf, such third party shall enter into a binding non-disclosure agreement with Theranos.  Should Theranos receive notice of an inspection and/or the results of an inspection that could potentially impact Walgreens' ability to provide services under this Agreement, then Theranos agrees that it shall provide a copy of such inspection report and where relevant, PT results to Walgreens.  If after written notice to Theranos, there exists any issue that impacts Walgreens' ability to provide services to Theranos under this Agreement, or that impacts the patient experience and such issue remains uncured after thirty days' written notice, then Walgreens shall have the right to visit the relevant portions of Theranos' facilities (including, but not limited to, laboratory facilities, call center, billing, logistics) in order to better understand the issue and the steps being taken to resolve such issue.

e.   **Property Ownership/Use.**

(i)      Walgreens will not use, disclose, share or sell Theranos Intellectual Property, including Processed Data, to other individuals or entities, except as otherwise specified in this Agreement;

(ii)      Walgreens, will not, without first obtaining Theranos' consent, which consent shall not be unreasonably withheld, use the Theranos Systems, Results, Reports or Processed Data with, or for the benefit of, pharmaceutical companies or payors to design, and subsequently implement programs, which are directed and funded by the respective pharmaceutical company or payor, relating to programs for

approved or developing pharmaceuticals, including usage or new indications that have not been approved by the applicable regulatory body, provided that Walgreens shall not need consent from Theranos in order to administer Tests based on Federal requirements and/or drug labeling. Walgreens may use the Theranos System for its proprietary and internally administered Medication Compliance/Adherence, Medication Persistence, MTM or other clinical management programs that do not require consent as detailed above, provided that Walgreens will not give pharmaceutical companies possession of Results and Reports.

Subject to a Non-Disclosure agreement, pharmaceutical companies will have the right to receive summarized results and have the right to visually inspect the de-identified Results in order to verify the summarized results. Walgreens agrees that any disclosure of the summarized results shall restrict against any further use, sale or disclosure of such results to a third party. Walgreens shall, on a semi-annual basis, inform Theranos of the active Medication Compliance/Adherence, Medication Persistence, MTM programs and other clinical management programs that do not require Theranos' consent, or have been consented to by Theranos that Walgreens is currently engaged in. The parties agree and acknowledge that Theranos' consent shall not be necessary to enter into a program with a pharmaceutical company that necessitates that a Test be performed prior to any dispensation of medications based on Federal requirements or drug labeling.

Walgreens and Theranos agree that they shall engage in discussions during the Pilot to reach mutually acceptable terms and conditions by which Walgreens may share data with Theranos used in connection with the Medication Compliance/Adherence, Medication Persistence and MTM programs for the limited purpose of strengthening the overall accuracy and clinical quality of the algorithms used in the Theranos System. Theranos agrees that any information licensed to Theranos will be limited to use in Theranos' model.

(iii)     Subject to patient consent and with the exception of anonymous testing, Theranos hereby provides Walgreens a perpetual, irrevocable, worldwide license to use and add Results which are collected at Walgreens Locations to its clinical databases and use said Results to provide medical care to its customers, provided such Result is not disclosed and no access is provided for any purpose to another entity besides Walgreens except as specified below.

(iv)     With respect to pharmaceutical companies, provided Walgreens obtains the patient's consent, Walgreens will only use de-identified Results and Processed Data for marketing and selling clinical programs, research programs or as otherwise agreed. Walgreens will not give these entities possession of the de-identified Results or Processed Data. Subject to a Non-Disclosure agreement, pharmaceutical companies would have the ability to receive summarized results and could look over the de-identified Results so that they could verify the summarized results. Walgreens agrees that any disclosure of summarized results shall restrict against any further use, sale or disclosure of such results.

(v)     Notwithstanding anything to the contrary in Section 19(d)(ii), the parties agree that with respect to payors, including employers and the government who are not currently paying for tests, Walgreens may use de-identified Results and Processed Data for marketing and selling clinical programs, so long as Walgreens will not give these entities possession of the detailed de-identified Results and Processed Data.

(vi)     Intentionally Deleted.

(vii)     Provided Walgreens obtains the patient's consent, Walgreens may sublicense Results and Reports to employers for employee health screening, drug screening, and other similar employment related programs, provided that the use of these Results and Reports is restricted to assessing compliance with a company's human resource policies for each specific patient for whom such Results and Reports are provided in accordance with federal and state laws. Walgreens agrees that any disclosure of identified Results or Processed Data shall restrict against any further use, sale, disclosure or sublicensing of such Results or Reports, including any blinding, aggregating, or analysis of the Results and Reports.

(viii)     Provided Walgreens obtains the patient's consent to do so, any Results or Processed Data shared with academic researchers will be provided under a clear NDA that will not allow them to do data mining. For clarity, these Results or Processed Data cannot be used for developing or identifying new biomarkers, including without limitation for purposes of monitoring disease progression or regression. Any such biomarkers which are identified or other intellectual property developed in association with Theranos data are the sole and exclusive property of Theranos.

(ix)     To the extent such Results or Processed Data have not been previously published, any publications around such Results or Processed Data shared in strategic clinical relationships must be approved in writing by Theranos and where required by Theranos must acknowledge Theranos as a contributor. Notwithstanding the previous, Theranos agrees, that to the extent such publication will not result in the disclosure of Theranos confidential information, that it shall not unreasonably withhold its consent to such publication.

(x)      As between Walgreens and Theranos:   (a) all data on Theranos Systems, including Results and Reports, and (b) all inventions and improvements developed in connection with the Deliverables or as a result of the services provided by Theranos to Walgreens during the term of this Agreement and thereafter, whether by Walgreens or Theranos, or by the parties jointly, if solely, directed to: (i) any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the TheranOS analytical engine and the algorithms therein; or (ii) the generation of assays for use in conjunction with the Theranos System, shall be the sole and exclusive property of Theranos. Walgreens shall promptly disclose to Theranos in writing any inventions described in the preceding sentence, and Walgreens hereby assigns to Theranos any right, title or interest it may have in such inventions.

f.   **Confidentiality.**

   i.   **Use and Protection.**   Each party will use a commercially reasonable degree of care to maintain all Confidential Information of the other in trust and confidence and will neither disclose to any third party nor use any Confidential Information of the other for any unauthorized purpose or without the other party's express prior written consent.  Each party may only disclose Confidential Information of the other to those of Recipient's employees and representatives on a need-to-know basis, and may use such Confidential Information only to the extent required to perform this Agreement.  Confidential Information may not be used for any purpose or in any manner that would constitute a violation of any laws or regulations, including, without limitation, the export control laws of the United States.  Unless otherwise stated in this Agreement, no rights or licenses to intellectual property in Confidential Information is granted by either party to the other under this Agreement, whether express, implied or otherwise.  Unless otherwise stated in this Agreement, all Confidential Information will remain the property of the Discloser (and its licensors, if any), including, but not limited to, any right to make, use or sell any product embodying any Confidential Information.  **All Confidential Information disclosed under this Agreement is provided on an "AS IS" basis, with no warranty, assurance, guarantee or inducement of any kind.**  In addition, Recipient shall be entitled to disclose Confidential Information to the extent required in response to a valid order of a court or other governmental body or is otherwise required by law to be disclosed, provided Recipient, as the responding party, gives sufficient notice to Discloser to enable it to take protective measures.

   ii.  **Terms of Agreement.**   Notwithstanding the foregoing, either party may disclose the terms or conditions of this Agreement only: (a) on a need-to-know and confidential basis to its legal, financial, and other professional advisors to the extent such disclosure is reasonably necessary, (b) as required by any court or other governmental body; (c) as otherwise required by law, including applicable securities and other law and regulation, including rules or regulations of any applicable securities exchange; (d) during the course of litigation so long as the disclosure of such terms and conditions are restricted in the same manner as is the confidential information of other litigating parties and so long as (1) the restrictions are embodied in a court-entered protective order limiting disclosure to outside counsel and (2) the disclosing party informs the other party in writing at least ten (10) business days in advance of the disclosure and discusses the nature and contents of the disclosure, in good faith, with the other party and (e) only on a need-to-know and confidential basis, to a third party in connection with an equity investment in such party, a merger, consolidation or similar transaction by such party, or the sale of all or substantially all of the assets of such party.  In addition, Walgreens shall not disclose any of the terms or conditions of Section 3.a or 3.b of this Schedule B except, and only to the extent, it must do so pursuant to one of the preceding exceptions and only after informing Theranos in writing at least ten (10) business days in advance of the disclosure and discussing the nature confidentiality, and contents of the disclosure, in good faith, with Theranos, provided that Walgreens shall not be prevented from making said disclosure if a judicial and/or governmental order demands production prior to such ten (10) business day notice period expiring.

    **iii.** **Term of Confidentiality**. The obligations imposed on Recipient shall survive until such time as Discloser's Confidential Information disclosed to Recipient under this Agreement becomes publicly available and/or made generally known through no action or inaction of Recipient or its Representatives. Recipient and its Representatives will return or destroy/erase all of Discloser's Confidential Information, including any and all information in whatever form generated making use of or reflecting Discloser's Confidential Information, except one copy for archival purposes, within thirty (30) business days of request of Discloser, or thirty (30) business days from termination or expiration of this Agreement.

    **iv.** **Confidentiality Protocol**. Should Walgreens desire to communicate with any third parties in order to cultivate a larger customer base as it relates to the Theranos System and/or Tests offered by Theranos, Walgreens, prior to engaging in such discussions shall do the following: (i) Walgreens shall have the receiving party sign a Non-Disclosure Agreement (in a form to be approved by Theranos and Walgreens). Theranos' identity will not be revealed until the agreement has been executed by both Walgreens and the receiving party; (ii) Walgreens will submit the form to Theranos, along with notations of any deviations from the agreed upon form; (iii) Within ten (10) days of receiving the NDA, Theranos shall either provide Walgreens with a signed copy, or advise in writing as to why the NDA is unacceptable. The parties shall separately agree on a set of materials that can be provided to third parties upon execution of a mutually acceptable NDA.

**21.** **Convertible Note.** In partial consideration for Walgreens' commitments set forth in this Agreement, within fourteen days of the Effective Date, Walgreens shall have the right to purchase, or cause its affiliate WVC Investments, LLC to purchase, a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedule H-1 (the "Convertible Note"). The Convertible Note shall bear interest at the rate of 0.79% and shall mature on the Maturity Date (as such term is defined in the Convertible Note). The outstanding principal on the Convertible Note will be convertible into Series C-1 preferred shares (the "Series C-1") of Theranos upon the occurrence of a Conversion Event (as such term is defined in the Convertible Note). Upon conversion, Walgreens' preferred shares will have certain Dividend, Liquidation, and Conversion Rights as set forth in Theranos' charter in the form provided to Walgreens. To exercise its right to purchase the Convertible Note within the time period described above, Walgreens shall execute and deliver to the Company a certificate in the form set forth on Schedule H-2.

**22. Indemnification.**

    **22.1** **Defense and Indemnification.** (i)Theranos will defend, indemnify and hold harmless Walgreens and its Affiliates, and their respective personnel, successors and assigns ("Walgreens Indemnitees"), against any claims, demands, suits, or causes of action by third parties, (the "Claims"), to the extent resulting or claimed to result from (a) any act or omission of Theranos or its personnel under or in connection with this Agreement; (b) any breach of this Agreement (including any Procurement Document and/or inaccurate or improper claims submissions caused by the TheranOS billing software) by Theranos or its personnel; (c) the violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens's use of the Theranos System, Services, Devices or Deliverables; (d) any malpractice, misdiagnosis and/or wrongful diagnosis or any other claim caused by a Test; or (e) the violation by Theranos or its Personnel of any law or regulation, provided that Theranos shall have no liability or obligation with respect to such Claim to the extent the Claim results from (1) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverables or other items by or for Walgreens); (2) breach of this Agreement by Walgreens; (3) the violation by Walgreens of any law or regulation; or (4) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement. Theranos will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction. (ii) Walgreens will defend, indemnify and hold harmless Theranos and its Affiliates, and their respective personnel, successors and assigns ("Theranos Indemnitees") against all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any claims, demands, suits or causes of action by third parties ("Claims"), which result or are claimed to result in whole or in part from (a) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverable or other items by or for Walgreens); (b) breach of this Agreement by Walgreens; (c) the violation by Walgreens of any law or regulation; or (d) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement. However, Walgreens will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of

competent jurisdiction.  (iii) Notwithstanding anything to the contrary, (a) to the extent that any Claim subject to Section 21.1(i) is brought by a Third Party against both parties, Theranos will have the duty to defend Walgreens, provided that Theranos will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction; and (b) to the extent that any Claim solely subject to Section 21.1(ii) is brought by a Third Party against both parties, Walgreens will have the duty to defend Theranos, provided that Walgreens will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.

**22.2        Infringement.**  In the event the Theranos System is held to constitute an infringement, or if Walgreens is enjoined from using the Theranos System, Theranos, at its own expense, will first use reasonable and prompt efforts to:  (a) procure for Walgreens the right to continue to use the Theranos System; (b) modify the Theranos System so that it is non-infringing and of at least equivalent performance and functionality; (c) provide functionally equivalent replacement product(s) to Walgreens; or (d) upon adequate showing to Walgreens that none of the foregoing options are commercially feasible pay to Walgreens a liquidated damage as follows:  (i) Between the date this Agreement is fully executed and the end of the Pilot, Walgreens shall be entitled to $0.00 as a liquidated damage; (ii) Between the end of the Pilot, and as applicable, the refund of the payment of Walgreens first $50 million of the  Innovation Fee commitment, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $20,000,0000; and (iii) After as applicable, the refund of the payment of Walgreen's second $50 million Innovation Feet, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $40,000,000.  Walgreens's rights under this Section will be in addition to and will not limit Walgreens's rights under the Section regarding Defense and Indemnification above.  Except as otherwise contemplated in this Agreement, this Section regarding Indemnity does not apply to any infringement caused by any combination of any Theranos System with any item not supplied by Theranos or any modification of any Theranos System other than by Theranos.  For purposes of this section "actual damages incurred" shall not include indirect, incidental, or consequential damages of any kind or nature whatsoever.  Actual damages shall include, but not be limited to, run-rate labor losses, capex, and investments made to individual Walgreens' locations to accommodate the Theranos System.

22.3     **Procedures.**  The indemnifying party has the right to control the defense and settlement of any Claim; provided, however, that the other party will have the right to participate in such defense, at its expense, and in selection of counsel, and to approve any settlement proposed by the indemnifying party (such approval not to be unreasonably withheld or delayed).  Upon the indemnifying partys' request, the other party will reasonably cooperate in such defense and the indemnifying party will reimburse the party for its reasonable out-of-pocket expenses in providing such cooperation.  Each party will provide prompt notification of any Claim; provided, however, that any reasonable delay by such party in giving such notice will not relieve the indemnifying party of its obligations pursuant to this Section regarding Indemnity, except to the extent that the indemnifying party demonstrates actual damage caused by such delay.

22.4     **Independent Obligation.**  The obligations of each party to defend, indemnify and hold harmless, their respective indemnified parties under this Section regarding Indemnity, will be independent of each other and any other obligation of the parties hereunder, provided that this Section 21 shall constitute Theranos' sole obligation and liability, and Walgreens' exclusive remedy, with respect to Third Party claims for violation of any intellectual property rights.

**23.     Limitation of Liability.**  In no event shall either party be liable to the other party or any other person or entity for any costs of substitute products or services or special, exemplary, indirect, incidental, consequential or punitive damages of any kind or nature whatsoever (including, without limitation, lost revenues, profits, savings or business, or contribution or indemnity in respect of any claim against the party) or loss of records or data, whether in an action based on contract, warranty, strict liability, tort (including, without limitation, negligence) or otherwise, even if such party has been informed in advance of the possibility of such damages or such damages could have been reasonably foreseen by such party.  In no event shall Theranos' liability to Walgreens or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise.  In no event shall Walgreen's liability to Theranos or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise.  Notwithstanding the foregoing, the limitations of liability and disclaimers of damages set forth in this Section will not apply to claims:  (i) resulting from fraud or willful or intentional conduct of, or bodily injury (including

death) or property damage caused by, a party; (ii) that are the subject of indemnification under this Agreement; (iii) for breach of a Party's confidentiality obligations under this Agreement or (iv) for violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens' use of the Theranos System, Services or Deliverables.  Except as otherwise allowed under this Agreement, Walgreens liability to Theranos shall not be limited with respect to claims regarding Walgreen's use or misuse of Theranos Intellectual Property, trade secrets and/or Confidential Information.  Notwithstanding the foregoing, Walgreens shall not be liable to Theranos to the extent such damage was caused by the acts or omissions of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.  The limitations specified in this Section will survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

24.  **Term and Termination.**

    a.   **Term.**  Assuming this Agreement is not terminated pursuant to Section 24(c) below, this Agreement will be in effect until three (3) years from  successful completion of the Pilot.  At the end each year of the Term, the Term of this Agreement shall automatically extend for one (1) additional year, unless either party provides written notice to the other of its intent not to renew at least ninety (90) days prior to the anniversary date of the day upon which the Pilot was completed.  For purposes of clarity, assume the following example:  The Pilot is successfully completed on January 1, 2013.  The term would then run through and including December 31, 2016.  Unless either party gives notice to the other 90 days prior to December 31, 2014, the Term would automatically extend to December 31, 2017.

    b.   **Termination due to unsatisfactory Pilot or inability to realize Pricing.**  Should Walgreens or Theranos determine that the success criteria for the Pilot has not been satisfied, Walgreens or Theranos shall have the right to terminate this Agreement.    Should Theranos terminate the Agreement, Theranos shall , within fourteen days of providing notice of termination, refund the Innovation Fee, and Theranos shall have the option to repurchase the Convertible Note detailed in Section 21 of this Agreement.  Should Walgreens terminate the Agreement, Walgreens shall forgive $25 million of the Innovation Fee, and Theranos shall pay off the remaining balance as detailed below in 24(d)(i).  Further, if Walgreens terminates the Agreement, Theranos shall have the option to repurchase the Convertible Note detailed in Section 21 of this Agreement.  In the event the parties fail to agree on either of the following issues:  (i) failure to agree on the fair market fee to be paid to Walgreens within fourteen (14) days of receipt of the FMV Report; and (ii) failure to agree to agree on revisions to Pricing within ninety (90) days after one party notifies the other in writing of a need to revise Pricing due to a governmental action, including, but not limited to, an audit, investigation, inquiry, change of law, issuance of new guidance or interpretation of law, then either party shall have the right to terminate this Agreement.

    c.   **Termination for Cause.**  If either party breaches a material provision of this Agreement and fails to cure such breach within thirty (30) calendar days after receiving written notice of the breach, the non-breaching party shall have the right to terminate this Agreement at any time until such cure; provided if a breach cannot be cured within thirty (30) calendar days but is capable of cure, the breaching party will not be in default if, within thirty (30) calendar days of receiving notice of breach, in good faith, it begins and continues to attempt to cure the breach.  In such case, the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days, before being in default.  Notwithstanding anything to the contrary herein, Walgreens' breach of payment obligation constitutes a default ten (10) business days after written notice from Theranos that the payment is due.  Should Walgreens fail to make such payment, or fail to respond in writing with its good faith objection to such invoice within such ten (10) day notice period, then Theranos shall have the right to terminate this Agreement immediately.

    d.   **Obligations upon Termination**.
        i.   Theranos' Obligations to Walgreens:
            1.   In the event Walgreens terminates this Agreement pursuant to Sections 24.b or 24.c or Theranos terminates this Agreement pursuant to Section 23.b, then within one hundred eighty (180) calendar days of the termination date Theranos will refund the Innovation Fee as detailed in subsections (b), as applicable, and (c).
        ii.  Walgreens' Obligations to Theranos:
            1.   In the event this Agreement is terminated by Theranos pursuant to Section 24.c Theranos shall retain the initial $25 million distribution of the Innovation Fee..
        iii. Upon termination, Theranos may enter Walgreens' facilities, at a time and date to be reasonably agreed upon, and remove the Devices installed on Walgreens' premises.

    **f.**      **Survival of Provisions**. Those Sections entitled "Reports," "Devices," "Warranty," "Licenses Sections b, c, d, and e," "Indemnification," "Limitation of Liability," "Term and Termination," "Miscellaneous" Schedule E ("Definitions") , and all accrued payment obligations of Walgreens, shall survive the expiration or termination of this Agreement for any reason.

**25.**      **Marketing/Sales**.The parties agree that during the term of the Agreement, Theranos shall be responsible for sales/marketing efforts with respect to physician sales. Walgreens shall bear responsibility for sales/marketing efforts within/to Walgreens' locations. The parties shall each be responsible for sales/marketing efforts with respect to consumer marketing. The parties agree that prior to the commencement of the Pilot a sales/marketing playbook shall be developed and agreed upon. Such playbook will lay out the framework by which each party will carry out its sales/marketing efforts and the messaging that will be used by each respective party. All Theranos locations will be branded with the Theranos name and meet Theranos service center standards.

**26.**      **Miscellaneous.**

**Governing Law/Venue.** This Agreement will be interpreted and governed by the laws of the State of Delaware without reference to its conflict of laws principles. The parties irrevocably consent to the sole and exclusive jurisdiction of and venue in the district court for Delaware.

**a.**    **Independent Contractor**. Theranos is an independent contractor, and the relationship of the parties under this Agreement will not be construed to create any other relationship, as partners, joint venturers, principal and agent, or otherwise. Neither party has the authority to represent the other as to any matters.

**b.**    **Entire Agreement.** The terms and conditions contained in this Agreement, including all Schedules, constitute the entire agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement and no agreement or understanding varying or extending the same shall be binding upon either party unless in a written document signed by both parties.

**c.**    **Force Majeure.** Non-performance of either party, except Walgreens' payment obligation, shall be excused to the extent that performance is rendered impossible by any other reason where failure to perform is beyond the reasonable control of the non-performing party. Notwithstanding the previous, the parties acknowledge and agree that if non-performance due to a force majeure event exceeds ninety (90) days, then on written notice to the party suffering the force majeure event at any time prior to resumption of performance by such party, the other party shall be entitled to terminate this Agreement.

**d.**    **Assignment.** Neither party may assign, delegate or otherwise transfer this Agreement or any of its rights or obligations under this Agreement without the other party's prior written approval, which approval will not be unreasonably withheld, delayed or conditioned. Any such attempt to do so will be ineffective. Notwithstanding the foregoing, either party may assign, delegate or otherwise transfer this Agreement by operation of law or otherwise, to: (i) any person or entity that becomes a successor entity, in connection with a change of control (which will include a direct or indirect transfer of all or substantially all of the party's' stock or assets to a third-party, a merger, reorganization or other such transaction) or (ii) a sister company or wholly-owned subsidiary. Notwithstanding any Change of Control, the parties agree that any successor entity will comply with the terms of this Agreement.

**e.**    **Notices.** All notices and other communications pertaining to this Agreement will be in writing and will be deemed delivered upon personal delivery, or refusal of delivery, via certified mail, return receipt requested, postage prepaid. All notices of communications between Walgreens and Theranos pertaining to this Agreement will be directed to the address specified on cover page of this Agreement, or such other address as a party may specify.

**f.**    **Prevailing Party.** In any suit or proceeding relating to this Agreement the prevailing party will have the right to recover from the other its costs and reasonable fees and expenses of attorneys, accountants, and other professionals incurred in connection with the suit of proceeding, including costs, fees and expenses upon appeal.

**g.**    **Amendment; Waiver.** No modification to this Agreement, or any waiver of any rights shall be effective unless assented to in writing by the party to be charged and shall not constitute the waiver of any other right hereunder or any subsequent breach or default.

h.  **Severability.** If any portion of this Agreement is held invalid or to be out of compliance with federal or state law, the parties agree that such invalidity shall not affect the validity of the remaining portions of this Agreement, and the parties shall seek in good faith if possible to agree to substitute for the invalid provision a valid provision that most closely approximates the economic effect and intent of the invalid provision.

i.  **Publicity.** Neither party will use the name(s), trademark(s) or trade name(s), whether registered or not, of the other party in publicity or press releases or advertising or in any manner (except as such disclosure may be required by applicable law or the rules or regulations of any applicable securities exchange or regulatory or governmental authority to which the relevant party is subject or submits, wherever situated), including customer lists, without that party's prior written consent. Consent of Walgreens shall not be valid unless obtained from Walgreen's Chief Information Officer and Director of Corporate Communications, which consent may be withheld in Walgreen's sole discretion.

j.  **Export and Import Requirements.** Theranos will prepare, maintain and, to the extent required under applicable law, submit to the applicable customs authorities, all necessary information and documentation to comply with the applicable customs and export and import requirements of each country from which any software, products, or other materials developed under this Agreement will be exported and each country into which they will be imported. Theranos will comply with all other applicable customs, technical compliance and country of origin requirements of each country into which any software, products, or other materials are to be imported.

k.  **Compliance With Laws.** Each party will comply with all applicable laws, ordinances, rules, and regulations governing its duties or responsibilities under this Agreement, including but not limited to, all United States and foreign export control laws or regulations. Without limiting the generality of the foregoing, each party represents that in the performance of its obligations under this Agreement, it will fully comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the standards issued by the US Department of Health and Human Services at 45 C.F.R. Parts 160 and 164, to protect the security and privacy of individually identifiable health information generated by or received from the other party,  whether such party is acting in the capacity of a covered entity, business associate, health care provider or any other capacity..

    o.  **EEOC Compliance.** In connection with its performance of the Agreement, Theranos shall comply with the **applicable** provisions of Executive Order 11246 and the regulations issued pursuant thereto (generally Part 60-1 of Title 41 of the Code of Federal Regulations), **unless exempted by said regulations,** particularly the provisions of the Equal Opportunity Clause (41 CFR Section 60-1.4(a)), which are incorporated herein by reference; the provisions and regulations pertaining to nondiscrimination and affirmative action in employment (41 CFR Sections 60-1.4, 1.40, 1.41 and 1.42), and the filing of Standard Form 100 (EEO-1). Theranos certifies, in accordance with the requirements of 41 CFR Section 60-1.8), that its facilities for employees are not segregated. In addition, unless exempted by said regulations, Theranos shall comply with the applicable provisions of the Affirmative Action Clause for Workers with Disabilities (41 CFR Section 60-741.5), and for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR Section 60-250.5), which are also incorporated herein by reference.

    p.  **Insurance.** Theranos will maintain at its expense the following insurance during the term of this Agreement:

    (i)    Workers' Compensation in the statutory limits required by the state or states in which work is performed under this Agreement (including all/other states endorsement) and Employers' Liability with minimum limits of $1,000,000;

    (ii)    Commercial General Liability with minimum limits of $2,000,000 per occurrence and $4,000,000 in the aggregate (to include bodily injury, property damage, products/completed operations, and contractual liability on a blanket basis for liability assumed hereunder); (iii)    Excess    liability insurance with minimum limits of $5,000,000 in the aggregate; and

    (iv)    Professional Liability (errors & omissions) with minimum limits of $2,000,000.

    q.  **Policy Requirements.** . All policies will be primary and at Theranos' sole expense. Walgreens will be included as an additional insured on all coverage listed above with the exception of Workers' Compensation and Professional Liability. All policies will include provisions that the insurers waive the rights of recovery or subrogation against Walgreens. Insurance coverage will be in a form and carrier acceptable to Walgreens with a minimum A.M. Best rating of A-/IX or higher. The insolvency, bankruptcy or failure of any insurance company shall not relieve Theranos of any of its obligations

herein.  Within fourteen (14) days of a request by Walgreens, Theranos shall provide certified copies of the actual policies of insurance including all endorsements and riders.  If any of the above policies are written on a "claims-made" basis, Theranos shall (i) ensure that continuous coverage is maintained or an extended coverage period will be exercised for a period of not less than three (3) years beyond the expiration or termination of this Agreement; and (ii) in the event a "claims-made" policy is not renewed or replaced, ensure that such policy must have an extended reporting period of three (3) years.

r.   **Theranos Data Security Reviews.**  Theranos will conduct its own periodic reviews or examinations of its data security procedures, consistent with prevailing industry good practices.  If any such review or examination indicates  that the procedures have or are likely to fail, Theranos will promptly notify Walgreens, providing pertinent details to the extent reasonable so that Walgreens can take steps to avoid or minimize the adverse impacts.  Theranos will also take reasonable steps to correct the errors or problems as soon as reasonably possible or otherwise cooperate reasonably with Walgreens to resolve the situation.  Furthermore, prior to and as a condition of Theranos bringing any hardware device onto Walgreen's premises to connect to Walgreen's internal computer network, Theranos shall provide Walgreens with a complete inventory of all such hardware devices, including manufacturer, model name and number, device type, and Media Access Control (MAC) address of each such device.  Walgreens shall at all times have the right to physically inspect any hardware device that is or has been connected to Walgreen's internal computer network in order to ensure compliance with provision of this Section 26.r.

*[remainder of page intentionally left blank]*

Theranos and Walgreens Confidential and Proprietary

## SCHEDULE C

## THERANOS SYSTEM SUPPORT AND MAINTENANCE TERMS

**1.      Support and Maintenance:  Hardware and Software.** Theranos and Walgreens will work together prior to Pilot initiation to cement the workflow around implementation of these Services.

**1.1      Client Services.**

Theranos, at its cost, will use commercially reasonable efforts to provide Walgreens Users 24x7 Hardware and Software support and maintenance.  Support and maintenance services include, but are not limited to, use of and access to the Software and TheranOS, and associated enhancements and updates; on-demand, interactive services; and diagnosis of problems or issues associated with the Hardware or Software and resolution of verifiable problems.  Theranos will designate a dedicated Client Solutions manager to Walgreens.  The Client Solutions manager will be responsible for assisting in the management of Walgreens' support and maintenance requests.  Support and maintenance services will be available by telephone, email, and via TheranOS Real-Time Support online.  In responding to Walgreens' support inquiries, Theranos will use the guidelines set forth in this Schedule.

**1.2      Reactive Incident Management Guidelines.**

Theranos, at its cost, will or will direct a service provider to use commercially reasonable efforts to respond to Walgreens' inquiry on a same-day basis via email or phone.  Each inquiry will be assigned a priority level (set forth below), and Service Provider will use commercially reasonable efforts to resolve the request in accordance with the associated timelines:

- **Priority 1** – Use of the Theranos System, as that term is defined in this Agreement, is severely impacted.  Important features/critical functions are not available, or system freezes or crashes. These situations will be treated as emergencies; reasonable efforts are made to respond to Priority 1 service requests within one (1) hour. Client Solutions will work 24x7 with Walgreens until the issue is resolved or as long as useful progress can be made and fixes can be applied.

- **Priority 2** – Walgreens experiences a minor loss of service or request information, an enhancement, or documentation clarification but there is no impact on the operation of the Software.  Reasonable efforts are made to respond to Priority 2 service requests within 3 business hours.  Examples of Priority 2 support inquiries include: help with web portal access, and instructions on using the TheranOS features. Service Provider will use commercially reasonable efforts to update Walgreens via email or phone (if email is not available) on the status of the inquiry and resolution within one business day.

**3.      Deployment Services.**

At Walgreens' written request, as noted on a purchase order, Theranos, at its cost shall deploy and install the Devices on Walgreens' premises.

**4.      Training.**

Theranos and Walgreens will mutually agree upon the scope of training that Theranos will offer to Walgreens at no cost to Walgreens.

*[remainder of page left intentionally blank]*

**SCHEDULE D**

**WALGREENS SERVICE PRICING**

PRICING TO BE AGREED UPON

*[remainder of page intentionally left blank]*

## SCHEDULE E

## DEFINITIONS

Capitalized terms, as used within this Agreement, including any Schedule or attachment, have the following meanings, unless otherwise indicated:

1. "**Affiliate**" means any legal entity(ies) which is directly or indirectly controlled by or under common Control with a party or Controls a party to this Agreement but only so long as such control exists.

2. "**Assay**" means any method used for the detection of an analyte (e.g., a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, but not limited to, human blood.

3. "**Calibration**" means processes and controls for optimizing the performance of the Theranos System which do not require running of any Tests that are not ordered tests.

4. "**Cartridge**" means Theranos' analytical chips containing biological fluid processing technology and Assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

5. "**Change of Control**" means (i)  any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

6. "**Client Accessible Software**" means Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").

7. "**Confidential Information**" means this Agreement, all information Discloser discloses to Recipient in connection with the performance of this Agreement.  Confidential Information may not be marked as such at the time of disclosure and will still be considered Confidential Information so long as Discloser identified or designated the information as confidential at the time of disclosure (or like designation), or Discloser disclosed the information in circumstances of confidence, or the information would be understood by the parties exercising reasonable business judgment to be confidential.  "Confidential Information" does not include information which:  (a) is or becomes generally known through no fault of Recipient; (b) is known to Recipient without restriction on disclosure, at the time of disclosure, as evidenced by its records; (c) is hereafter furnished to Recipient by a third party as a matter of right and without restriction on disclosure; (d) is independently developed by Recipient without any breach of this Agreement or, (e) is otherwise necessary to establish rights or enforce obligations under this Agreement, but only to the extent that any such disclosure is necessary.  Results and Reports shall be included in the definition of Theranos' Confidential Information, provided that such classification shall not reduce Walgreens' rights of use as described within this Agreement.

8. "**Control, Controls or Controlled**" mean owning or controlling directly or indirectly more than 50% of shares, partnership interests, membership shares, ownership interests or voting rights of such controlling or controlled entity.

9.  "**Device**" means Theranos' analyzer, the Theranos patient interface and sample collection tools.

10. "**Deliverable**" means any Hardware, Software, Cartridge, Device, Theranos System, Support and Maintenance Services and/or training to be provided by Theranos to Walgreens under this Agreement.

11. "**Delivery Date**" means the date on which Theranos will ship the Cartridges to Walgreens, or otherwise make the Deliverable available to Walgreens at Theranos' manufacturing facilities.

12. "**Discloser**" means the party disclosing Confidential Information.

13. **"Documentation"** means user manuals and technical notes for the Theranos System regarding the use and maintenance of the Theranos System.

14. "**Hardware**" means equipment and hardware Theranos is to deliver pursuant to this Agreement.

15. **"Medication Compliance/Adherence"** means the act of conforming to the recommendations made by the clinician with respect to timing, dosage, and frequency of medication taking within the guidelines approved by the FDA or as set forth in that medication's labeling.

16. **"Medication Persistence"** means the duration of time from initiation to discontinuation of administration of medications.

17. **"MTM"** or **"Medication Therapy Management"** means services provided by Walgreens in order to help consumers get the best results from medications through enhancing consumer understanding of medication therapy, increasing consumer adherence to medications, controlling costs, and preventing drug complications, conflicts, and interactions.

18. **"Ordered Tests"** means Tests that were: (i) ordered or authorized by an Ordering Practitioner or other individual permitted under federal and state law to order clinical laboratory tests; and (ii) initiated by a Walgreens employee or agent by entering the Tests specified on the order into the Device.

19. **"Ordering Practitioner"** means a licensed physician, osteopathic physician, physician assistant, nurse practitioner, or any other health care professional who is authorized under federal and state law to order clinical laboratory tests and who ordered one or more Tests.

20. **"Pilot"** means the pilot program as set forth in Schedule F.

21. "**Payment Refund Obligation**" means the conditional obligation to refund the pre-purchase payments if the pilot is not successful.

22. "**Payment Refund Obligation Termination**" means the earlier of (i) the date on which the success criteria for the pilot have been satisfied, or (ii) the date on which Theranos has refunded the amounts due under the Payment Refund Obligation.

23. "**Predictive Test**" means a test for diabetes/pre-diabetes, congestive heart failure, women's caner, men's cancer or other such Theranos proprietary test.

24. **"Processed Data"** means information generated by Theranos utilizing Theranos IP such as predictive modeling.

25. "**Program**" means the project outlined in Schedule A, but shall not include the Pilot for purposes of the Innovation Fee.

26. "**PSC**" means patient service center.

27. "**Recipient**" means the party receiving Confidential Information from Discloser.

28. **"Report(s)"** means the collective Routine Reports, Specialty Test Results and Predictive Results provided to Walgreens.

29. "**Representatives**" mean each party's employees, directors, officers, contractors, consultants, stockholders and agents.

30. **"Result(s)"** means the collective Routine and/or Specialty Results, and Predictive Results provided to Walgreens.

31. "**Routine "Test"** means a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association.

32. **"Services"** means all services related to the Cartridges, Tests, and Theranos System described in this Agreement including but not limited to the services described in Schedule B, Section 14 and Schedule C.

33. "**Software**" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. . The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement.

34. "**Specialty Test**" means laboratory tests, including, but not limited to, influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy and all available esoteric Tests (the parties agree that they will memorialize the CPT codes that are include all Specialty Tests as such codes become available).

35. **"Support and Maintenance Services(s)"** means support and maintenance services that Theranos will may provide Walgreens, as more fully set forth in Schedule C.

36. **"Test"** means a) in the context of routine laboratory analyses: a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association and that have been granted CLIA-waived status by FDA or b) in the context of Predictive tests: a Cartridge, software program, information system or any other product necessary to perform a Predictive test that has been granted CLIA-waived status by FDA.

37. "**TheranOS**" means Theranos' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, web or device accessible Software, and related statistical and other analysis methods, data, data repositories and technologies.

38. **"Theranos Intellectual Property"** means all algorithms, analytical methodologies, data collection processes, software, hardware, Results, Reports, and Processed Data.

39. "**Theranos System**" means the system comprising the Assays, Cartridges, Device(s), and the TheranOS, and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination.

40. **"Routine Results"** means the numerical outcome (raw data points) of a Routine laboratory Test originated at a Walgreens' Location.

41. **"Routine Report"** means the documentation provided to the ordering clinician and Walgreens for a laboratory test originated at a Walgreens Location.  A Report for a Routine test is made up of  the following three (3) components: (i) a Routine Result; (ii) trending information for that given patient and (iii) analysis, including, but not limited to, predictive modeling.

42. **"Specialty Result"** or **Predictive Result"** means the documentation provided to the ordering clinician and Walgreens for a Specialty Test or Predictive Test originated at a Walgreens Location.  A Specialty or Predictive Result is made up of analysis only.

43. **"Walgreens"** means Walgreen Co. and its wholly owned subsidiaries.

44. **"Walgreens Location"** means a clinical or retail location including employer sites and academic research centers.

## SCHEDULE F
## PILOT

Theranos and Walgreens will enter into a written Pilot agreement on mutually acceptable terms.  The terms of the Pilot agreement shall address the following objectives:

- Exceeding customer expectations for lab Services;
- Evaluating operating feasibility of delivering the Services within Walgreens locations;
- Evaluating the capacity/capability of supporting systems
- Ensuring payors will pay for lab Tests and that A/R will be collected.

The Pilot agreement will include, but not be limited to, the following provisions:

- The Pilot will include all Routine and Specialty tests as specified in Schedule B, Section 2 of the Agreement.
- The services will be offered in all stores (including 24 hour stores) in the pilot market to be mutually agreed upon between the parties ("Pilot Market").  The services will be available during normal store hours.
- The Pilot for store locations will commence no sooner than September 15, 2012, provided that the following three criteria must be met: (i) Theranos shall first obtain all necessary approvals to provide laboratory services in the State of California;  (i) payor coverage that will be reasonably expected to produce the 15 patient average per day per store goal; and (ii) Theranos must show Walgreens, to its reasonable satisfaction, that the Theranos System is fully functional and operational, including, but not limited to, billing software necessary to support the Pilot markets, and that Theranos' ability to process Tests is adequate to support reaching the 15 patient average per store per day goal.  While the Parties intend the Pilot to start no sooner than September 15, 2012 the actual start date of the Pilot will be agreed upon and memorialized by the parties once these three (3) requirements are satisfied. The Services will be offered for a period of 90 days unless extended in writing upon mutual agreement of both parties if the success criteria below have not yet been met.  At such time as Theranos has satisfied the above requirements, Theranos shall provide written notice to Walgreens of the same.  Walgreens shall commence the Pilot within forty-five (45) days of such notice.  In order for Pilot to commence, Theranos must accredit the PSC locations and staff and all such locations must meet Theranos Lab Standards as defined in this Agreement.  Both parties agree that they shall make commercially reasonable efforts to ensure that the Pilot will commence after September 15, 2012, but no later than February 1, 2013.
- The services will be offered in at least one (1) Employer Solutions Group ("ESG") locations.  The Pilot for the ESG location will commence on a mutually agreeable date.
- Should Theranos fail to meet its requirements under this Schedule F prior to April 1, 2013, Walgreens shall have the option to terminate this Agreement pursuant to Schedule B, Section 24(c).  Should Theranos comply with the requirements under this Schedule F and Walgreens fails to commence the Pilot, then Theranos shall have the option to terminate this Agreement.

The following criteria, among other criteria developed and agreed upon in writing by the parties, will be utilized to evaluate pilot success for purposes of Schedule B, Section 24(b) and 24(d)(i) of this Agreement. When the following criteria have been met, the pilot will be deemed successful. Both parties will confirm pilot success in writing and Walgreens will notify Theranos in writing of its intent to proceed with deployment at whatever pace Walgreens deems appropriate within thirty (30) calendar days from successful pilot completion:

- Walgreens Service Fee received during the pilot timeframe shall be at least $10.00 per patient, in accordance with the Pricing agreed upon per the terms of this Agreement.

- Other criteria mutually agreed to in writing by both parties prior to the commencement of the pilot.

National rollout criteria:
- Assuming adequate payor coverage, Theranos must demonstrate to Walgreens' reasonable satisfaction that it can support 100,000Tests per day within three (3) months after successful completion of the Pilot to support full roll out of the program post Pilot.  In a subsequent amendment, the parties shall document terms regarding national roll-out schedule, expectations, etc.
- Theranos and Walgreens mutually agree upon expansion criteria for nationwide rollout of the program post Pilot.

Should the Pilot success criteria not be initially met within ninety (90) days of the Pilot commencement, the parties agree that they shall not terminate this Agreement, so long as at least three (3) patients per day have had laboratory services provided at Walgreens.  In good faith, the parties shall work together to identify the problems that prevented the Pilot from being successful.  If after twelve (12) months of continued efforts to address the issues identified in the Pilot, the parties are unable to resolve the Pilot issues, the parties will have the right to terminate this Agreement pursuant to Section 24(c) of this Agreement.

**SCHEDULE G**
**HIPAA BUSINESS ASSOCIATE AGREEMENT**

TO COME.

SCHEDULE H-1
CONVERTIBLE PROMISSORY NOTE

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.   THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

THERANOS, INC.

CONVERTIBLE PROMISSORY NOTE

$40,000,000                                                                                          [DATE]


FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to WVC Investments, LLC ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Forty Million Dollars ($40,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof.  This Note is issued pursuant to that certain Amended and Restated Theranos Master Services Agreement by and between the Company and Investor dated [ _6/5/12_ ] (the "Agreement").  All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      **Payments.**

(a)   Interest.  This Note shall bear interest at the rate of 0.79% per annum, which interest shall accrue annually.  Accrued interest on this Note shall be payable on the Maturity Date.

(b)   The "Maturity Date" shall be the earlier of:

i.   the date of the Company's Initial Public Offering;

ii.   the effective date of a Change of Control;

iii.   one hundred eighty (180) calendar days from the date of receipt by the Company of Investor's written demand for repayment of this Note pursuant to this Section 1(b)(iii), which demand may be made only if the Company does not meet the mutually agreed-upon success criteria for the Pilot set forth in Schedule F of the Agreement; or

iv.   the date that is ten years after the date of the Note .

(c)   Prepayment.  The Company shall not have the right to prepay any portion of principal or accrued interest under this Note except with the express written consent of Investor unless and only to the extent that the Company and/or the Investor have determined that the Pilot contemplated by the Agreement is unsuccessful.


2.      **Conversion.**

(a) Optional Conversion. At any time prior to repayment by the Company of the Note, if services are being offered in at least 1,000 Investor locations (as contemplated in the Agreement), Investor may elect to convert all or any party of the outstanding principal amount up to $20,000,000 of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted. At any time prior to repayment by the Company of the Note, if services are being offered in at least 2,500 locations (as contemplated in the Agreement) Investor may elect to convert all or any part of the remaining outstanding principal amount of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price, provided, however, that upon conversion 50% of the converted amount must come from Tranche 1 and 50% from Tranche 2 until such time as Tranche 1 is exhausted.  Investor's election to convert shall be evidenced by Investor's delivery to the Company of written notice of Investor's intention to convert.  All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a conversion pursuant to a Company Event. If Investor elects to convert the Note following receipt by Investor of notice of a Company event pursuant to Section 2(b) hereof and for any reason the Company Event described in any such notice does not occur, such election to convert by Investor shall be rescinded and shall be null and void.

(b) Notice of Company Events.        The Company shall give written notice to Investor of the anticipated occurrence of any Company Event.  Such written notice of the anticipated occurrence of a Company Event shall be given not less than fifteen (15) days and not more than thirty (30) days prior to the actual occurrence of a Company Event

(c)      Conversion Procedure.

    i.   Conversion Pursuant to Section 2(a).  Before Investor shall be entitled to convert this Note into shares of Series C-1 Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 2(a).  Upon such conversion of this Note, the Company and the Investor hereby agree to execute and deliver to one another a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including, without limitation, the Amended and Restated Investors' Rights Agreement, the Amended and Restated Co-Sale Agreement and the Amended and Restated Voting Agreement).  The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 2(c)(ii).  Any conversion of this Note pursuant to Section 2(a) shall be deemed to be effective upon the earlier to occur of (i) the tenth day following the Company's receipt of Investor's written notice of its intention to convert, and (ii) immediately prior to the occurrence of the Company Event, and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

    ii.  Fractional Shares; Interest; Effect of Conversion.  No fractional shares shall be issued upon conversion of this Note.  In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable conversion price by the fraction of a share not issued pursuant to the previous sentence.  The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Company pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note.  Upon conversion of this Note in full and the payment of the amounts specified in this paragraph, Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

3.      **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Amended and Restated Co-Sale Agreement" shall mean that certain Amended and Restated Co-Sale Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Investors' Rights Agreement" shall mean that certain Amended and Restated Investors' Rights Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Voting Agreement" shall mean that certain Amended and Restated Voting Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Change of Control" shall mean (i)  any reorganization, merger or consolidation of the Company (excluding any sale of stock for capital raising purposes), other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Company held by such holders prior to such transaction or series of related transactions,  at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity; (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company

"Company Event" shall mean the Company's Initial Public Offering, a Change of Control, a dissolution of the Company, other event of liquidation, declaration of a Series C-1 Dividend or other events agreed upon in writing by the Company.

"Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series C-1 Dividend" shall mean any dividend, whether in the form of cash, property or securities, payable or paid to the holders of the Company's Series C-1 Preferred Stock. For the avoidance of doubt, C-1 Dividends do not include any stock re-purchases.

"Tranche 1" shall mean $10,000,000 of the principal amount of this Note.

"Tranche 2" shall mean $30,000,000 of the principal amount of this Note.

"Tranche 1 Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Tranche 2 Conversion Price" shall mean $75.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

4.      **Investor Representations.** Investor represents and warrant to the Company as follows:

   (a)  Binding Obligation.  Investor has full legal capacity, power and authority to execute and deliver this Note and to perform its obligations hereunder. This Note constitutes a valid and binding obligation of Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

   (b)  Securities Law Compliance.  Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration, except as may be provided in the Amended and Restated Investors' Rights Agreement. Investor has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor has such knowledge and experience in financial and business matters that Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. Investor is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company. The principal place of business of Investor is correctly set forth beneath Investor's name on the signature page hereto.

5.      **Miscellaneous.**

   (a)  Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

        i.   Subject to the restrictions on transfer described in this Section 5(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

        ii.  Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by the Investor to any legal entity or person, other than a wholly-owned direct or indirect subsidiary of Investor.  In the event Investor intends to assign any rights, interests or obligations under this Note to a wholly-owned direct or indirect subsidiary, Investor shall give Company no less than thirty (30) calendar days' prior written notice.

        iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor.

   (b)  Waiver and Amendment.  Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the Investor.

   (c)  Notices.  All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

   (d)  Payment.  Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

(e)   Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)   Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By: _____
Name: _____ Elizabeth Holmes _____
Its: _____ CEO _____

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By: _____
Name: _____
Its: _____

(e)  Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)  Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Name:_____
Its:_____

Acknowledged and accepted by Investor:
WVC INVESTMENTS, LLC

By:_____
Name:_____
Its:_____

**SCHEDULE H-2**
**CERTIFICATE EVIDENCING RIGHT TO PURCHASE CONVERTIBLE PROMISSORY NOTE**

|June 5|, 2012

PURSUANT to Section 21of that certain Amended and Restated Theranos Master Services Agreement of even date herewith (the "**Agreement**"), by and between Walgreen Co. ("**Walgreens**") and Theranos, Inc. ("**Theranos**"), this Certificate evidences the right granted to Walgreens under the Agreement to purchase a convertible promissory note in the principal amount of $40 million in substantially the form set forth in Schedules H-1 of the Agreement (the "**Convertible Note**").

From the Effective Date (as defined in the Agreement) to fourteen (14) days after the Effective Date with respect to Schedule H-1, Walgreens shall have the right to purchase the Convertible Note, subject to the terms of the Agreement, by countersigning this Certificate, for the applicable Convertible Note, below.

THERANOS, INC.

By: _____

Name: _Elizabeth Holmes_

Title: _CEO_

*THE FOLLOWING IS TO BE EXECUTED ONLY UPON EXERCISE OF RIGHT TO PURCHASE NOTE:*

On this _5th_ day of _June_, 201 _2_, Walgreens hereby elects to purchase the Convertible Note pursuant to the terms of the Agreement, and tenders herewith the full purchase price of the Convertible Note.

WVC INVESTMENTS, LLC
~~WALGREEN CO.~~

By: _____

Name: _WADE MIQUELON_

Title: _PRESIDENT_

CTK-LAW

**SCHEDULE I**
**THERANOS PHARMACEUTICAL CLINICAL TRIALS INFRASTRUCTURE**


Final terms for extending Theranos' clinical trials infrastructure to Walgreens' stores shall be agreed upon following execution of this Agreement.  At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted.

**SCHEDULE J**
**TEST MENU**

**TO COME**

# Exhibit B

**Confidentiality Undertaking**

Walgreen Co.
108 Wilmot Road
Deerfield, IL   60015

I agree and acknowledge that I am bound by confidentiality obligations to Walgreen Co. and its subsidiaries and affiliates (collectively, the "Company") pursuant to Company policies, including under the Company's Code of Conduct and Business Ethics and Disclosure Policy and Guidelines.  Further, I acknowledge that the Company is subject to certain non-disclosure and confidentiality requirements with regard to Theranos, Inc. ("Theranos") as detailed on the attached Exhibit "A" ("Theranos NDA"), which applies to any Theranos confidential or proprietary information I receive, access, or observe.  I agree and acknowledge that included with my obligations to the Company, I will personally comply with the terms of the Theranos NDA.  I understand that the Company will receive access to information concerning certain confidential and sensitive matters with respect to its relationship with Theranos, and that I may be providing assistance in this regard and will observe and receive access to certain confidential and proprietary information in the course of providing such assistance or otherwise.  I confirm and agree that I will keep such information confidential in compliance with Company policies and the Theranos NDA, and that unless required by applicable law, I will not disclose to any person (other than employees of or outside advisors to the Company who are permitted under paragraph 3 of the Theranos NDA to have access to confidential or proprietary Theranos information and have executed a Confidentiality Undertaking) or use for any purpose (other than in connection with the evaluation and facilitation of the Theranos project on behalf of the Company) any information or details concerning such matters, including the existence of such matters, the nature or status of such matters or the identity of any person or entity involved in such matters or that such matters are under consideration by the Company, and will keep all such information and details strictly confidential.

Sincerely,

EMPLOYEE/ADVISOR


_____
Signature

Name: _____

Title: _____

**Exhibit A**

*and is retroactive to the 1st day of February, 2010*

## MUTUAL CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

This MUTUAL NON-DISCLOSURE AGREEMENT (the "Agreement") is made this __6__ day of April, 2010, by and between WALGREEN CO., an Illinois corporation, on behalf of itself and its subsidiaries and affiliates, with offices at 1411 Lake Cook Road, Deerfield, Illinois 60015 ("Walgreens") and THERANOS, INC., with offices at 3200 Hillview Avenue, Palo Alto, California 94304 (the "Company").

WHEREAS, the Company shall be given access to and examine certain data, methods and procedures and other proprietary information relating to the business of Walgreens (collectively the "Walgreens Proprietary Information") in connection with a potential business arrangement between the parties regarding healthcare products and services and

WHEREAS, Walgreens shall be given access to and examine certain data, methods, procedures and other proprietary information relating to the business and products and services of the Company (the "Company's Proprietary Information"), and

WHEREAS, Walgreens and the Company each desire to maintain the confidentiality and proprietary nature of their respective Proprietary Information, and

WHEREAS, to induce Walgreens to furnish and allow the Company access to Walgreens Proprietary Information, and

WHEREAS, to induce the Company to furnish and allow Walgreens access to the Company's Proprietary Information, and

WHEREAS, Walgreens and the Company, respectively, are willing to execute this Mutual Non-Disclosure Agreement.

NOW, THEREFORE, in consideration of the delivery of, and access to, the parties' Proprietary Information, each party agrees as follows:

1.       The Company agrees and acknowledges that all Walgreens Proprietary Information (whether prepared by Walgreens or by Walgreens advisors, agents or contractors) is and shall remain the sole and exclusive property of Walgreens and that no license or similar proprietary right is granted to the Company hereunder. The Company will use Walgreens Proprietary Information only for the purpose of evaluating a potential business arrangement described in the preamble to this Agreement.

2.       Walgreens agrees and acknowledges that all the Company's Proprietary Information (whether prepared by the Company or by the Company's advisors, agents or contractors) is and shall remain the sole and exclusive property of the Company and that no license or similar proprietary right is granted to Walgreens hereunder. Walgreens will use the Company's Proprietary Information only for the purpose of evaluating a potential business arrangement as described in the preamble to this Agreement.

3.       Each party agrees to hold in strict confidence and to maintain as confidential all Proprietary Information of the other party. Each party agrees (a) not to use any Proprietary Information or any information derived therefrom for its own purposes except as may be permitted by this Agreement, and (b) not to disclose any Proprietary Information or any information derived therefrom to any person or entity except to those of Walgreens or the Company's respective employees or consultants (provided the same are bound by the terms of this Agreement) necessary to the analysis, creation or maintenance of the possible business arrangements described in the preamble hereof. Each party shall be liable for any breach of this Agreement by such party or any person to whom Proprietary Information of the other party is disclosed. Each party agrees to take all other necessary precautions and actions, including, without limitation, those precautions which each employs with respect to its own proprietary information, to avoid the unauthorized disclosure or use of the other party's Proprietary Information.

4.       The provisions of Paragraph 3 shall not apply to any information (a) which is or becomes known generally within the relevant industry (except as a result of a breach hereof by one of the parties or by any person to whom the

Proprietary Information has been disclosed or of either party's obligations under this Agreement); or (b) which the party can establish and document by competent proof was in the possession of or known to such party prior to its receipt from the other; or (c) which is rightfully disclosed to a party by another person or entity not in violation of the Proprietary or other rights of Walgreens or the Company respectively, or any other person or entity; or (d) is required to be disclosed pursuant to court order by legal, governmental or regulatory authority.

5.       Upon request of Walgreens, the Company will destroy all of Walgreens Proprietary Information and all copies thereof, and all other written or recorded material containing or reflecting any facts in the Walgreens Proprietary Information; except that Company may retain one copy in its files for archival purposes and the Company agrees to continue observing the confidentiality requirements as specified above. Company agrees to certify, in writing, that all of the foregoing materials have been destroyed to the best of Company's ability. Upon request of the Company, Walgreens will destroy all of the Company's Proprietary Information and all copies thereof, and all other written or recorded material containing or reflecting any facts in the Company's Proprietary Information; except that Walgreens may retain one copy in its files for archival purposes and Walgreens agrees to continue observing the confidentiality requirements as specified above. Walgreens agrees to certify, in writing, that all of the foregoing materials have been destroyed to the best of Walgreens ability.

6.       The Company hereby consents to and acknowledges that in the event of any breach or threatened breach of this Agreement by the Company or any other person or entity who has gained access to Walgreens Proprietary Information, Walgreens shall have, in addition to any and all other legal rights and remedies, the right to seek injunctive relief, it being expressly acknowledged that such breach would cause irreparable injury to Walgreens and the award of monetary damages therefor would be wholly inadequate.

7.       Walgreens hereby consents to and acknowledges that in the event of any breach or threatened breach of this Agreement by Walgreens or any other person or entity who has gained access to the Company's Proprietary Information, the Company shall have, in addition to any and all other legal rights and remedies, the right to seek injunctive relief, it being expressly acknowledged that such breach would cause irreparable injury to the Company and the award of monetary damages therefor would be wholly inadequate.

8.       This Agreement supersedes all prior discussions and writing and constitutes the entire agreement between Walgreens and the Company with respect to the Proprietary Information of the other. No waiver or modification of this Agreement shall be binding upon either party unless made in writing and signed by a duly authorized representative of the other party. The failure of a party to enforce at any time or for any period of time the provisions of this Agreement shall not affect the right of such party to enforce each and every such provision. This Agreement may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

9.       This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois. Walgreens and the Company hereby submit and consent to the exclusive jurisdiction and venue in the federal courts for the Northern District of Illinois, unless no federal subject matter jurisdiction exists, in which case the parties consent to the exclusive jurisdiction and venue in the state courts of Lake County, Illinois in respect of the interpretation and enforcement of the provisions of this Agreement and all transactions contemplated hereby, and hereby waives and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement of this Agreement, that a party is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that this Agreement may not be enforced in or by said courts or that such property is exempt or immune from execution, that the suit, action or proceeding is brought in an inconvenient forum, or that the venue of the suit, action or proceeding is improper.

10.      Either party may terminate this Agreement at any time by giving the other party at least thirty (30) days' prior written notice of its intent to do so. Notwithstanding any termination of this Agreement, Paragraphs 1, 2, 3, 6, 7, 9, and 10 will survive and be enforceable according to their terms.

11.      This Agreement shall inure to the benefit of Walgreens and the Company respectively and their respective successors and assigns and be binding upon each, and their successors and assigns.

12.     Walgreens and the Company understand and acknowledge that the other is not making any representation or warranty, express or implied, as to the accuracy or completeness of either party's Proprietary Information, and that neither party or any of their respective officers, directors, employees, stockholders, owners, affiliates or agents shall have any liability to the other party or to any other person resulting from the use of the Proprietary Information.

13.     Should either party become legally obligated to disclose the Proprietary Information of the other party, such party shall promptly notify the other party that the receiving party believes it has become so legally obligated and, upon the request of the disclosing party, shall cooperate with the disclosing party in contesting such a disclosure.

14.     The parties agree that this Agreement shall in no way be construed in any manner which could lessen competition between them or their respective affiliates and that the parties' communication hereunder will not serve to impair the right of either party or its affiliates to independently develop, make, use, procure or market products or services now or in the future which may be competitive with those offered by the other or its affiliates, nor require any party to disclose any planning or other information to the other.

15.     All notices hereunder shall be deemed to have been duly given upon actual receipt if post-paid and addressed as follows (unless such addresses are changed by written notice): Walgreen Co., 1411 Lake Cook Road, MS L319, Deerfield, Illinois 60015, Attention: Health Law, Divisional Vice President, with a copy to HealthLawLegalNotices@walgreens.com; for Company, at the address filled in above.

IN WITNESS WHEREOF, the parties have caused authorized individuals to execute this Agreement on their behalf under the date and year first above written.

THERANOS, INC.                              WALGREEN CO.

By: _____                By: _____

Print Name: _ELIZABETH HOLMES_              Print Name: _Wade Miquelon_

Print Title: _PRESIDENT & CEO_              Print Title: _EVP and CFO_

Date: _April 6, 2010_                       Date: _April 6, 2010_

# Exhibit C

# THERANOS MASTER PURCHASE AGREEMENT

This Master Purchase Agreement ("Agreement") dated July____30ᵗʰ____, 2010 ("Effective Date") is by and between:

| WALGREENS | | | |
|---|---|---|---|
| Full Legal Name | Walgreen Co. | Client Signatory | Wade Miquelon |
| Jurisdiction of Incorporation | Illinois | Title | Executive Vice President & Chief Financial Officer |
| Principal Business Address | 200 Wilmot Road Deerfield, IL 60015 | Telephone | 847.315.3090 |
| Company Phone Number | 847.914.2500 | Email | wade.miquelon@walgreens.com |
| Company Fax Number | 847.914.2804 | | |
| THERANOS | | | |
| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | 650-470-6111 |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:
Schedule A:  Program Overview
Schedule B:  Purchasing Terms and Conditions
Schedule C:  Support and Maintenance Terms
Schedule D:  Pricing
Schedule E:  Definitions
Schedule F:  Pilot
Schedule G: HIPAA Business Associate Agreement
Schedule H-1: Convertible Promissory Note
Schedule H-2: Certificate Evidencing Right to Purchase Convertible Promissory Note
Schedule I: Projections
Schedule J: Theranos Pharmaceutical Clinical Trials Infrastructure

The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference.  This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| _(signature)_ | |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| WADE MIQUELON | |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| EXECUTIVE VICE PRESIDENT | |
| (Title) | (Title) |

Theranos and Walgreens Confidential and Proprietary

# THERANOS MASTER PURCHASE AGREEMENT

This Master Purchase Agreement ("Agreement") dated July 30, 2010 ("Effective Date") is by and between:

| WALGREENS | | | |
|---|---|---|---|
| Full Legal Name | Walgreen Co. | Client Signatory | Wade Miquelon |
| Jurisdiction of Incorporation | Illinois | Title | Executive Vice President & Chief Financial Officer |
| Principal Business Address | 200 Wilmot Road Deerfield, IL 60015 | Telephone | 847.315.3090 |
| Company Phone Number | 847.914.2500 | Email | wade.miquelon@walgreens.com |
| Company Fax Number | 847.914.2804 | | |
| THERANOS | | | |
| Full Legal Name | Theranos, Inc. | Theranos Signatory | Elizabeth Holmes |
| Jurisdiction of Incorporation | Delaware | Title | President and CEO |
| Principal Business Address | 3200 Hillview Avenue Palo Alto, CA 94304 | Telephone | 650-470-6111 |
| Company Phone Number | 650-838-9292 | Email | eholmes@theranos.com |
| Company Fax Number | 650-838-9165 | | |

This Agreement is comprised of:
Schedule A:  Program Overview
Schedule B:  Purchasing Terms and Conditions
Schedule C:  Support and Maintenance Terms
Schedule D:  Pricing
Schedule E:  Definitions
Schedule F:  Pilot
Schedule G: HIPAA Business Associate Agreement
Schedule H-1: Convertible Promissory Note
Schedule H-2: Certificate Evidencing Right to Purchase Convertible Promissory Note
Schedule I: Projections
Schedule J: Theranos Pharmaceutical Clinical Trials Infrastructure

The parties agree to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference.  This Agreement may be signed in counterparts each of which will be deemed an original and together shall constitute one and the same Agreement.

| WALGREEN CO. | THERANOS, INC. |
|---|---|
| | |
| (Authorized Representative - Signature) | (Authorized Representative - Signature) |
| | Elizabeth Holmes |
| (Authorized Representative – Printed) | (Authorized Representative – Printed) |
| | President & CEO |
| (Title) | (Title) |

## SCHEDULE A

## PROGRAM OVERVIEW

This Schedule sets forth the Program, including the objectives of the Program and shall be used only for illustrative purposes.  The terms and conditions governing this Schedule are set forth in Schedule B, attached.  Schedule A is intended to be used for each parties understanding of the relationship and shall not govern nor bind either party's actions.  If and to the extent this Schedule provides additional terms and/or conflicting terms to the terms and conditions set forth in Schedule B, the terms of Schedule B will prevail.  The capitalized terms as used in this Agreement are defined in Schedule E, attached.

1.  **Background.**

Theranos has developed, and is developing, generations of "mini-lab" devices that can run any blood test in real-time for less than the traditional cost of central lab tests. The Theranos Systems will run routine laboratory tests and proprietary tests that detect the appearance of diseases, enabling early intervention and initiation of treatment long before complications emerge.



In-store blood testing from a single finger-stick could transform the role of pharmacies in healthcare. It is estimated that 80% of physicians' diagnoses are a result of laboratory tests. By putting the right tools and information in the hands of clinicians at a pharmacy or other Walgreens clinical locations, Theranos could play a major role in realizing the true potential of pharmacies in improving patient health and reducing national healthcare costs. In addition to driving new traffic into stores and increasing ownership of the totality of health needs for store customers, pharmacies will fundamentally improve patient outcomes, be better predictors of the health of consumers, and reduce the costs of healthcare.

In introducing Theranos Systems at Walgreens stores and through Walgreens' Employer Solutions Group, Walgreens could become the hub for early detection and treatment of critical ailments to prevent the complications that lead to extraordinary healthcare costs and, ultimately, fatalities.

Equally, the Theranos infrastructure at Walgreens is a powerful clinical studies infrastructure for pharmaceutical drug development, post-marketing, and safety studies. Theranos' investment in clinical development over the past six years can be applied to making Walgreens a hub for pharmaceutical programs.

Theranos Systems installed at Walgreens' pharmacies and Employer Solutions Group locations could bring cutting edge, personalized, and preventative healthcare into pharmacies without the need for complex infrastructure and the overhead associated with it. Walgreens will enable fast, efficient and scalable health services at the point-of-care; this service will quickly drive even more new, predictable and repeat customer traffic in stores.

The ability to run blood tests from a finger-stick in less than an hour at Walgreens' pharmacies creates a new workflow and a new diagnostic paradigm for health care. Patients will be able to come to Walgreens for most of their health needs. The time saved will reduce visits to hospitals and paperwork prone to medical errors, while enabling more accurate and earlier treatment, improving the outcomes of the patients who get their care at Walgreens.

Individual's biochemical profiles will link to targeted recommendations through "smart" software and self-learning software applications that facilitate behavior modification. Health information and nutritional recommendations provide insight into improvements in lifestyle, diet, and other resources available through Walgreens' stores. Walgreens' *Health Assistant* software will provide "smart" individualized support, links to prescriptions and health resources through mobile and online portals for a total customer lifestyle/health solution. Trusted health solutions could build customer loyalty and result in Walgreens becoming the center for continuity of care for store customers and members.

2.  **Program Objectives.**  The objectives of this Program include:

    a.  Make blood testing faster and far more accessible, effective, and actionable by introducing a more cost-effective, real-time blood testing service at Walgreens stores and Walgreens' other clinical operations nationwide.

    b.   Empower Walgreens to play a more active role in patient health management and well-being. Theranos Systems include a decision support system, which will be accessible through the touch screens on the devices or through the web browser.  This decision support system will deliver real-time, actionable information to the clinicians in the pharmacy and other Walgreens clinical locations by providing analysis, interpretations and recommendations based on patient test results.

    c.   Generate health care cost savings by reducing direct out-of-pocket costs of lab tests and visits.

    d.   Early intervention and reduced hospitalization through early detection of the onset of disease.

    e.   Introduce a new revenue stream for Walgreens through this disruptive technology and associated services.

**3.**   **Program Managers.**  Each party will assign a program manager to this Program.  The responsibilities of each party's program manager include:  (i) serve as the interface between the other party; (ii) develop a mutually agreed upon detailed business plan including milestones, projections/forecasts and deliverables, and success/acceptance criteria for each milestone (details of the business plan and any applicable schedule shall be memorialized in an amendment to this Agreement); (iii) ensure that Theranos and Walgreens have committed the necessary resources necessary to meet the objectives and timeline of the Program; (iv) prepare regularly-scheduled status reports on the Program, on an agreed-upon time-frame; (v) identify, schedule and confirm availability of resources, including management, to provide agreed-upon services and deliverables; and (vi) assist in resolving issues, and escalate, as appropriate, within the other party.  The parties acknowledge that the Program Plan is subject to change as the Program progresses.  Notwithstanding anything to the contrary in this Section 3, all terms of the relationship shall be detailed in Schedules B through J or by an amendment to this Agreement.

**4.**   **Reviews**.  As needed, the appropriate Representatives from each party will meet on a regularly-scheduled basis to be determined, to review the status of the Program.

*[remainder of page intentionally left blank]*

## SCHEDULE B

## PURCHASING TERMS AND CONDITIONS

1. **Scope.** The terms and conditions set forth in this Schedule apply to this Agreement, including each attached Schedule or other attachment. To the extent a Schedule or other attachment provides additional terms and/or conflicting terms to the terms and conditions set forth in this Schedule B, the terms of this Schedule B will prevail.

2. **Best Price Guarantee.** Theranos agrees that no other United States retail pharmacy, grocer, mass merchant, or physician office(s) will be able to purchase Tests or Cartridges, defined as Available Cartridges, for a price lower than that available to Walgreens. Should Theranos provide Available Cartridges to United States retail pharmacies, grocers, mass merchants, or physician office(s) through an alternative delivery arrangement, Theranos agrees that the pricing for such arrangement shall not be lower than the reasonably equivalent Cartridge price charged to Walgreens. Any promotional strategic contracts with thought leaders, physicians or charitable work shall not be subject to the Best Price Guarantee, provided sales of such Tests or Cartridges below the Walgreens price are not material to Theranos for any given twelve (12) month period. For purposes of this Agreement Available Cartridges include First Generation Cartridges of Theranos Systems Versions 1, 2, and 3 defined as follows:

   a. Version 1 ("V1") – All routine laboratory Tests specified on Schedule D;
   b. Version 2 ("V2") – The following laboratory Tests including, but not limited to, influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy and all available esoteric Tests, (the parties agree that they will memorialize the CPT codes that are included in Version 2 as such codes become available);
   c. Version 3 ("V3") – Predictive Tests (including, but not limited to, diabetes/pre-diabetes, congestive heart failure, women's cancer, men's cancer) and remaining esoteric Tests to be identified by description and/or CPT code by the parties at a later date.

3. **Exclusivity.**

   a. **Central Labs and PBMs.** Theranos agrees not to make the Theranos System available for sale to, distribution to, or for use in delivering Tests to (a) any central lab company (including but not limited to Quest Diagnostics Inc., Laboratory Corporation of America Holdings, and all their related entities, as well as any other company doing business as a centralized commercial laboratory), and (b) any pharmacy benefit manager (PBM) (including but not limited to MedcoHealth Solutions Inc., Express Scripts, Inc., and all their related entities, as well as any other company doing business as a pharmacy benefit manager).

   b. **Retail Pharmacies, Grocers and Mass Merchants.** For all retail pharmacy companies (for purposes of this Agreement, the retail drug store division of CVS Caremark Corporation will be considered as a retail pharmacy), grocers, and retail mass merchants, including, but not limited to Wal-Mart Stores, Inc., and its related entities ("Wal-Mart"), Theranos will make the Theranos System available for sale as follows:

      i.   For V1:  Six (6) months after the successful completion of the Pilot;
      ii.  For V2:  Six (6) months after the date such Cartridges are available to Walgreens for sale; and
      iii. For V3:  Twelve (12) months after the date that each new Cartridge is made available to Walgreens for sale. To illustrate this exclusivity, assume a women's cancer test is made available to Walgreens on 1/1/2011. Walgreens' exclusivity right to secure and offer said test would expire on 1/1/2012. Then if a men's cancer test is introduced on 1/1/2012, Walgreens' exclusivity right to secure and offer said test would expire on 1/1/2013.
      iv.  For twelve (12) months after the date of completion of Walgreens' 12 month exclusivity period on each new V3 Cartridge, Theranos will grant Walgreens a 15-25% price advantage (as set forth below) over Walmart on all V3 tests for another twelve months. Under this arrangement, Theranos will guarantee that Walgreens will have at least a 15% price advantage over Walmart for tests that cost Walgreens $100 or greater and at least a 25% price advantage over Walmart for tests that cost Walgreens $30 or less. For all tests that cost Walgreens between $100 and $30, Theranos will linearly increase the % margin over Walmart from 15% to 25% at dollar increments. For instance, a test that costs Walgreens $100 will be sold to Walmart for at least $120. A test that costs Walgreens $30 will be sold for at least $40 to Walmart.

The parties agree that Theranos shall have an independent auditor, acceptable to Walgreens, certify to Walgreens that the prices charged to Walgreens during such twelve (12) month period for V3 Cartridges shall be in accordance with this Section 3(b)iv. Should the results of such audit show that Walgreens was charged more than what is provided for in this Section, Theranos shall refund such additional charges to Walgreens within thirty (30) days of such certification. Said certification shall be made twice: Within sixty (60) days of the date that is six (6) months after the date Walgreens' exclusivity period on each new V3 Cartridge completes, and within sixty (60) days of the date that is twelve (12) months after the date Walgreens' exclusivity period on such V3 Cartridge completes.

Any tests developed after the execution of this Agreement that are not specifically listed in the definitions of V2 and V3 cartridges and are subject to development or licensing agreements with pharmaceutical companies and/or United States or foreign government agencies will not be subject to the exclusivity terms listed above.

For purposes of this Agreement, one other United States retail grocer, but specifically excluding any mass merchant, selected by Theranos in its discretion, and its related entities will not be subject to Schedule B, Section 3.b. Theranos shall promptly notify Walgreens in writing of the identity of such retail grocer and its related entities. During the time of exclusivity, Theranos retains the right to pilot with other companies. Such pilots shall be no greater in number of stores or locations than as defined in Schedule F.

c.  **Priority Capacity Allocation.** Upon ninety (90) calendar days' notice at any time, Walgreens can notify Theranos of its commitment to purchase specific quantities of Existing Cartridges and Theranos will dedicate its production capacity to fulfill those commitments from ninety (90) days of the date of notice until completion before using that production capacity to supply any other United States retail pharmacy, grocer, or mass merchant. Under this provision, Walgreens shall have the right to purchase Existing Cartridges for direct sale in the United States by Walgreens and Affiliates, but not for resale. Sales of cartridges under this provision are not cancellable or subject to reschedule and not subject to inclusion in the Excess Inventory provision below.

d.  **Excess Inventory.** Walgreens, no more than once per calendar quarter, may elect to engage the Excess Inventory Return described as follows: if within sixty (60) calendar days preceding the expiration of the Warranty Period (see Schedule B, Section 17.a.) Walgreens determines that the Warranty Period for a number of the purchased Available Cartridges will expire prior to Walgreens' forecasted capacity to sell the Available Cartridges directly ("Excess Inventory"), Walgreens may notify Theranos in writing ("Excess Inventory Notification") of such Excess Inventory and Theranos will arrange to have such Cartridges returned to Theranos, with Walgreens responsible for the reasonable cost of the associated shipping, including shipment of the replacement Cartridge to Walgreens. Theranos will replace said Cartridge with a new Cartridge within 180 days of the Excess Inventory being shipped back to Theranos. The Excess Inventory Notification will include: (i) the type of Available Cartridge; (ii) the quantity of Available Cartridges; (iii) the location of each Available Cartridge; (iv) the purchase price paid (or owing) for each Available Cartridge; and (v) written confirmation that subject Available Cartridges were maintained in the standard shipping packaging and stored in environments consistent with Theranos' data sheets and/or storage recommendations. In the case of V1 Cartridges, Walgreens will pay to Theranos a fixed fee of $5.00 per Cartridge to restock and replace the Excess Inventory. In the case of V2 and V3 Cartridges, Walgreens will pay a restocking fee equal to 20% of the Cartridge price. Should said Cartridge be purchased through a Pre-Purchase commitment, then the remaining credit available to Walgreens after the restocking fee is paid would be split equally between a cash refund and to the credit balance for pre-purchases. As an example, if the restocking fee for a V2 Cartridge is 20% and the Cartridge was originally purchased for $10.00, with $5.00 paid in cash and $5.00 applied from the pre-purchase credit balance, Walgreens would receive $4.00 in cash and $4.00 would be credited to its pre-purchase credit balance.

e.  **Notice of Cartridge Availability.** Theranos shall (a) deliver to Walgreens a written notice (the "Notice") stating the forecasted availability of the Available Cartridges, including the Cartridge type, the estimated shipment dates, and, subject to Schedule B, Section 10, below, the proposed price ("Offered Price"); and (b) offer to sell the Available Cartridges to Walgreens at the Offered Price and on the other terms set forth in this Agreement.

4.  **First Announcement Rights.** Theranos will not authorize any other United States retail pharmacy, grocer, or mass merchant to announce availability of the newly Available Cartridges before Walgreens, in accordance with and as applicable under the Exclusivity terms described more fully in Schedule B, Section 3.

5.  **Theranos Pharmaceutical Clinical Trials Infrastructure.** As part of its ongoing business partnerships with pharmaceutical companies, Theranos will extend its clinical trials infrastructure to include Walgreens stores so that pharmaceutical clinical trial patients will have the option to have their laboratory tests performed at a Walgreens location. Following execution of this Agreement, Theranos and Walgreens will negotiate the terms and conditions

between Theranos and Walgreens for the clinical trial work which will then be described and agreed upon in writing in Schedule J.

6. **Cartridge Pre-Purchase Commitments**.

(a)        Walgreens agrees to initially pre-purchase fifty million dollars ($50 million) of Cartridges ("Inventory") which includes use of Devices and provision of Services according to the following schedule:

          (i)      $30 million on the Effective Date of this Agreement
          (ii)     $20 million within five (5) days of receipt of official, written FDA approval and CLIA Waived Status for Theranos System including all Version 1 Tests

The first $30 million pre-purchase payment will be invoiced at the Effective Date of this Agreement.  The second $20 million payment will be invoiced after Theranos obtains any and all official, written FDA approvals, CLIA-waived status and any other federal regulatory approvals necessary in order for Walgreens to commence utilizing the Theranos System and Cartridges to perform Tests of its customers in accordance with the Pilot set forth in Schedule F (the "Approvals").  If Theranos fails to obtain the Approvals by December 31, 2010, such failure shall entitle Walgreens to terminate this Agreement in accordance with Schedule B, Section 23.c.

(b)        In the event the initial commitment detailed in Section 6(a) above is satisfied to Walgreens' satisfaction, Walgreens shall commit to two (2) additional $25 million purchase commitments, subject to the following terms:

          (i)      The existing commitment is exhausted;
          (ii)     Walgreens assumptions regarding cost and performance are being met; and
          (iii)    The prepaid amount is expected to be exhausted by Walgreens in a period not to exceed 180 days.

7. **Ordering**.

a. **Purchase Orders**.  Walgreens will issue purchase orders to Theranos specifying the Theranos Deliverable that Walgreens requests Theranos to deliver.  Each purchase order will reference this Agreement.   If, and to the extent, a purchase order contains boilerplate or pre-printed terms, this Agreement supersedes any and all such boilerplate or preprinted terms.  At a minimum, each purchase order shall specify (i) a complete list of the Deliverables covered by the purchase order, including the quantity, model number and description of each; (ii) the price of each Deliverable, and any applicable discounts; (iii) the billing address; (iv) the ship-to address; (v) the proposed requested ship date, which shall be no later than six (6) months from the date of the purchase order; and (vi) the signature of the employee or agent authorized to place the order.

b. **Order Acknowledgment**.  Theranos will acknowledge Walgreens' purchase order in writing within ten (10) days after receipt.  Theranos' acknowledgment will note any exceptions regarding matters such as the Deliverables ordered and pricing.  In no event will any purchase order be binding on Theranos until Walgreens' purchase order and Theranos' acknowledgment are in agreement as to Deliverables ordered, quantity, pricing and scheduled shipping dates.

8. **Scheduling and Cancellation**.  For all Cartridge purchase orders, cancellations shall be handled in the same manner as Excess Inventory returns as detailed in Section 3(d) above with the exception of those orders placed under Walgreens' Priority Capacity Allocation detailed in Section 3(c).

9. **Invoicing**.  Theranos will issue invoices as follows:

| Deliverable (as applicable) | Invoice |
|---|---|
| Cartridges | On shipment date and will specify number of Cartridges shipped by shipping destination; charge to be reflected on invoice for Services described below. |
| Devices | No invoice, as Walgreens will not be separately charged for Devices. Theranos, in its discretion, will determine the number of Devices to be placed in each location based on Cartridge consumption, provided that each location selected by Walgreens shall be able to process twelve (12) Tests at a time. |

| Training (installation and use of Devices)*<br><br>*Theranos will train the trainer and will assist Walgreens in developing appropriate training materials, videos, and literature to operate devices and run the tests. Additionally, Theranos will provide periodic trainer updates as new versions of Devices and Tests require it. | No invoice, as Walgreens will not be separately charged for Training |
|---|---|
| Services | At the beginning of each month, as may be amended from time to time based on mutual agreement of the parties in writing. The invoice will specify by CPT code the number of successful Tests that generated a Result performed during prior calendar month, by store location, multiplied by the pricing for each such Test as set forth on Schedule D. |

10. **Payment.** Commencing with the Pilot Phase, Walgreens shall compensate Theranos for purchase of Cartridges, use of the Devices, and of Services, as follows: The parties will allocate the initial pre–purchase commitment of $30 million into an account on the Effective Date, with the remaining $20 million funded at the time of receipt of official, written FDA approval and CLIA Waived Status for Theranos System including all Version 1 Tests.

   i.     **Deduction from Pre-Purchase Account.**     Theranos will apply 50% of the invoiced amount to the first $50 million of Pre-Purchase until such time as the balance reaches zero, provided that if Walgreens exercises its rights under Section 20, Theranos will only apply 50% of the invoiced amount to the first $25 million of Pre-Purchase until such time as the balance reaches zero. The remaining 50% shall be paid in cash in accordance with subsection (ii). Once the balance reaches zero, payment to Theranos will be made in accordance with subsection (ii).Any adjustments to pre-purchase commitments resulting from paragraphs 3.d or 7 shall be made to the account for the related adjusting transaction.

   ii.     **Issuing Payment to Theranos.**     All payments are due within thirty calendar days from the date of Invoice. If, after ten (10) days written notice to Walgreens that a payment is overdue and such Invoice remains unpaid,  late payments will be charged interest at 1% per month until paid in full (or, if less, the maximum allowed under applicable law).

All fees payable to Theranos under this Agreement will be detailed, categorized and clearly stated on an invoice, in a form reasonably acceptable to Walgreens, in accordance with this Agreement.   Theranos reserves the right to suspend providing any Deliverable if any payment obligation which has not been reasonably disputed by Walgreens is more than ten (10) days past due and that such suspension will not be deemed a breach or failure under this Agreement and will not trigger any remedies provided within this Agreement.  Theranos agrees that it will provide written notice to Walgreens should any invoice be past due.  Theranos will immediately resume providing Deliverables upon full and final payment of such past-due payment obligation.  Walgreens will have the right to set off any damages or charges assessed by Walgreens under this Agreement, for which Walgreens has notified Theranos in writing and which have not been reasonably disputed by Theranos, against any undisputed amounts owed to Theranos under this Agreement.  Walgreens shall have no obligation to pay any charges or expenses first invoiced more than 12 months after they accrue, except to the extent they are for taxes which Walgreens is obligated to pay pursuant to this Agreement and which are imposed after such period.

Theranos will also send a completed W9 to the following address:

Walgreen Co.
Danville Accounting Office
1901 E. Voorhees, MS 685
Danville, IL 61834

11. **Purchase Price.** Prior to initiating the Pilot as described in Schedule F, the parties will negotiate and agree upon pricing for the newly Available Cartridges and related Services. In the event the parties fail to negotiate and agree upon pricing prior to the time of Pilot initiation as described in Schedule F, either party shall have the right to terminate this Agreement pursuant to Section 23.b. The agreed-upon pricing schedule will be reduced to writing and this Agreement will be amended by including the pricing in Schedule D. The price to be agreed upon by the parties will not include applicable taxes, or custom duties. If Theranos has the legal obligation to collect any taxes, duties or charges of any kind imposed by any country, federal, state, or local government entity, the appropriate amount shall be added to Walgreens' invoice and shall be paid by Walgreens unless Walgreens provides Theranos with a valid tax exemption certificate authorized by the appropriate taxing authority.

12. **Discounts.** The parties agree that any discounts or reductions in price offered or provided to Walgreens hereunder are intended to comply with all applicable federal, state and local laws, statutes, rules and regulations, as such are amended from time to time, including but not limited to the Federal Anti-Kickback Statute [42 U.S.C. 1320a-7b(b)], and specifically the Discount Safe Harbor under the Federal Anti-Kickback Statute and its implementing regulations (the "Discount Safe Harbor"), as well as similar State law exceptions. Thus, with respect to the foregoing, the parties shall comply with all relevant obligations under the Discount Safe Harbor as well as all similar State law exceptions. The parties shall do nothing to impede the other party's ability to meet all of its obligations under the Discount Safe Harbor and any similar State law safe harbors and exceptions as contemplated herein. The parties shall take all necessary steps to comply with the Discount Safe Harbor and any similar State law safe harbors and exceptions. The parties agree to timely produce any information or documentation requested or that is required for purposes of compliance with the Discount Safe Harbor and similar State law safe harbors and exceptions.

13. **Currency.** All prices and fees set forth in this Agreement are stated in U.S. dollars. Payment will be in U.S. dollars.

14. **Services.** Theranos shall provide Walgreens with the services set forth in this Section 14.

a. **Limitation.** Theranos will ensure that, with respect to Walgreens Customers, the Theranos System will only be utilized to perform Ordered Tests, provided that Theranos shall run calibration tests remotely on the Theranos System.

b. **Reports.**

    i. **Generation.** Theranos will use commercially reasonable efforts to generate a Result for each Ordered Test.

    ii. **Transmission.** Theranos will use commercially reasonable efforts to, within one (1) hour of generating a Result, transmit the Report to the Ordering Practitioner either by a secure website portal, secure electronic transmission or facsimile. All Reports generated, including but not limited to all Results provided to clinicians, will be provided to Walgreens. Results from other Tests not performed at Walgreens Locations will only be provided to Walgreens upon receipt of patient consent. Theranos agrees that any patient authorization or consent that it may seek to obtain from a potential Walgreens patient will not include any provision offering the patient the opportunity to block, prohibit or in any way restrict release of the Report to Walgreens.

    iii. **Critical Values.** In the event a Result reflects one or more values at such variance with normal as to be potentially life-threatening ("Critical Value"), Theranos will be solely responsible for notifying the Ordering Practitioner, the technician that performed the Test, and, to the extent required by state law, any other individuals or entities of the Critical Value and using commercially reasonable efforts to verify that the Ordering Practitioner received notification of the Critical Value.

    iv. **Consultation.** Theranos will maintain a toll-free phone number and email address that Ordering Practitioners can contact with questions or requests for professional consultation regarding a Report. The toll-free number shall, at a minimum, be staffed 7 days per week from 5 am to 11 pm central. Theranos will ensure that all requests for professional consultation are responded to promptly by an appropriately licensed and qualified health care professional.

    v. **Public Health Reporting.** To the extent required by state or local law and/or regulations applicable to each Walgreens location utilizing the Theranos System, Theranos will, on behalf of Walgreens, prepare and submit any and all Reports, or other information or forms that Walgreens may be required to disclose to a health department or other government agency as a result of performing certain Tests.

     vi.  **Ownership and Retention.** For the duration of this Agreement and in accordance with: (a) the terms set forth in the HIPAA Business Associate Agreement attached hereto as Schedule G; (b) federal and state laws governing document retention by health care providers; and (c) Medicare, Medicaid and all other third-party payor document retention requirements, Theranos will electronically maintain and store all Reports on behalf of and for the benefit of Walgreens.

     vii.  **Walgreens' Retention Right:** Walgreens, without first obtaining patient consent, may maintain, use and disclose Reports for purposes of complying with applicable federal and state legal requirements including, but not limited, to: (i) licensure; (ii) record retention; (iii) patient privacy and confidentiality; (iv) Medicare, Medicaid and any other federal or state health care programs; (v) subpoena or court order.

c.  **Billing.**

     i.  **Provider.** Theranos acknowledges and agrees that Walgreens will be the provider of the clinical laboratory services performed at Walgreen's locations utilizing the Theranos System. As the provider of service, all claims for payment submitted to patients and/or third-party payors will be submitted in the name of Walgreens and under a Walgreen's tax identification number. Theranos acknowledges and agrees that it will not submit under its name or tax id number any claims for payment to any customers or third-party payors for Tests performed at Walgreens locations. Theranos shall look solely to Walgreens for payment of the items and services it provides to Walgreens pursuant to this Agreement.

     ii.  **Billing Software.** For the duration of the Pilot phase, Walgreens will utilize the TheranOS billing software to electronically bill payors for Tests performed at Walgreens stores. Walgreens will determine, and will notify Theranos in writing, within sixty (60) days after the conclusion of the Pilot if it subsequently wishes to use TheranOS billing software to electronically bill payors for Tests performed at Walgreens stores. Walgreen's use of the TheranOS billing software will be subject to the license specified in Section 19 of this Agreement.

     iii.  **Collections.** During the Pilot, Theranos will utilize the TheranOS software to submit initial electronic claims to third-party payors, and Theranos will be responsible for any subsequent follow-up or collection activities that may be required to resolve claim rejections, underpayments or other reimbursement issues. The process and subsequent execution of filing claims shall be subject to Walgreens' approval, with Walgreens having access to Theranos' billing system and process. Walgreens will determine, and will notify Theranos in writing, within sixty (60) days after the conclusion of the Pilot if it subsequently wishes to have Theranos to continue to manage the collection process.

     iv.  **Records.** In accordance with the requirements of Schedule G, Theranos will electronically maintain an archive of all transactions generated utilizing the TheranOS billing software including but not limited to claims submissions, remittance advice and claims history.

     v.  **Bank Account.** All reimbursement collected from patients and third-party payors for Tests performed at Walgreens locations and billed using the TheranOS software will be electronically directed or otherwise deposited into one or more bank accounts established and owned by Walgreens.

d.  **HIPAA.** The parties acknowledge that as a result of providing the services described above in Sections 14.b and c, each party will be acting as a Business Associate of the other party and will contemporaneously with this Agreement execute the HIPAA Business Associate Agreement attached hereto as Schedule G.

**15. Delivery.** Delivery of Cartridges and any other Theranos Deliverables to which Walgreens will acquire title will be shipped F.O.B. (Domestic) to Walgreens' warehouse ("Delivery Point"). Walgreens will request a date for delivery of such Deliverables on the purchase order. Theranos will confirm that date, or some other date ("Delivery Date") which will be no later than 30 days after Theranos' receipt of the Purchase Order subject to reasonable availability of the requested volumes. Theranos shall confirm the Delivery Date in the Warehouse Ship to Arrive ("WSTA") in the Walgreens purchase order system. Theranos will use reasonable efforts to deliver the Deliverables on the Delivery Date. However, Theranos shall not be liable for any failure to meet such date. Title for the Deliverable, assuming title is transferring in accordance with this Agreement, excluding any Software, and risk of loss or damage to the Deliverable will pass to Walgreens upon Theranos' delivery of Deliverable to the Walgreens facility specified in the purchase order. If specified, Theranos will use commercially reasonable efforts to manage just-in-time inventory for Walgreens.

**16. Shipment.** In the absence of specific shipping instructions from Walgreens, Theranos will ship by the method it deems most advantageous. Transportation costs will be at Theranos' sole cost and expense, unless Walgreens requests special shipping instructions. If Walgreens requests special shipment, the associated costs will be collect, or, if prepaid, will be subsequently invoiced to Walgreens. Unless otherwise specified, the Cartridges will be shipped in Theranos' standard commercial packaging, with each cartridge and cartridge package properly labeled. When special packaging is, in the reasonable opinion of Theranos, required under the circumstances, Theranos will issue an invoice to Walgreens for the cost of the same. In the event any of Theranos' production facilities are located in close proximity to Walgreens' distribution centers, special facilities can be provided for direct transfer of Cartridges into Walgreens' distribution centers.

**17. Devices.**

a. Any Devices, Cartridges and other Deliverable provided by Theranos to Walgreens shall only be used by Walgreens' employees, contractors and/or agents for Walgreens' internal business purposes, solely for use at Walgreens' Locations. Walgreens agrees to take all reasonable steps to protect the Devices from theft or use contrary to the provisions of this Agreement. Walgreens agrees not to disassemble or otherwise reverse engineer the Devices or any component thereof. Walgreens is not authorized to sell, rent, transfer, license, or distribute the Devices or Cartridges or any other Deliverable, unless specifically authorized by Theranos in writing.

b. Theranos shall at all times retain ownership of the Devices; provided however that Walgreens assumes the entire risk of loss, damage, theft or destruction of the Devices while they are in the possession of Walgreens and shall pay the full cost of any Devices not returned in good condition (ordinary wear and tear excepted). As Theranos develops upgrades and enhancements to the Devices, the parties will agree on a deployment schedule for such next-generation Devices. Walgreens shall permit any authorized representative of Theranos to inspect the Devices, during normal business hours after first sending written notice of such inspection prior to the return of such Devices to Theranos, at Walgreens' facilities or any other location at which the particular Program is being conducted. If Walgreens is unable to return the Devices in accordance with this Agreement, Walgreens will permit Theranos, on dates and times to be agreed upon, to access Walgreens' premises for the purposes of repossessing such Devices.

c. Theranos shall regularly calibrate the deployed Devices in a commercially reasonable manner to ensure timely and accurate Tests.

d. If Walgreens experiences any problems with the deployed Devices, then, subject to Walgreens' responsibilities in Section 17.b, Theranos will repair or replace the Device as soon as reasonably possible after being notified of the problem, in accordance with Schedule C.

e. Upon expiration or termination of this Agreement, Walgreens shall ensure that all Walgreens employees, contractors and/or agents cease using the Devices and Client Accessible Software, and Walgreens shall return to Theranos all authorization codes allowing users to access the Software, TheranOS, and all Devices as set forth in Section 23.d.

**18. Warranty.**

a. At the time Theranos notifies Walgreens of Available Cartridges, Theranos shall also advise Walgreens of the expected shelf-life ("Warranty Period") of the Cartridges. Unless otherwise provided in the applicable procurement document, all Cartridges provided to Walgreens will be new and will contain the functionality, and will operate in accordance with, and conform to, the applicable specifications with shelf life of at least 90% of useful life as further specified in the procurement documentation. Provided Walgreens maintains the Cartridges in the environment specified in the Documentation that ships with the Cartridges or is otherwise made available to Walgreens, Theranos will warrant the shelf-life of the Cartridges. For Cartridges that Theranos confirms are non-conforming to this warranty, and provided Walgreens notifies Theranos in writing during the Warranty Period of the non-conformance, Theranos, at its expense, will replace the non-conforming Cartridges within thirty (30) calendar days of Walgreens' notification. The parties agree that replacement of cartridges, as noted in the previous sentence, shall be Theranos' sole obligation and Walgreens' exclusive remedy, provided that not more than 3% of the Cartridges used in any three (3) month period require replacement. Should more than 3% of the Cartridges used in any three (3) month period require replacement it will be deemed a material breach under this Agreement.. This warranty shall not apply to Cartridge subject to abuse, misuse, modification, repair, accident, or use other than pursuant to and in accordance with this Agreement.

b. Each party warrants that: (i) it has the legal authority to enter into this Agreement; and (ii) the execution, delivery, and performance of this Agreement by it and its obligations hereunder do no conflict with any agreement, instrument or understanding to which it is a party or by which it may be bound.

c.   Each party will perform its obligations under this Agreement: (i) in a timely and professional manner; (ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws.

d.   **Disclaimer. EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT, THERANOS EXPRESSLY DISCLAIMS ALL OTHER EXPRESS, IMPLIED, OR OTHER WARRANTIES, INCLUDING THE WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

19.  **Licenses.**

a.   **Theranos License Grant.**  Theranos hereby grants to Walgreens a non-exclusive, worldwide, multi-site, enterprise wide, royalty free, non-transferable license, without the right to sublicense, to use, in accordance with, and solely to perform its obligations in this Agreement and only for the term of this Agreement: (a) Software installed on Devices, solely for use of the Device by Walgreens employees, contractors and agents who are obligated in writing by confidentiality obligation at least as protective of Theranos and its Confidential Information as this Agreement; and (b) Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software"). In this Agreement, "Software" means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement. Without Walgreen's prior written approval, Theranos will not use in performing the Services, and the Deliverables will not incorporate, link to, call, or depend in any way upon, any software or other intellectual property that is subject to an Open Source or Copyleft license (including the GNU General Public License) or any other agreement that may give rise to any third party's right to use any Deliverables or to limit Walgreen's right to use, such software and other intellectual property in any respect.

b.   **Ownership.**  Theranos and its licensors shall at all times retain sole and exclusive ownership of all Software and, as between the parties, all Software is Theranos Confidential Information. Walgreens shall use commercially reasonable efforts to prevent unauthorized access to, or use of, the Software, and notify Theranos promptly of any such unauthorized use. Walgreens shall not: (a) allow access to the Client Accessible Software by more than the number of concurrent users agreed upon in writing by the parties, (b) disassemble, decompile or otherwise reverse engineer the Software, (c) modify, copy (except for backup, archival, distribution of software to authorized users, disaster recovery, testing, training and other similar uses), sell, rent, transfer, reproduce or distribute the Software, except as specifically provided in the Agreement, (d) use the Software to provide processing services to third parties or otherwise use the Software on a "service bureau" basis, or (e) create Internet "links" to or from the Software, or "frame" or "mirror" any of Walgreens' content which forms part of the Software. Walgreens shall at all times comply with terms and conditions applicable to third party software provided with the Software. Theranos reserves all rights in the Software not expressly granted herein.

c.   **Walgreens License Grant.**  Walgreens hereby grants to Theranos a perpetual, irrevocable, worldwide, royalty-free, and non-exclusive license to integrate, use and disclose in TheranOS Walgreens' data provided under, related to or generated in connection with this Agreement for use in TheranOS' analytical engine to the extent permitted by law, provided that Theranos does not disclose, and any resulting analyses do not contain, any personally identifying information regarding individuals or any information identifying Walgreens or Walgreens compounds, except in connection with the provision of any Professional Services to Walgreens under this Agreement.

d.   **Property Ownership/Use.**

(i)   Walgreens will not use, disclose, share or sell Theranos Intellectual Property, including Processed Data, to other individuals or entities, except as otherwise specified in this Agreement;

(ii)  Walgreens, will not, without first obtaining Theranos' consent, which consent shall not be unreasonably withheld, use the Theranos Systems, Results, Reports or Processed Data with, or for the benefit of, pharmaceutical companies or payors to design, and subsequently implement programs, which are directed and funded by the respective pharmaceutical company or payor, relating to programs for approved or developing pharmaceuticals, including usage or new indications that have not been approved by the applicable regulatory body, provided that Walgreens shall not need consent from Theranos in order to administer Tests based on Federal requirements and/or drug labeling. Walgreens

may use the Theranos System for its proprietary and internally administered Medication Compliance/Adherence, Medication Persistence, MTM or other clinical management programs that do not require consent as detailed above, provided that Walgreens will not give pharmaceutical companies possession of Results and Reports.

Subject to a Non-Disclosure agreement, pharmaceutical companies will have the right to receive summarized results and have the right to visually inspect the de-identified Results in order to verify the summarized results. Walgreens agrees that any disclosure of the summarized results shall restrict against any further use, sale or disclosure of such results to a third party. Walgreens shall, on a semi-annual basis, inform Theranos of the active Medication Compliance/Adherence, Medication Persistence, MTM programs and other clinical management programs that do not require Theranos' consent, or have been consented to by Theranos that Walgreens is currently engaged in. The parties agree and acknowledge that Theranos' consent shall not be necessary to enter into a program with a pharmaceutical company that necessitates that a Test be performed prior to any dispensation of medications based on Federal requirements or drug labeling.

Walgreens and Theranos agree that they shall engage in discussions during the Pilot to reach mutually acceptable terms and conditions by which Walgreens may share data with Theranos used in connection with the Medication Compliance/Adherence, Medication Persistence and MTM programs for the limited purpose of strengthening the overall accuracy and clinical quality of the algorithms used in the Theranos System. Theranos agrees that any information licensed to Theranos will be limited to use in Theranos' model.

(iii)    Theranos hereby provides Walgreens a perpetual, irrevocable, worldwide license to use and add Results which are collected at Walgreens Locations to its clinical databases and use said Results to provide medical care to its customers, provided such Result is not disclosed and no access is provided for any purpose to another entity besides Walgreens except as specified below.

(iv)    With respect to pharmaceutical companies, provided Walgreens obtains the patient's consent, Walgreens will only use de-identified Results and Processed Data for marketing and selling clinical programs, research programs or as otherwise agreed. Walgreens will not give these entities possession of the de-identified Results or Processed Data. Subject to a Non-Disclosure agreement, pharmaceutical companies would have the ability to receive summarized results and could look over the de-identified Results so that they could verify the summarized results. Walgreens agrees that any disclosure of summarized results shall restrict against any further use, sale or disclosure of such results.

(v)    Notwithstanding anything to the contrary in Section 19(d)(ii), the parties agree that with respect to payors, including employers and the government who are not currently paying for tests, Walgreens may use de-identified Results and Processed Data for marketing and selling clinical programs, so long as Walgreens will not give these entities possession of the detailed de-identified Results and Processed Data.

(vi)    Provided Walgreens obtains the patient's consent, Walgreens may sublicense Results and Reports to payors, including the government who are paying for tests, provided that the use of these Results and Reports is restricted to treatment of the specific patient for whom such Results and Reports are provided. Walgreens agrees that any disclosure of identified Results or Processed Data shall restrict against any further use, sale, disclosure or sublicensing of such Results or Reports, including any blinding, aggregating, or analysis of the Results and Reports.

(vii)    Provided Walgreens obtains the patient's consent, Walgreens may sublicense Results and Reports to employers for employee health screening, drug screening, and other similar employment related programs, provided that the use of these Results and Reports is restricted to assessing compliance with a company's human resource policies for each specific patient for whom such Results and Reports are provided in accordance with federal and state laws. Walgreens agrees that any disclosure of identified Results or Processed Data shall restrict against any further use, sale, disclosure or sublicensing of such Results or Reports, including any blinding, aggregating, or analysis of the Results and Reports.

(viii)    Provided Walgreens obtains the patient's consent to do so, any Results or Processed Data shared with academic researchers will be provided under a clear NDA that will not allow them to do data mining. For clarity, these Results or Processed Data cannot be used for developing or identifying new biomarkers,

including without limitation for purposes of monitoring disease progression or regression. Any such biomarkers which are identified or other intellectual property developed in association with Theranos data are the sole and exclusive property of Theranos.

(ix)   To the extent such Results or Processed Data have not been previously published, any publications around such Results or Processed Data shared in strategic clinical relationships must be approved in writing by Theranos and where required by Theranos must acknowledge Theranos as a contributor. Notwithstanding the previous, Theranos agrees, that to the extent such publication will not result in the disclosure of Theranos confidential information, that it shall not unreasonably withhold its consent to such publication.

(x)   As between Walgreens and Theranos:  (a) all data on Theranos Systems, including Results and Reports, and (b) all inventions and improvements developed in connection with the Deliverables or as a result of the services provided by Theranos to Walgreens during the term of this Agreement and thereafter, whether by Walgreens or Theranos, or by the parties jointly, if solely, directed to: (i) any part or the whole of the Theranos System or any improvements thereto, including, without limitation, the TheranOS analytical engine and the algorithms therein; or (ii) the generation of assays for use in conjunction with the Theranos System, shall be the sole and exclusive property of Theranos. Walgreens shall promptly disclose to Theranos in writing any inventions described in the preceding sentence, and Walgreens hereby assigns to Theranos any right, title or interest it may have in such inventions.

e.   **Confidentiality.**

i.   **Use and Protection.**  Each party will use a commercially reasonable degree of care to maintain all Confidential Information of the other in trust and confidence and will neither disclose to any third party nor use any Confidential Information of the other for any unauthorized purpose or without the other party's express prior written consent. Each party may only disclose Confidential Information of the other to those of Recipient's employees and representatives on a need-to-know basis, and may use such Confidential Information only to the extent required to perform this Agreement. Confidential Information may not be used for any purpose or in any manner that would constitute a violation of any laws or regulations, including, without limitation, the export control laws of the United States. Unless otherwise stated in this Agreement, no rights or licenses to intellectual property in Confidential Information is granted by either party to the other under this Agreement, whether express, implied or otherwise. Unless otherwise stated in this Agreement, all Confidential Information will remain the property of the Discloser (and its licensors, if any), including, but not limited to, any right to make, use or sell any product embodying any Confidential Information.  **All Confidential Information disclosed under this Agreement is provided on an "AS IS" basis, with no warranty, assurance, guarantee or inducement of any kind.**  In addition, Recipient shall be entitled to disclose Confidential Information to the extent required in response to a valid order of a court or other governmental body or is otherwise required by law to be disclosed, provided Recipient, as the responding party, gives sufficient notice to Discloser to enable it to take protective measures.

ii.   **Terms of Agreement.**  Notwithstanding the foregoing, either party may disclose the terms or conditions of this Agreement only: (a) on a need-to-know and confidential basis to its legal, financial, and other professional advisors to the extent such disclosure is reasonably necessary, (b) as required by any court or other governmental body; (c) as otherwise required by law, including applicable securities and other law and regulation, including rules or regulations of any applicable securities exchange; (d) during the course of litigation so long as the disclosure of such terms and conditions are restricted in the same manner as is the confidential information of other litigating parties and so long as (1) the restrictions are embodied in a court-entered protective order limiting disclosure to outside counsel and (2) the disclosing party informs the other party in writing at least ten (10) business days in advance of the disclosure and discusses the nature and contents of the disclosure, in good faith, with the other party and (e) only on a need-to-know and confidential basis, to a third party in connection with an equity investment in such party, a merger, consolidation or similar transaction by such party, or the sale of all or substantially all of the assets of such party.  In addition, Walgreens shall not disclose any of the terms or conditions of Section 3.a or 3.b of this Schedule B except, and only to the extent, it must do so pursuant to one of the preceding exceptions and only after informing Theranos in writing at least ten (10) business days in advance of the disclosure and discussing the nature confidentiality, and contents of the disclosure, in good faith, with Theranos, provided that Walgreens shall not be prevented from

making said disclosure if a judicial and/or governmental order demands production prior to such ten (10) business day notice period expiring.

    **iii. Term of Confidentiality**.   The obligations imposed on Recipient shall survive until such time as Discloser's Confidential Information disclosed to Recipient under this Agreement becomes publicly available and/or made generally known through no action or inaction of Recipient or its Representatives.   Recipient and its Representatives will return or destroy/erase all of Discloser's Confidential Information, including any and all information in whatever form generated making use of or reflecting Discloser's Confidential Information, except one copy for archival purposes, within thirty (30) business days of request of Discloser, or thirty (30) business days from termination or expiration of this Agreement.

**20.      Convertible Note.**          In partial consideration for Walgreens' commitments set forth in this Agreement, from the Effective Date until the six (6)-month anniversary of the successful completion of the Pilot, Walgreens shall have the right to purchase a convertible promissory note in the principal amount of $25 million in substantially the form set forth in Schedule H-1 (the "Convertible Note").   Payments made by Walgreens pursuant to its pre-purchase commitments described in Schedule B, Section 7 that have not been applied to Invoices may, at the election of Walgreens, be applied to pay all or a part of the purchase price of the Convertible Note.   The Convertible Note shall bear interest at the rate of 0.79% and shall mature on the Maturity Date (as such term is defined in the Convertible Note). The outstanding principal on the Convertible Note will be convertible into Series C-1 preferred shares (the "Series C-1") of Theranos upon the occurrence of a Conversion Event (as such term is defined in the Convertible Note) and initially be convertible into 1,666,666 shares of Series C-1 based on a $15 Conversion Price of each Series C-1 preferred share. Upon conversion, Walgreens' preferred shares will have certain Dividend, Liquidation, and Conversion Rights as set forth in Theranos' charter in the form provided to Walgreens. To exercise its right to purchase the Convertible Note within the time period described above, Walgreens shall execute and deliver to the Company a certificate in the form set forth on Schedule H-2.

**21. Indemnification.**

    **21.1 Defense and Indemnification.**   (i)Theranos will defend, indemnify and hold harmless Walgreens and its Affiliates, and their respective personnel, successors and assigns ("Walgreens Indemnitees"), against any claims, demands, suits, or causes of action by third parties, (the "Claims"), to the extent resulting or claimed to result from (a) any act or omission of Theranos or its personnel under or in connection with this Agreement; (b) any breach of this Agreement (including any Procurement Document and/or inaccurate or improper claims submissions caused by the TheranOS billing software) by Theranos or its personnel; (c) the violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens's use of the Theranos System, Services or Deliverables; (d) any malpractice, misdiagnosis and/or wrongful diagnosis or any other claim caused by a Test; or (e) the violation by Theranos or its Personnel of any law or regulation, provided that Theranos shall have no liability or obligation with respect to such Claim to the extent the Claim results from (1) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverables or other items by or for Walgreens); (2) breach of this Agreement by Walgreens; (3) the violation by Walgreens of any law or regulation; or (4) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement.   Theranos will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction.   (ii) Walgreens will defend, indemnify and hold harmless Theranos and its Affiliates, and their respective personnel, successors and assigns ("Theranos Indemnitees") against all liabilities, damages, awards, losses, costs and expenses (including costs and attorney's fees) arising out of any claims, demands, suits or causes of action by third parties ("Claims"), which result or are claimed to result in whole or in part from (a) any act or omission of Walgreens or its personnel (including without limitation the modification or combination of Deliverable or other items by or for Walgreens); (b) breach of this Agreement by Walgreens; (c) the violation by Walgreens of any law or regulation; or (d) misuse, failure to properly use, or improper disclosure by Walgreens or its personnel of any data provided by Theranos or generated or otherwise available in connection with the Theranos System or this Agreement.   However, Walgreens will not be liable for damage to third parties to the extent such damage was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.   (iii) Notwithstanding anything to the contrary, (a) to the extent that any Claim subject to Section 21.1(i) is brought by a Third Party against both parties, Theranos will have the duty to defend Walgreens, provided that Theranos will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Walgreens as determined in a final, non-appealable order of a court of competent jurisdiction; and (b) to the extent that any Claim solely subject to Section

21.1(ii) is brought by a Third Party against both parties, Walgreens will have the duty to defend Theranos, provided that Walgreens will not be responsible for the defense costs to the extent such Claim was caused by the negligence or willful misconduct of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction.

**21.2**          **Infringement.**  In the event the Theranos System is held to constitute an infringement, or if Walgreens is enjoined from using the Theranos System, Theranos, at its own expense, will first use reasonable and prompt efforts to:  (a) procure for Walgreens the right to continue to use the Theranos System; (b) modify the Theranos System so that it is non-infringing and of at least equivalent performance and functionality; (c) provide functionally equivalent replacement product(s) to Walgreens; or (d) upon adequate showing to Walgreens that none of the foregoing options are commercially feasible pay to Walgreens a liquidated damage as follows:  (i) Between the date this Agreement is fully executed and the end of the Pilot, Walgreens shall be entitled to $0.00 as a liquidated damage; (ii) Between the end of the Pilot and exhaustion of Walgreens $50 million pre-purchase commitment, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $20,000,0000; and (iii) After exhaustion of Walgreen's $50 million pre-purchase commitment, Walgreens shall be entitled to receive the lesser of actual damages incurred as a result of such termination, or $40,000,000.  Walgreens's rights under this Section will be in addition to and will not limit Walgreens's rights under the Section regarding Defense and Indemnification above.  Except as otherwise contemplated in this Agreement, this Section regarding Indemnity does not apply to any infringement caused by any combination of any Theranos System with any item not supplied by Theranos or any modification of any Theranos System other than by Theranos.  For purposes of this section "actual damages incurred" shall not include indirect, incidental, or consequential damages of any kind or nature whatsoever.  Actual damages shall include, but not be limited to, run-rate labor losses, capex, and investments made to individual Walgreens' locations to accommodate the Theranos System.

21.3     **Procedures.**  The indemnifying party has the right to control the defense and settlement of any Claim; <u>provided</u>, however, that the other party will have the right to participate in such defense, at its expense, and in selection of counsel, and to approve any settlement proposed by the indemnifying party (such approval not to be unreasonably withheld or delayed).  Upon the indemnifying party's' request, the other party will reasonably cooperate in such defense and the indemnifying party will reimburse the party for its reasonable out-of-pocket expenses in providing such cooperation.  Each party will provide prompt notification of any Claim; <u>provided</u>, however, that any reasonable delay by such party in giving such notice will not relieve the indemnifying party of its obligations pursuant to this Section regarding Indemnity, except to the extent that the indemnifying party demonstrates actual damage caused by such delay.

21.4     **Independent Obligation.**  The obligations of each party to defend, indemnify and hold harmless, their respective indemnified parties under this Section regarding Indemnity, will be independent of each other and any other obligation of the parties hereunder, provided that this Section 21 shall constitute Theranos' sole obligation and liability, and Walgreens' exclusive remedy, with respect to Third Party claims for violation of any intellectual property rights.

**22.**     **Limitation of Liability.**  In no event shall either party be liable to the other party or any other person or entity for any costs of substitute products or services or special, exemplary, indirect, incidental, consequential or punitive damages of any kind or nature whatsoever (including, without limitation, lost revenues, profits, savings or business, or contribution or indemnity in respect of any claim against the party) or loss of records or data, whether in an action based on contract, warranty, strict liability, tort (including, without limitation, negligence) or otherwise, even if such party has been informed in advance of the possibility of such damages or such damages could have been reasonably foreseen by such party.  In no event shall Theranos' liability to Walgreens or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise.  In no event shall Walgreen's liability to Theranos or any other person or entity arising out of or in connection with this Agreement or the Services exceed $40,000,000, whether such liability is based on an action in contract, warranty, strict liability or tort (including, without limitation, negligence) or otherwise. Notwithstanding the foregoing, the limitations of liability and disclaimers of damages set forth in this Section will not apply to claims:  (i) resulting from fraud or willful or intentional conduct of, or bodily injury (including death) or property damage caused by, a party; (ii) that are the subject of indemnification under this Agreement; (iii) for breach of a Party's confidentiality obligations under this Agreement or (iv) for violation of any intellectual property rights of Third Parties caused by Theranos, its personnel or resulting from Walgreens' use of the Theranos System, Services or Deliverables. Except as otherwise allowed under this Agreement, Walgreens liability to Theranos shall not be limited with respect to claims regarding Walgreen's use or misuse of Theranos Intellectual Property, trade secrets and/or Confidential

Information. Notwithstanding the foregoing, Walgreens shall not be liable to Theranos to the extent such damage was caused by the acts or omissions of Theranos as determined in a final, non-appealable order of a court of competent jurisdiction. The limitations specified in this Section will survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

23. **Term and Termination.**

    a. **Term.** This Agreement will be in effect until three (3) years from the Effective Date or longer based on performance thresholds mutually agreed upon in writing by amending this Agreement after successful completion of the Pilot. This Agreement will be automatically extended for three (3) year periods unless either party provides written notice to the other of its intent not to renew at least ninety (90) days prior to the renewal date.

    b. **Termination due to unsatisfactory Pilot.** Should Walgreens or Theranos determine that the success criteria for the Pilot has not been satisfied, Walgreens or Theranos shall have the right to terminate this Agreement, with Walgreens receiving a refund of all sums paid by Walgreens as further detailed in Section 23.d.

    c. **Termination for Cause.** If either party breaches a material provision of this Agreement and fails to cure such breach within thirty (30) calendar days after receiving written notice of the breach, the non-breaching party shall have the right to terminate this Agreement at any time until such cure; provided if a breach cannot be cured within thirty (30) calendar days but is capable of cure, the breaching party will not be in default if, within thirty (30) calendar days of receiving notice of breach, in good faith, it begins and continues to attempt to cure the breach. In such case, the breaching party will have a reasonable time to cure the breach, but not to exceed sixty (60) days, before being in default. Notwithstanding anything to the contrary herein, Walgreens' breach of payment obligation constitutes a default ten (10) business days after written notice from Theranos that the payment is due. Should Walgreens fail to make such payment, or fail to respond in writing with its good faith objection to such invoice within such ten (10) day notice period, then Theranos shall have the right to terminate this Agreement immediately..

    d. **Obligations upon Termination.**

      i. Theranos' Obligations to Walgreens:

        1. In the event Walgreens terminates this Agreement pursuant to Sections 23.b or 23.c or Theranos terminates this Agreement pursuant to Section 23.b, then within one hundred eighty (180) calendar days of the termination date Theranos will refund all sums paid by Walgreens pursuant to Section 5 that were not applied by Walgreens towards payment of Invoices.

      ii. Walgreens' Obligations to Theranos:

        1. In the event this Agreement is terminated by Theranos pursuant to Section 23.c or Walgreens elects not to renew, Theranos will retain such sums as Walgreens may have paid under, and in accordance with, this Agreement. Within one hundred eighty (180) calendar days of the termination date, Theranos will provide Walgreens with, and Walgreens shall pay, an invoice setting forth any amounts owed, but not yet paid, prior to the termination date, including any additional expenses Theranos incurred with respect to non-cancellable commitments attributable to the termination of this Agreement.

      iii. Upon termination, Theranos may enter Walgreens' facilities, at a time and date to be reasonably agreed upon, and remove the Devices installed on Walgreens' premises.

e. **Letter of Credit.** Theranos agrees that until the Payment Refund Obligation Termination occurs, Theranos will maintain a letter of credit equal to the amount of pre-purchase commitments for the benefit of Walgreens. The letter of credit shall be issued by a bank, and shall be on terms, reasonably acceptable to Walgreens.

    f. **Survival of Provisions.** Those Sections entitled "Reports," "Devices," "Warranty," "Licenses Sections b, c, d, and e," "Indemnification," "Limitation of Liability," "Term and Termination," "Miscellaneous" Schedule E ("Definitions") , and all accrued payment obligations of Walgreens, shall survive the expiration or termination of this Agreement for any reason.

24. **Miscellaneous.**

e. **Governing Law/Venue.** This Agreement will be interpreted and governed by the laws of the State of Delaware without reference to its conflict of laws principles. The parties irrevocably consent to the sole and exclusive jurisdiction of and venue in the district court for Delaware.

f. **Independent Contractor.** Theranos is an independent contractor, and the relationship of the parties under this Agreement will not be construed to create any other relationship, as partners, joint venturers, principal and agent, or otherwise. Neither party has the authority to represent the other as to any matters.

g. **Entire Agreement.** The terms and conditions contained in this Agreement, including all Schedules, constitute the entire agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter of this Agreement and no agreement or understanding varying or extending the same shall be binding upon either party unless in a written document signed by both parties.

h. **Force Majeure.** Non-performance of either party, except Walgreens' payment obligation, shall be excused to the extent that performance is rendered impossible by any other reason where failure to perform is beyond the reasonable control of the non-performing party. Notwithstanding the previous, the parties acknowledge and agree that if non-performance due to a force majeure event exceeds ninety (90) days, then on written notice to the party suffering the force majeure event at any time prior to resumption of performance by such party, the other party shall be entitled to terminate this Agreement.

i. **Assignment.** Neither party may assign, delegate or otherwise transfer this Agreement or any of its rights or obligations under this Agreement without the other party's prior written approval, which approval will not be unreasonably withheld, delayed or conditioned. Any such attempt to do so will be ineffective. Notwithstanding the foregoing, either party may assign, delegate or otherwise transfer this Agreement by operation of law or otherwise, to: (i) any person or entity that becomes a successor entity, in connection with a change of control (which will include a direct or indirect transfer of all or substantially all of the party's' stock or assets to a third-party, a merger, reorganization or other such transaction) or (ii) a sister company or wholly-owned subsidiary. Notwithstanding any Change of Control, the parties agree that any successor entity will comply with the terms of this Agreement.

j. **Notices.** All notices and other communications pertaining to this Agreement will be in writing and will be deemed delivered upon personal delivery, or refusal of delivery, via certified mail, return receipt requested, postage prepaid. All notices of communications between Walgreens and Theranos pertaining to this Agreement will be directed to the address specified on cover page of this Agreement, or such other address as a party may specify.

k. **Prevailing Party.** In any suit or proceeding relating to this Agreement the prevailing party will have the right to recover from the other its costs and reasonable fees and expenses of attorneys, accountants, and other professionals incurred in connection with the suit of proceeding, including costs, fees and expenses upon appeal.

l. **Amendment; Waiver.** No modification to this Agreement, or any waiver of any rights shall be effective unless assented to in writing by the party to be charged and shall not constitute the waiver of any other right hereunder or any subsequent breach or default.

m. **Severability.** If any portion of this Agreement is held invalid, the parties agree that such invalidity shall not affect the validity of the remaining portions of this Agreement, and the parties shall seek in good faith to agree to substitute for the invalid provision a valid provision that most closely approximates the economic effect and intent of the invalid provision.

n. **Publicity.** Neither party will use the name(s), trademark(s) or trade name(s), whether registered or not, of the other party in publicity or press releases or advertising or in any manner (except as such disclosure may be required by applicable law or the rules or regulations of any applicable securities exchange or regulatory or governmental authority to which the relevant party is subject or submits, wherever situated), including customer lists, without that party's prior written consent. Consent of Walgreens shall not be valid unless obtained from Walgreen's Chief Information Officer and Director of Corporate Communications, which consent may be withheld in Walgreen's sole discretion.

o.  **Export and Import Requirements.** Theranos will prepare, maintain and, to the extent required under applicable law, submit to the applicable customs authorities, all necessary information and documentation to comply with the applicable customs and export and import requirements of each country from which any software, products, or other materials developed under this Agreement will be exported and each country into which they will be imported. Theranos will comply with all other applicable customs, technical compliance and country of origin requirements of each country into which any software, products, or other materials are to be imported.

p.  **Compliance With Laws.** Each party will comply with all applicable laws, ordinances, rules, and regulations governing its duties or responsibilities under this Agreement, including but not limited to, all United States and foreign export control laws or regulations. Without limiting the generality of the foregoing, each party represents that in the performance of its obligations under this Agreement, it will fully comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the standards issued by the US Department of Health and Human Services at 45 C.F.R. Parts 160 and 164, to protect the security and privacy of individually identifiable health information generated by or received from the other party, whether such party is acting in the capacity of a covered entity, business associate, health care provider or any other capacity..

o.  **EEOC Compliance.** In connection with its performance of the Agreement, Theranos shall comply with the **applicable** provisions of Executive Order 11246 and the regulations issued pursuant thereto (generally Part 60-1 of Title 41 of the Code of Federal Regulations), **unless exempted by said regulations,** particularly the provisions of the Equal Opportunity Clause (41 CFR Section 60-1.4(a)), which are incorporated herein by reference; the provisions and regulations pertaining to nondiscrimination and affirmative action in employment (41 CFR Sections 60-1.4, 1.40, 1.41 and 1.42), and the filing of Standard Form 100 (EEO-1). Theranos certifies, in accordance with the requirements of 41 CFR Section 60-1.8), that its facilities for employees are not segregated. In addition, unless exempted by said regulations, Theranos shall comply with the applicable provisions of the Affirmative Action Clause for Workers with Disabilities (41 CFR Section 60-741.5), and for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR Section 60-250.5), which are also incorporated herein by reference.

p.  **Insurance.** Theranos will maintain at its expense the following insurance during the term of this Agreement:

(i)      Workers' Compensation in the statutory limits required by the state or states in which work is performed under this Agreement (including all/other states endorsement) and Employers' Liability with minimum limits of $1,000,000;

(ii)     Commercial General Liability with minimum limits of $2,000,000 per occurrence and $4,000,000 in the aggregate (to include bodily injury, property damage, products/completed operations, and contractual liability on a blanket basis for liability assumed hereunder); (iii)   Excess          liability insurance with minimum limits of $5,000,000 in the aggregate; and

(iv)     Professional Liability (errors & omissions) with minimum limits of $2,000,000.

q.  **Policy Requirements.**  . All policies will be primary and at Theranos' sole expense. Walgreens will be included as an additional insured on all coverage listed above with the exception of Workers' Compensation and Professional Liability. All policies will include provisions that the insurers waive the rights of recovery or subrogation against Walgreens. Insurance coverage will be in a form and carrier acceptable to Walgreens with a minimum A.M. Best rating of A-/IX or higher.  The insolvency, bankruptcy or failure of any insurance company shall not relieve Theranos of any of its obligations herein. Within fourteen (14) days of a request by Walgreens, Theranos shall provide certified copies of the actual policies of insurance including all endorsements and riders. If any of the above policies are written on a "claims-made" basis, Theranos shall (i) ensure that continuous coverage is maintained or an extended coverage period will be exercised for a period of not less than three (3) years beyond the expiration or termination of this Agreement; and (ii) in the event a "claims-made" policy is not renewed or replaced, ensure that such policy must have an extended reporting period of three (3) years.

r.  **Theranos Data Security Reviews.** Theranos will conduct its own periodic reviews or examinations of its data security procedures, consistent with prevailing industry good practices. If any such review or examination indicates  that the procedures have or are likely to fail, Theranos will promptly notify

Walgreens, providing pertinent details to the extent reasonable so that Walgreens can take steps to avoid or minimize the adverse impacts. Theranos will also take reasonable steps to correct the errors or problems as soon as reasonably possible or otherwise cooperate reasonably with Walgreens to resolve the situation. Furthermore, prior to and as a condition of Theranos bringing any hardware device onto Walgreen's premises to connect to Walgreen's internal computer network, Theranos shall provide Walgreens with a complete inventory of all such hardware devices, including manufacturer, model name and number, device type, and Media Access Control (MAC) address of each such device. Walgreens shall at all times have the right to physically inspect any hardware device that is or has been connected to Walgreen's internal computer network in order to ensure compliance with provision of this Section 24.r.

*[remainder of page intentionally left blank]*

### SCHEDULE C

### SUPPORT AND MAINTENANCE TERMS

**1.      Support and Maintenance: Hardware and Software.** Theranos and Walgreens will work together prior to Pilot initiation to cement the workflow around implementation of these Services.

**1.1      Client Services.**

Theranos, at its cost, will use commercially reasonable efforts to provide Walgreens Users 24x7 Hardware and Software support and maintenance. Support and maintenance services include, but are not limited to, use of and access to the Software and TheranOS, and associated enhancements and updates; on-demand, interactive services; and diagnosis of problems or issues associated with the Hardware or Software and resolution of verifiable problems. Theranos will designate a dedicated Client Solutions manager to Walgreens. The Client Solutions manager will be responsible for assisting in the management of Walgreens' support and maintenance requests. Support and maintenance services will be available by telephone, email, and via TheranOS Real-Time Support online. In responding to Walgreens' support inquiries, Theranos will use the guidelines set forth in this Schedule.

**1.2      Reactive Incident Management Guidelines.**

Theranos, at its cost, will or will direct a service provider to use commercially reasonable efforts to respond to Walgreens' inquiry on a same-day basis via email or phone. Each inquiry will be assigned a priority level (set forth below), and Service Provider will use commercially reasonable efforts to resolve the request in accordance with the associated timelines:

- **Priority 1** – Use of the Theranos System, as that term is defined in this Agreement, is severely impacted. Important features/critical functions are not available, or system freezes or crashes. These situations will be treated as emergencies; reasonable efforts are made to respond to Priority 1 service requests within one (1) hour. Client Solutions will work 24x7 with Walgreens until the issue is resolved or as long as useful progress can be made and fixes can be applied.

- **Priority 2** – Walgreens experiences a minor loss of service or request information, an enhancement, or documentation clarification but there is no impact on the operation of the Software. Reasonable efforts are made to respond to Priority 2 service requests within 3 business hours. Examples of Priority 2 support inquiries include: help with web portal access, and instructions on using the TheranOS features. Service Provider will use commercially reasonable efforts to update Walgreens via email or phone (if email is not available) on the status of the inquiry and resolution within one business day.

**3.      Deployment Services.**

At Walgreens' written request, as noted on a purchase order, Theranos, at its cost shall deploy and install the Devices on Walgreens' premises.

**4.      Training.**

Theranos and Walgreens will mutually agree upon the scope of training that Theranos will offer to Walgreens at no cost to Walgreens.

*[remainder of page left intentionally blank]*

## SCHEDULE D

## PRICING

Final Pricing for the Deliverables shall be agreed upon prior to the commencement of the pilot phase of the project.  At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted.  Pricing will not be finalized unless and until it is reduced to writing, and signed by an authorized representative(s) of each party.  Pursuant to Schedule B, paragraph 2, Theranos agrees that no United States retail pharmacy, grocer, or mass merchant will purchase Tests and Available Cartridges at lower prices than Walgreens.

**Routine Laboratory Tests (Version 1)**

List attached to end of Agreement

The parties acknowledge and agree that this list is subject to further additions.  Theranos will provide notice to Walgreens of such changes by sending an email to: (i) renaat.VanDenHooff@walgreens.com; and (ii) jay.rosan@walgreens.com

**Exclusions.**  The prices to be negotiated will not include costs and expenses Theranos will incur in performing the obligations outlined in this Agreement, which will be invoiced separately as incurred by Theranos.   These costs are limited to Theranos personnel travel and lodging and meals (including, to the extent requested by Walgreens, travel to all of Walgreens' sites where training will be conducted and Devices installed), and any incidental expenses.  Said travel costs shall be subject to Walgreens' Consultant Travel Policy, a copy of which has been provided to Theranos.

*[remainder of page intentionally left blank]*

## SCHEDULE E

## DEFINITIONS

Capitalized terms, as used within this Agreement, including any Schedule or attachment, have the following meanings, unless otherwise indicated:

1. **"Affiliate"** means any legal entity(ies) which is directly or indirectly controlled by or under common Control with a party or Controls a party to this Agreement but only so long as such control exists.

2. **"Assay"** means any method used for the detection of an analyte (e.g., a biomarker) or multiplexed set of analytes and/or measuring their concentration in a matrix, including, but not limited to, human blood.

3. **"Available Cartridges"** means First Generation Cartridges of Theranos Systems Versions 1, 2, and 3 defined as follows: Version 1 – all routine laboratory Tests; Version 2 – diagnostic (influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy) and all available esoteric Tests; Version 3 – predictive Tests, each a separate V3 Cartridge, (diabetes/pre-diabetes, congestive heart failure, women's cancer, men's cancer) and remaining esoteric Tests.

4. **"Calibration"** means processes and controls for optimizing the performance of the Theranos System which do not require running of any Tests that are not ordered tests.

5. **"Cartridge"** means Theranos' analytical chips containing biological fluid processing technology and Assays to measure, among other matters, the concentration of specific analytes, including biomarkers in a biological fluid sample.

6. **"Change of Control"** means (i) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

7. **"Client Accessible Software"** means Software related to the TheranOS which may be accessed through the Devices or at a designated website or IP address, disc, programs or other designated location ("Client Accessible Software").

8. **"Confidential Information"** means this Agreement, all information Discloser discloses to Recipient in connection with the performance of this Agreement. Confidential Information may not be marked as such at the time of disclosure and will still be considered Confidential Information so long as Discloser identified or designated the information as confidential at the time of disclosure (or like designation), or Discloser disclosed the information in circumstances of confidence, or the information would be understood by the parties exercising reasonable business judgment to be confidential. "Confidential Information" does not include information which: (a) is or becomes generally known through no fault of Recipient; (b) is known to Recipient without restriction on disclosure, at the time of disclosure, as evidenced by its records; (c) is hereafter furnished to Recipient by a third party as a matter of right and without restriction on disclosure; (d) is independently developed by Recipient without any breach of this Agreement or, (e) is otherwise necessary to establish rights or enforce obligations under this Agreement, but only to the extent that any such disclosure is necessary. Results and Reports shall be included in the definition of Theranos' Confidential Information, provided that such classification shall not reduce Walgreens' rights of use as described within this Agreement.

9. **"Control, Controls** or **Controlled"** mean owning or controlling directly or indirectly more than 50% of shares, partnership interests, membership shares, ownership interests or voting rights of such controlling or controlled entity.

10. **"Device"** means Theranos' reader capable of running Cartridges, extracting data from a Cartridge or other analytical device, transmitting data to a database hosted by Theranos, communicating with authorized parties and providing analytical information.

11. **"Deliverable"** means any Hardware, Software, Cartridge, Device, Theranos System, Support and Maintenance Services and/or training to be provided by Theranos to Walgreens under this Agreement.

12. "**Delivery Date**" means the date on which Theranos will ship the Cartridges to Walgreens, or otherwise make the Deliverable available to Walgreens at Theranos' manufacturing facilities.

13. "**Discloser**" means the party disclosing Confidential Information.

14. "**Documentation**" means user manuals and technical notes for the Theranos System regarding the use and maintenance of the Theranos System.

15. "**Existing Cartridges**" means, at any time, all Cartridges of Theranos Systems Versions 1, 2, and 3 defined as follows that have previously been made available to Walgreens: Version 1 -- all routine laboratory Tests; Version 2 – diagnostic (influenza/strep, pregnancy, fertility, pre-natal/trimester, STD, compliance, drug efficacy) and all available esoteric Tests; Version 3 – predictive Tests (diabetes/pre-diabetes, congestive heart failure, breast cancer, ovarian cancer, prostate cancer, colorectal cancer) and remaining esoteric Tests.

16. "**First Generation**" means the first product version of any Cartridge.

17. "**Hardware**" means equipment and hardware Theranos is to deliver pursuant to this Agreement.

18. "**Medication Compliance/Adherence**" means the act of conforming to the recommendations made by the clinician with respect to timing, dosage, and frequency of medication taking within the guidelines approved by the FDA or as set forth in that medication's labeling.

19. "**Medication Persistence**" means the duration of time from initiation to discontinuation of administration of medications.

20. "**MTM**" or "**Medication Therapy Management**" means services provided by Walgreens in order to help consumers get the best results from medications through enhancing consumer understanding of medication therapy, increasing consumer adherence to medications, controlling costs, and preventing drug complications, conflicts, and interactions.

21. "**Ordered Tests**" means Tests that were: (i) ordered or authorized by an Ordering Practitioner or other individual permitted under federal and state law to order clinical laboratory tests; and (ii) initiated by a Walgreens employee or agent by entering the Tests specified on the order into the Device.

22. "**Ordering Practitioner**" means a licensed physician, osteopathic physician, physician assistant, nurse practitioner, or any other health care professional who is authorized under federal and state law to order clinical laboratory tests and who ordered one or more Tests.

23. "**Payment Refund Obligation**" means the conditional obligation to refund the pre-purchase payments if the pilot is not successful.

24. "**Payment Refund Obligation Termination**" means the earlier of (i) the date on which the success criteria for the pilot have been satisfied, or (ii) the date on which Theranos has refunded the amounts due under the Payment Refund Obligation.

25. "**Pilot**" means the pilot program as set forth in Schedule F.

26. "**Processed Data**" means information generated by Theranos utilizing Theranos IP such as predictive modeling.

27. "**Program**" means the project outlined in Schedule A.

28. "**Recipient**" means the party receiving Confidential Information from Discloser.

29. "**Report(s)**" means the collective V1 Reports, V2 Results and V3 Results provided to Walgreens.

30. "**Representatives**" mean each party's employees, directors, officers, contractors, consultants, stockholders and agents.

31. "**Result(s)**" means the collective V1 Results, V2 Results, and V3 Results provided to Walgreens.

32. **"Services"** means all services related to the Cartridges, Tests, and Theranos System described in this Agreement including but not limited to the services described in Schedule B, Section 14 and Schedule C.

33. **"Software"** means computer programs, object code and related materials, in machine readable or printed form, including the TheranOS, and any updates or upgrades thereto. . The term **"Software"** also includes updates, enhancements and new versions delivered pursuant to this Agreement.

34. **"Support and Maintenance Services(s)"** means support and maintenance services that Theranos will may provide Walgreens, as more fully set forth in Schedule C.

35. **"Test"** means a) in the context of routine laboratory analyses: a combination of one or more Assays that match existing Current Procedural Terminology (CPT) codes for laboratory analyses as defined by the American Medical Association and that have been granted CLIA-waived status by FDA or b) in the context of diagnostic or predictive tests: a Cartridge, software program, information system or any other product necessary to perform a diagnostic or predictive test that has been granted CLIA-waived status by FDA.

36. **"TheranOS"** means Theranos' ambulatory bioinformatics communication system, database, analytical engine, algorithms and methodologies, web or device accessible Software, and related statistical and other analysis methods, data, data repositories and technologies.

37. **"Theranos Intellectual Property"** means all algorithms, analytical methodologies, data collection processes, software, hardware, Results, Reports, and Processed Data.

38. **"Theranos System"** means the system comprising the Assays, Cartridges, Device(s), and the TheranOS, and any other components developed by or for Theranos facilitating the operation of any of the foregoing, alone or in any combination.

39. **"V1 Results"** means the numerical outcome (raw data points) of a V1 laboratory Test originated at a Walgreens' Location.

40. **"V1 Report"** means the documentation provided to the ordering clinician and Walgreens for a laboratory test originated at a Walgreens Location. A Report for a V1 test is made up of the following three (3) components: (i) a V1 Result; (ii) trending information for that given patient and (iii) analysis, including, but not limited to, predictive modeling. .

41. **"V2 Report"** or **V3 Result"** means the documentation provided to the ordering clinician and Walgreens for a V2 or V3 test originated at a Walgreens Location. A V2 or V3 Result is made up of analysis only.

42. **"Walgreens"** means Walgreen Co. and its wholly owned subsidiaries.

43. **"Walgreens Location"** means a clinical or retail location including employer sites and academic research centers.

## SCHEDULE F
## PILOT

Theranos and Walgreens will enter into a written Pilot agreement on mutually acceptable terms. The terms of the Pilot agreement shall address the following objectives:

- Exceeding customer expectations for lab Services;
- Evaluating operating feasibility of delivering the Services within Walgreens locations;
- Evaluating the capacity/capability of supporting systems
- Measuring potential demand for the services to evaluate the potential for national expansion of the services within Walgreens locations and so that Walgreens assures itself that it will be able to utilize the $50 million purchase commitment within 360 days of completing the Pilot.
- Ensuring payors will pay for lab Tests and that A/R will be collected.

The Pilot agreement will include, but not be limited to, the following provisions:

- The Pilot will include all Version 1 tests as specified in Schedule B, Section 2 of the Agreement.
- The services will be offered in up to 90 stores with 30 stores offering service at least between the hours of 6 AM and 9 PM.
- The Pilot for store locations will commence no sooner than January 15, 2011, provided that the following three criteria must be met: (i) Theranos shall first obtain all necessary FDA approvals and CLIA waived status for the Theranos System including all Version 1 Tests; (ii) payor coverage that will be reasonably expected to produce the 15 patient average per day per store goal; and (iii) Theranos must show Walgreens, to its reasonable satisfaction, that the Theranos System is fully functional and operational, including, but not limited to, billing software necessary to support the Pilot markets, and that Theranos' ability to produce the Device and Cartridges is adequate to support reaching the 15 patient average per store per day goal. While the Parties intend the Pilot to start no sooner than January 15, 2011, the actual start date of the Pilot will be agreed upon and memorialized by the parties once these three (3) requirements are satisfied. The Services will be offered for a period of 90 days unless extended in writing upon mutual agreement of both parties if the success criteria below have not yet been met. At such time as Theranos has satisfied the above three (3) requirements, Theranos shall provide written notice to Walgreens of the same. Walgreens, shall either: (i) Commence the Pilot within forty-five (45) days of such notice; or (ii) inform Theranos in writing as to why it can not yet commence the Pilot. Both parties agree that they shall make commercially reasonable efforts to ensure that the Pilot will commence after January 15, 2011, but no later than June 30, 2011.
- The services will be offered in at least two (2) Employer Solutions Group ("ESG") locations. The Pilot for ESG locations will commence on a mutually agreeable date once Theranos obtains all necessary FDA approvals and CLIA waived status for the Theranos System including all Version 1 Tests, and acceptable terms are reached with the employers regarding reimbursement.
- Should Theranos fail to meet its requirements under this Schedule F prior to June 30, 2011, Walgreens shall have the option to terminate this Agreement pursuant to Schedule B, Section 23(c). Should Theranos comply with the requirements under this Schedule F and Walgreens fails to commence the Pilot, then Theranos shall have the option to terminate this Agreement.

The following criteria, among other criteria developed and agreed upon in writing by the parties, will be utilized to evaluate pilot success for purposes of Schedule B, Section 23(b) and 23(d)(i) of this Agreement. When the following criteria have been met, the pilot will be deemed successful. Both parties will confirm pilot success in writing and Walgreens will notify Theranos in writing of its intent to proceed with deployment at whatever pace Walgreens deems appropriate within thirty (30) calendar days from successful pilot completion:

- At the retail store level, Walgreens average gross profit per patient during the pilot timeframe shall exceed $10.00 per patient.
- At the retail store level for the last 30 days of the pilot, the average patients tested per store will exceed 15 patients.
- Other criteria mutually agreed to in writing by both parties prior to the commencement of the pilot.
- Theranos must demonstrate to Walgreens' reasonable satisfaction that it can produce devices to support 1,000 stores and 450,000 Cartridges per month within three (3) months after successful completion of the Pilot to support full roll out of the program post Pilot.
- Theranos and Walgreens mutually agree upon expansion criteria for nationwide roll out of the program post Pilot.

(Signature Page Follows)

**SCHEDULE G**
**HIPAA BUSINESS ASSOCIATE AGREEMENT**

TO COME.

**SCHEDULE H-1**
**CONVERTIBLE PROMISSORY NOTE**

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.   THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

**THERANOS, INC.**

**CONVERTIBLE PROMISSORY NOTE**

$25,000,000                                                                                              [DATE]

FOR VALUE RECEIVED, Theranos, Inc., a Delaware corporation (the "Company") promises to pay to Walgreen Co. ("Investor"), or its registered assigns, in lawful money of the United States of America the principal sum of Twenty-Five Million Dollars ($25,000,000), or such lesser amount as shall equal the outstanding principal amount hereof, together with interest from the date of this Convertible Promissory Note (this "Note") on the unpaid principal balance.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder, shall be due and payable on the Maturity Date (as defined below) in accordance with the terms hereof.  This Note is issued pursuant to that certain Master Purchase Agreement by and between the Company and Investor dated [_____] (the "Agreement"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

The following is a statement of the rights of Investor and the conditions to which this Note is subject, and to which Investor, by the acceptance of this Note, agrees:

1.      **Payments.**

(a)  Interest.  This Note shall bear interest at the rate of 0.79% per annum, which interest shall accrue annually.  Accrued interest on this Note shall be payable on the Maturity Date.

(b)  The "Maturity Date" shall be the earlier of:

   i.   the date of the Company's Initial Public Offering;

   ii.  the effective date of a Change of Control;

   iii. one hundred eighty (180) calendar days from the date of receipt by the Company of Investor's written demand for repayment of this Note pursuant to this Section 1(b)(iii), which demand may be made only if the Company does not meet the mutually agreed-upon success criteria for the Pilot set forth in Schedule F of the Agreement; or

   iv.  the date that is ten years after the date of the Note .

(c)  Voluntary Prepayment. Unless waived in writing by the Company, if the $100,000,000 purchase of Inventory is not fulfilled in accordance with Schedule B of the Agreement, or if the Company determines that the Pilot is not successful based upon the mutually agreed-upon success criteria in Schedule F of the Agreement, Company has the right to repay this Note without penalty, in whole or in part, plus any accrued and unpaid interest on the portion being prepaid, and Investor is obligated to accept full repayment of the Note within one hundred eighty (180) calendar days from the date of Company's written request.

2.      **Conversion.**

(a)    Optional Conversion. At any time prior to repayment by the Company of the Note, Investor may elect to convert the entire outstanding principal amount of this Note into fully paid and non-assessable shares of the Company's Series C-1 Preferred Stock at the Conversion Price. Investor's election to convert shall be evidenced by Investor's delivery to the Company of written notice of Investor's intention to convert. All accrued and unpaid interest on this Note shall be paid in full in cash and not in shares of capital stock upon the occurrence of a conversion pursuant to a Company Event. If Investor elects to convert the Note following receipt by Investor of notice of a Company event pursuant to Section 2(b) hereof and for any reason the Company Event described in any such notice does not occur, such election to convert by Investor shall be rescinded and shall be null and void.

(b)    Notice of Company Events.    The Company shall give written notice to Investor of the anticipated occurrence of any Company Event. Such written notice of the anticipated occurrence of a Company Event shall be given not less than fifteen (15) days and not more than thirty (30) days prior to the actual occurrence of a Company Event

(b)    Conversion Procedure.

      i.    <u>Conversion Pursuant to Section 2(a)</u>. Before Investor shall be entitled to convert this Note into shares of Series C-1 Preferred Stock, it shall surrender this Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) and give written notice to the Company at its principal corporate office of the election to convert the same pursuant to Section 2(a). Upon such conversion of this Note, the Company and the Investor hereby agree to execute and deliver to one another a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including, without limitation, the Amended and Restated Investors' Rights Agreement, the Amended and Restated Co-Sale Agreement and the Amended and Restated Voting Agreement). The Company shall, as soon as practicable thereafter, issue and deliver to such Investor a certificate or certificates for the number of shares to which Investor shall be entitled upon such conversion, including a check payable to Investor for any cash amounts payable as described in Section 2(c)(ii). Any conversion of this Note pursuant to Section 2(a) shall be deemed to be effective upon the earlier to occur of (i) the tenth day following the Company's receipt of Investor's written notice of its intention to convert, and (ii) immediately prior to the occurrence of the Company Event, and on and after such date the Persons entitled to receive the shares issuable upon such conversion shall be treated for all purposes as the record holder of such shares.

      ii.    <u>Fractional Shares; Interest; Effect of Conversion</u>. No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Investor upon the conversion of this Note, the Company shall pay to Investor an amount equal to the product obtained by multiplying the applicable conversion price by the fraction of a share not issued pursuant to the previous sentence. The Company shall pay to Investor any interest accrued on the amount converted and on the amount to be paid to Company pursuant to the previous sentence in cash and not in shares of capital stock upon the conversion of this Note. Upon conversion of this Note in full and the payment of the amounts specified in this paragraph, Company shall be forever released from all its obligations and liabilities under this Note and this Note shall be deemed of no further force or effect, whether or not the original of this Note has been delivered to the Company for cancellation.

3.      **Definitions.** As used in this Note, the following capitalized terms have the following meanings:

"Amended and Restated Co-Sale Agreement" shall mean that certain Amended and Restated Co-Sale Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Investors' Rights Agreement" shall mean that certain Amended and Restated Investors' Rights Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Amended and Restated Voting Agreement" shall mean that certain Amended and Restated Voting Agreement by and among the Company and the other signatories thereto dated as of July 1, 2010. as such agreement may be amended from time to time.

"Change of Control" shall mean (i) any reorganization, merger or consolidation of the Company (excluding any sale of stock for capital raising purposes), other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, as a result of shares in the Company held by such holders prior to such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity; (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company

"Company Event" shall mean the Company's Initial Public Offering, a Change of Control, a dissolution of the Company, other event of liquidation, declaration of a Series C-1 Dividend or other events agreed upon in writing by the Company.

"Conversion Price" shall mean $15.00 per share, as may be adjusted from time to time for stock splits, stock dividends or similar events with respect to the Series C-1 Preferred Stock.

"Initial Public Offering" shall mean the closing of the Company's first firm commitment underwritten initial public offering of the Company's Common Stock pursuant to a registration statement filed under the Securities Act.

"Investor" shall mean the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series C-1 Dividend" shall mean any dividend, whether in the form of cash, property or securities, payable or paid to the holders of the Company's Series C-1 Preferred Stock. For the avoidance of doubt, C-1 Dividends do not include any stock re-purchases.

4. **Investor Representations.** Investor represents and warrant to the Company as follows:

(a) Binding Obligation. Investor has full legal capacity, power and authority to execute and deliver this Note and to perform its obligations hereunder. This Note constitutes a valid and binding obligation of Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(b) Securities Law Compliance. Investor has been advised that the Note and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Investor is aware that the Company is under no obligation to effect any such registration with respect to the Note or the underlying securities or to file for or comply with any exemption from registration, except as may be provided in the Amended and Restated Investors' Rights Agreement. Investor has not been formed solely for the purpose of making this investment and is purchasing the Note for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor has such knowledge and experience in financial and business matters that Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time. Investor is an "accredited investor" as such term is defined in Rule 501 of Regulation D under the Securities Act and shall submit to the Company such further assurances of such status as may be reasonably requested by the Company. The principal place of business of Investor is correctly set forth beneath Investor's name on the signature page hereto.

5. **Miscellaneous.**

(a) Successors and Assigns; Transfer of this Note or Securities Issuable on Conversion Hereof.

    i. Subject to the restrictions on transfer described in this Section 5(a), the rights and obligations of the Company and Investor shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

    ii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, by the Investor to any legal entity or person, other than a wholly-owned direct or indirect subsidiary of Investor. In the event Investor intends to assign any rights, interests or obligations under this Note to a wholly-owned direct or indirect subsidiary, Investor shall give Company no less than thirty (30) calendar days' prior written notice.

    iii. Neither this Note nor any of the rights, interests or obligations hereunder may be assigned, by operation of law or otherwise, in whole or in part, by the Company without the prior written consent of the Investor.

(b) Waiver and Amendment. Any provision of this Note may be amended, waived or modified upon the written consent of the Company and the Investor.

(c) Notices. All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and faxed, mailed or delivered to each party at the respective addresses of the parties as set forth in the signature page to this Note. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service of recognized standing or (v) four days after being deposited in the U.S. mail, first class with postage prepaid.

(d) Payment. Unless converted into the Company's equity securities pursuant to the terms hereof, payment shall be made in lawful tender of the United States.

(e)  Governing Law.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(f)  Counterparts.  This Note may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Note.

The Company has caused this Note to be issued as of the date first written above.

THERANOS, INC.,
a Delaware corporation

By:_____
Name:_____
Its:_____

Acknowledged and accepted by Investor:
WALGREEN CO.

By:_____
Name:_____
Its:_____

**SCHEDULE H-2**
**CERTIFICATE EVIDENCING RIGHT TO PURCHASE CONVERTIBLE PROMISSORY NOTE**

[July 30], 2010

PURSUANT to Section 20 of that certain Master Purchase Agreement of even date herewith (the "**Agreement**"), by and between Walgreen Co. ("**Walgreens**") and Theranos, Inc. ("**Theranos**"), this Certificate evidences the right granted to Walgreens under the Agreement to purchase a convertible promissory note in the principal amount of $25 million in substantially the form set forth in Schedule H-1 of the Agreement (the "**Convertible Note**").

From the Effective Date (as defined in the Agreement) until the six (6)-month anniversary of the successful completion of the Pilot (as defined in the Agreement), Walgreens shall have the right to purchase the Convertible Note, subject to the terms of the Agreement, by countersigning this Certificate below.

THERANOS, INC.

By: _____

Name: _Elizabeth Holmes_

Title: _President & CEO_

*THE FOLLOWING IS TO BE EXECUTED ONLY UPON EXERCISE OF RIGHT TO PURCHASE NOTE:*

On this _____ day of _____, 201__, Walgreens hereby elects to purchase the Convertible Note pursuant to the terms of the Agreement, and tenders herewith the full purchase price of the Convertible Note.

WALGREEN CO.

By: _____

Name: _____

Title: _____

**SCHEDULE I**
**PROJECTIONS**

The parties agree and acknowledge that the information attached to this Schedule I is an estimation provided for informational purposes only.  Nothing in this Schedule I shall be binding and the information contained herein is subject to change , without notice.

**SCHEDULE J**
**THERANOS PHARMACEUTICAL CLINICAL TRIALS INFRASTRUCTURE**

Final terms for extending Theranos' clinical trials infrastructure to Walgreens' stores shall be agreed upon following execution of this Agreement.  At that time, this Schedule will be completed accordingly, and this Agreement amended, if warranted.



# Theranos Base Assay Library

| CPT | TestName | CMS Long Description |
|---|---|---|
| 82947 | assay, glucose, blood quant | Glucose; quantitative, blood (except reagent strip) |
| 82565 | creatinine (egfr) | Creatinine; blood |
| 84520 | urea nitrogen | Urea nitrogen; quantitative |
| 84132 | serum potassium | Potassium; serum, plasma or whole blood |
| 84460 | alanine amino (alt) (sgpt) | Transferase; alanine amino (ALT) (SGPT) |
| 82310 | calcium | Calcium; total |
| 84295 | serum sodium | Sodium; serum, plasma or whole blood |
| 82435 | blood chloride | Chloride; blood; serum/plasma |
| 84450 | transferase (ast) (sgot) | Transferase; aspartate amino (AST) (SGOT) |
| 82374 | assay, blood carbon dioxide | Carbon dioxide (bicarbonate), serum/plasma |
| 82040 | serum albumin | Albumin; serum, plasma or whole blood |
| 82247 | bilirubin, total | Bilirubin; total |
| 84075 | alkaline phosphatase | Phosphatase, alkaline; |
| 84155 | protein, serum | Protein, total, except by refractometry; serum, plasma or whole blood |
| 85018 | hemoglobin | Blood count; hemoglobin (Hgb) |
| 90006 | mean cell volume | |
| 90007 | mean corpuscular hemoglobin | |
| 90008 | mean corpuscular hemoglobin per cell | |
| 90011 | red cell distribution width | |
| 85014 | hematocrit | Blood count; hematocrit (Hct) |
| 85041 | automated rbc count | Blood count; red blood cell (RBC), automated |
| 85045 | automated reticulocyte count | Blood count; reticulocyte, automated |

THERANOS CONFIDENTIAL



| 85048 | automated leukocyte count | Blood count; leukocyte (WBC), automated |
| 90003 | basophils | |
| 90004 | eosinophils | |
| 90005 | lymphocytes | |
| 90009 | monocytes | |
| 90010 | neutrophils | |
| 85049 | automated platelet count | Blood count; platelet, automated |
| 83051 | plasma hemoglobin | Hemoglobin; plasma |
| 84478 | triglycerides | Triglycerides |
| 82465 | assay, bld/serum cholesterol | Cholesterol, serum or whole blood, total |
| 83718 | lipoprotein | Lipoprotein, direct measurement; high density cholesterol (HDL cholesterol) |
| 84443 | thyroid stim hormone | Thyroid stimulating hormone (TSH) |
| 84156 | protein, urine | Protein, total, except by refractometry; urine |
| 82340 | calcium in urine | Calcium; urine quantitative, timed specimen |
| 82042 | urine albumin | Albumin; urine or other source, quantitative, each specimen |
| 82436 | urine chloride | Chloride; urine |
| 83069 | urine hemoglobin | Hemoglobin; urine |
| 84578 | urine urobilinogen | Urobilinogen, urine; qualitative |
| 84583 | urine urobilinogen | Urobilinogen, urine; semiquantitative |
| 83036 | glycosylated hemoglobin | Hemoglobin; glycosylated (A1C) |
| 84153 | psa, total | Prostate specific antigen (PSA); total |
| 84439 | free thyroxine | Thyroxine; free |
| 82248 | bilirubin, direct | Bilirubin; direct |
| 85610 | prothrombin time | Prothrombin time; |
| 82306 | vitamin d, 25 hydroxy | Vitamin D; 25 hydroxy, includes fraction(s), if performed |



theranos™
redefining healthcare

| 85652 | rbc sed rate, automated | Sedimentation rate, erythrocyte; automated |
|---|---|---|
| 87491 | chylmd trach, dna, amp probe | Infectious agent detection by nucleic acid (DNA or RNA); Chlamydia trachomatis, amplified probe technique |
| 87591 | n.gonorrhoeae, dna, amp prob | Infectious agent detection by nucleic acid (DNA or RNA); Neisseria gonorrhoeae, amplified probe technique |
| 84436 | total thyroxine | Thyroxine; total |
| 80101 | drug screen, single | Drug screen, qualitative; single drug class method (eg, immunoassay, enzyme assay), each drug class |
| 85027 | complete cbc, automated | Blood count; complete (CBC), automated (Hgb, Hct, RBC, WBC and platelet count) |
| 84550 | blood/uric acid | Uric acid; blood |
| 82570 | urine creatinine | Creatinine; other source |
| 82043 | microalbumin, quantitative | Albumin; urine, microalbumin, quantitative |
| 83540 | iron | Iron |
| 87340 | hepatitis b surface ag, eia | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; hepatitis B surface antigen (HBsAg) |
| 86592 | syphilis non-trep qual | Syphilis test, non-treponemal antibody; qualitative (eg, VDRL, RPR, ART) |
| 86703 | hiv-1/hiv-2, single | Antibody; HIV-1 and HIV-2, single assay |
| 82607 | vitamin b-12 | Cyanocobalamin (Vitamin B-12); |
| 86140 | c-reactive protein | C-reactive protein; |
| 84479 | thyroid (t3 or t4) | Thyroid hormone (T3 or T4) uptake or thyroid hormone binding ratio (THBR) |
| 82728 | ferritin | Ferritin |
| 84403 | total testosterone | Testosterone; total |
| 86038 | antinuclear antibodies | Antinuclear antibodies (ANA); |
| 83550 | iron binding | Iron binding capacity |
| 84100 | phosphorus | Phosphorus inorganic (phosphate); |
| 86803 | hepatitis c ab | Hepatitis C antibody; |
| 82550 | ck (cpk) | Creatine kinase (CK), (CPK); total |
| 83001 | gonadotropin (fsh) | Gonadotropin; follicle stimulating hormone (FSH) |



*theranos*™
*redefining healthcare*

| 84702 | chorionic gonadotropin | Gonadotropin, chorionic (hCG); quantitative |
| 83615 | lactate dehydrogenase (ld) (ldh) enzyme | Lactate dehydrogenase (LD), (LDH); |
| 82784 | assay, iga/igd/igg/igm each | Gammaglobulin (immunoglobulin); IgA, IgD, IgG, IgM, each |
| 82746 | blood folic acid serum | Folic acid; serum |
| 82977 | ggt | Glutamyltransferase, gamma (GGT) |
| 86431 | rheumatoid factor, quant | Rheumatoid factor; quantitative |
| 84480 | assay, triiodothyronine (t3) | Triiodothyronine T3; total (TT-3) |
| 86235 | nuclear antigen antibody | Extractable nuclear antigen, antibody to, any method (eg, nRNP, SS-A, SS-B, Sm, RNP, Sc170, J01), each antibody |
| 84481 | free  (ft-3) | Triiodothyronine T3; free |
| 83735 | magnesium | Magnesium |
| 86901 | blood typing, rh (d) | Blood typing; Rh (D) |
| 86900 | blood typing, abo | Blood typing; ABO |
| 86762 | rubella antibody | Antibody; rubella |
| 86850 | rbc antibody screen | Antibody screen, RBC, each serum technique |
| 83002 | gonadotropin (lh) | Gonadotropin; luteinizing hormone (LH) |
| 82670 | estradiol | Estradiol |
| 85730 | thromboplastin time, partial | Thromboplastin time, partial (PTT); plasma or whole blood |
| 86677 | helicobacter pylori ab, iga | Antibody; Helicobacter pylori |
| 86705 | hep b core antibody, igm | Hepatitis B core antibody (HBcAb); IgM antibody |
| 84146 | prolactin | Prolactin |
| 86709 | hep a antibody, igm | Hepatitis A antibody (HAAb); IgM antibody |
| 84402 | testosterone | Testosterone; free |
| 84144 | progesterone | Progesterone |
| 82150 | amylase | Amylase |
| 83690 | lipase | Lipase |

THERANOS CONFIDENTIAL



| | | |
|---|---|---|
| 82105 | alpha-fetoprotein, serum | Alpha-fetoprotein (AFP); serum |
| 86336 | inhibin A or B | Inhibin A |
| 86376 | microsomal antibody | Microsomal antibodies (eg, thyroid or liver-kidney), each |
| 83970 | parathormone | Parathormone (parathyroid hormone) |
| 86706 | hep b surface antibody | Hepatitis B surface antibody (HBsAb) |
| 86160 | complement, antigen | Complement; antigen, each component |
| 86665 | epstein-barr antibody | Antibody; Epstein-Barr (EB) virus, viral capsid (VCA) |
| 83525 | insulin | Insulin; total |
| 86696 | herpes simplex type 2 | Antibody; herpes simplex, type 2 |
| 86618 | lyme disease antibody | Antibody; Borrelia burgdorferi (Lyme disease) |
| 86617 | lyme disease antibody | Antibody; Borrelia burgdorferi (Lyme disease) confirmatory test (eg, Western Blot or immunoblot) |
| 86800 | thyroglobulin antibody | Thyroglobulin antibody |
| 82785 | ige | Gammaglobulin (immunoglobulin); IgE |
| 86695 | herpes simplex | Antibody; herpes simplex, type 1 |
| 87536 | hiv-1, dna, quant | Infectious agent detection by nucleic acid (DNA or RNA); HIV-1, quantification |
| 86304 | immunoassay, tumor, ca 125 | Immunoassay for tumor antigen, quantitative; CA 125 |
| 86300 | immunoassay, tumor, ca 15-3 | Immunoassay for tumor antigen, quantitative; CA 15-3 (27.29) |
| 82627 | dehydroepiandrosterone sulfate (dheas) | Dehydroepiandrosterone-sulfate (DHEA-S) |
| 83721 | blood lipoprotein | Lipoprotein, direct measurement; LDL cholesterol |
| 87480 | candida, dna, dir probe | Infectious agent detection by nucleic acid (DNA or RNA); Candida species, direct probe technique |
| 87510 | gardner vag, dna, dir probe | Infectious agent detection by nucleic acid (DNA or RNA); Gardnerella vaginalis, direct probe technique |
| 87660 | trichomonas vagin, dir probe | Infectious agent detection by nucleic acid (DNA or RNA); Trichomonas vaginalis, direct probe technique |
| 82533 | total cortisol | Cortisol; total |
| 86225 | dna antibody | Deoxyribonucleic acid (DNA) antibody; native or double stranded |
| 86200 | ccp antibody | Cyclic citrullinated peptide (CCP), antibody |



| | | |
|---|---|---|
| 86308 | **heterophile antibodies** | Heterophile antibodies; screening |
| 82272 | **occult bld feces, 1-3 tests** | Blood, occult, by peroxidase activity (eg, guaiac), qualitative, feces, 1-3 simultaneous determinations, performed for other than colorectal neoplasm screening |
| 83090 | **homocystine** | Homocysteine |
| 86787 | **varicella-zoster antibody** | Antibody; varicella-zoster |
| 86708 | **hep a antibody, total** | Hepatitis A antibody (HAAb); total |
| 82652 | **vit d 1, 25-dihydroxy** | Vitamin D; 1, 25 dihydroxy, includes fraction(s), if performed |
| 86704 | **hep b core antibody, total** | Hepatitis B core antibody (HBcAb); total |
| 82378 | **carcinoembryonic antigen** | Carcinoembryonic antigen (CEA) |
| 86360 | **t cell, absolute count/ratio** | T cells; absolute CD4 and CD8 count, including ratio |
| 87324 | **clostridium ag, eia** | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; Clostridium difficile toxin(s) |
| 86147 | **cardiolipin antibody** | Cardiolipin (phospholipid) antibody, each Ig class |
| 82677 | **estriol** | Estriol |
| 86664 | **epstein-barr antibody** | Antibody; Epstein-Barr (EB) virus, nuclear antigen (EBNA) |
| 84270 | **sex hormone globul** | Sex hormone binding globulin (SHBG) |
| 87329 | **giardia ag, eia** | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; giardia |
| 83013 | **h pylori (c-13), breath** | Helicobacter pylori; breath test analysis for urease activity, non-radioactive isotope (eg, C-13) |
| 87400 | **influenza a/b, ag, eia** | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; Influenza, A or B, each |
| 86021 | **wbc antibody identification** | Antibody identification; leukocyte antibodies |
| 87522 | **hepatitis c, rna, quant** | Infectious agent detection by nucleic acid (DNA or RNA); hepatitis C, quantification |
| 86694 | **herpes simplex** | Antibody; herpes simplex, non-specific type test |
| 80164 | **assay, dipropylacetic acid** | Dipropylacetic acid (valproic acid) |
| 83921 | **organic acid,  single, quant** | Organic acid, single, quantitative |
| 86039 | **antinuclear antibodies (ana)** | Antinuclear antibodies (ANA); titer |



| | | |
|---|---|---|
| 86361 | t cell, absolute count | T cells; absolute CD4 count |
| 82787 | igg 1, 2, 3 or 4, each | Gammaglobulin (immunoglobulin); immunoglobulin subclasses (eg, IgG1, 2, 3, or 4), each |
| 84482 | t3 reverse | Triiodothyronine T3; reverse |
| 87255 | genet virus isolate, hsv | Virus isolation; including identification by non-immunologic method, other than by cytopathic effect (eg, virus specific enzymatic activity) |
| 83880 | natriuretic peptide | Natriuretic peptide |
| 87427 | shiga-like toxin ag, eia | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; Shiga-like toxin |
| 86359 | t cells, total count | T cells; total count |
| 80156 | assay, carbamazepine, total | Carbamazepine; total |
| 80185 | phenytoin, total | Phenytoin; total |
| 87350 | hepatitis be ag, eia | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; hepatitis Be antigen (HBeAg) |
| 89055 | leukocyte assessment, fecal | Leukocyte assessment, fecal, qualitative or semiquantitative |
| 86747 | parvovirus antibody | Antibody; parvovirus |
| 87517 | hepatitis b, dna, quant | Infectious agent detection by nucleic acid (DNA or RNA); hepatitis B virus, quantification |
| 80162 | digoxin | Digoxin |
| 82232 | beta-2 protein | Beta-2 microglobulin |
| 82390 | ceruloplasmin | Ceruloplasmin |
| 84681 | c-peptide | C-peptide |
| 86060 | antistreptolysin o, titer | Antistreptolysin 0; titer |
| 80178 | lithium | Lithium |
| 84154 | psa, free | Prostate specific antigen (PSA); free |
| 86631 | chlamydia antibody | Antibody; Chlamydia |
| 86707 | hep be antibody | Hepatitis Be antibody (HBeAb) |
| 80197 | tacrolimus | Tacrolimus |
| 85660 | rbc sickle cell | Sickling of RBC, reduction |



| 85613 | russell viper venom, diluted | Russell viper venom time (includes venom); diluted |
|---|---|---|
| 86146 | glycoprotein antibody | Beta 2 Glycoprotein I antibody, each |
| 82085 | aldolase | Aldolase |
| 84305 | somatomedin | Somatomedin |
| 86663 | epstein-barr antibody | Antibody; Epstein-Barr (EB) virus, early antigen (EA) |
| 86765 | rubeola antibody | Antibody; rubeola |
| 82523 | collagen crosslinks | Collagen cross links, any method |
| 86735 | mumps antibody | Antibody; mumps |
| 87338 | hpylori, stool, eia | Infectious agent antigen detection by enzyme immunoassay technique, qualitative or semiquantitative, multiple-step method; Helicobacter pylori, stool |
| 80158 | cyclosporine | Cyclosporine |
| 83010 | haptoglobin, quant | Haptoglobin; quantitative |
| 83925 | opiates | Opiate(s), drug and metabolites, each procedure |
| 84425 | vitamin b-1 | Thiamine (Vitamin B-1) |
| 86615 | bordetella antibody | Antibody; Bordetella |
| 86812 | hla typing, a, b, or c | HLA typing; A, B, or C (eg, A10, B7, B27), single antigen |
| 87902 | genotype, dna, hepatitis c | Infectious agent genotype analysis by nucleic acid (DNA or RNA); Hepatitis C virus |
| 82024 | acth | Adrenocorticotropic hormone (ACTH) |
| 82140 | ammonia | Ammonia |
| 84445 | tsi | Thyroid stimulating immune globulins (TSI) |
| 85306 | Clotting inhibitors or anticoagulants; protein S, free | Clotting inhibitors or anticoagulants; protein S, free |
| 86644 | cmv antibody | Antibody; cytomegalovirus (CMV) |
| 86671 | fungus antibody | Antibody; fungus, not elsewhere specified |
| 82164 | angiotensin i enzyme | Angiotensin I - converting enzyme (ACE) |
| 84432 | thyroglobulin | Thyroglobulin |

# Exhibit D

December 31, 2013


Theranos, Inc.
Attn: Elizabeth Holmes
1601 S. California Avenue
Palo Alto, CA 94304

Re:    Amended and Restated Theranos Master Services Agreement

Dear Ms. Holmes:

In reference to that certain Amended and Restated Theranos Master Services Agreement dated June 5, 2012, as amended by that letter agreement dated January 7, 2013 (collectively "Agreement"), by and between Theranos, Inc. ("Theranos"), and Walgreen Co. ("Walgreens"), the parties agree that it is necessary to revisit certain terms contained within the Agreement as the intentions of the parties regarding their business relationship have evolved since the Agreement was first executed.

It is the intention of the parties to develop a mutually beneficial strategic relationship that facilitates the successful deployment of Theranos nationally, establishes Walgreens as the national partner for  laboratory services that Theranos is able to provide (the "Theranos Services"), and Theranos as Walgreens national partner for such Theranos Services, and protects the long-term strategic and competitive positioning of Theranos and Walgreens with respect to competitive technologies and services.  Assuming appropriate coverage, quality and performance by Walgreens, it is the expectation that Walgreens will be Theranos' exclusive retail pharmacy and clinic partner.    Assuming the ability to scale, acceptable quality and performance by Theranos, it is the expectation that Theranos will be Walgreens exclusive partner for the Services.   The parties understand that this relationship may evolve, and their business relationship may change over time as a result of industry developments, competitive dynamics, regulations, technological advances, consumer acceptance, Theranos' desired store and patient experience, and other factors.  The parties also understand that their economic relationship will similarly evolve, and as the market roll-out advances the capital investments, costs of healthcare professionals, marketing expense and Walgreens service fees related to new markets will be adjusted based on requirements existing at the time.   The parties intend that this Agreement be structured in a manner that provides flexibility but also commits both parties to each other as "anchor" partners and provides adequate protections to justify the significant investment that both are expecting to make in reliance on their strategic relationship.

To that end, the parties agree to the following:

1

1.    **National Roll-out; New Market Entry**. The parties shall work together to develop a forecast that details the anticipated roll-out dates for Theranos Services in individual U.S. States/territories (each, a "State").  The parties are committed to taking all steps reasonably necessary to ensure a successful national roll-out of the Theranos Services, and agree that a quality store and patient experience is an important component of this success as patient adoption and acceptance of Theranos' laboratory services will be highly impacted by the patient experience.  To that end, the parties agree that, within sixty (60) days prior to entering a new State, they will develop a plan (the "New Market Entry Plan") that sets forth the material terms that will govern the parties' expectations as it relates to that new State.  The New Market Entry Plan will describe the required coverage for Theranos within that State (i.e., how many outlets are required to serve patients within that market), the expectations regarding how to provide that coverage, including expected Geo-access and Branding Acceptability (and, whether the market will be exclusive [as further described below], specifically which Walgreens locations will be utilized and any non-Walgreens locations), expected mix of Walgreens store formats (i.e., Gold, Silver, Bronze) and associated capital investments, required health care professionals, marketing expenses, and similar items.  The New Market Entry Plan will also include the expected allocation of costs among the parties, and the economic relationship that will exist between them as it relates to that new State (i.e., Walgreens' service fee).

2.    **Exclusivity**.  As detailed below, Walgreens is willing to commit to a higher level of build out with respect to its stores in order to provide Services to Theranos. The parties' expectation is that the majority of Theranos spaces will be gold or silver spaces with no more than 20% bronze spaces and minimum 40% gold spaces. As such, the parties agree that increased exclusivity represents a fair market value exchange for such commitment. While the parties acknowledge the need to further document specifics concerning each party's performance, Branding Acceptability and Geo-access of Walgreens stores in respective markets, the parties agree to the following:

a.   In addition to the exclusivity provisions, and subject to the carve-outs related to pharmaceutical companies and United States and foreign government agencies, in Schedule B, Section 3(b) of the Agreement, with respect to California, Arizona and New York, the parties agree to the following exclusivity framework:  For each state listed above, a period of eighteen (18) months commencing on the date on which 20 Walgreens stores (or other number the parties may agree) located such state  are actively collecting samples for commercial patients, Theranos shall not provide testing services or have samples collected on its behalf through or at any of the following entities:  Wal-Mart Stores, Inc., CVS Caremark Corporation, Rite Aid Corporation, and Target Corporation.   Provided that Walgreens satisfies mutually agreed upon requirements regarding Geo-access, Branding Acceptability, and Walgreens performance, the parties will conduct an annual exclusivity extension review, with the presumption being that if Walgreens has satisfied the Geo-access, Branding Acceptability, and performance

requirements, the parties will negotiate to extend the above exclusivity framework for an additional twelve (12) month period.

b. In connection with developing the New Market Entry Plan and at least sixty (60) days prior to the planned launch date for such State, the parties shall discuss and agree on Walgreens's proposed Geo-access and Branding Acceptability for such State and Walgreens's performance to date.  Should Walgreens (a) elect to move forward with such State, (b) satisfy the Geo-access and Branding Acceptability negotiations for such State and (c) satisfy Theranos' reasonable expectations as to Walgreens's performance to date (consistent with the intention of the parties described above), the parties agree that the following exclusivity (subject to the carve-outs related to pharmaceutical companies and United States and foreign government agencies in Schedule B, Section 3(b) of the Agreement) shall apply with respect to each State: for a period of twelve (12) months commencing on the date on which the first Walgreens location in such State actively collects samples for commercial patients, Theranos shall not launch testing services or have samples collected on its behalf through or at locations owned or operated by CVS Caremark Corporation, Rite Aid Corporation or Target Corporation.

c. Theranos further agrees that it shall not launch testing services or have samples collected on its behalf through or at locations owned or operated by Wal-Mart at any time during 2014, except with Walgreens approval if needed to fill gaps in Walgreens coverage.  After 2014, Theranos will have discretion to launch testing services or have samples collected on its behalf through or at locations owned or operated by Wal-Mart if, after good faith discussions with Walgreens, Theranos believes it is necessary to do so to advance Theranos' business or strategic objectives. For the avoidance of doubt, after 2014, such decision will be made in Theranos' sole discretion.

d. Notwithstanding anything to the contrary, Theranos agrees that it shall not, without Walgreens prior written consent, offer services or collect samples through CVS Caremark Corporation's Minute Clinics, or their equivalent in exclusive Walgreens markets. In the event Theranos desires to utilize such clinics in non-exclusive Walgreens markets it will inform Walgreens in advance and review their rationale for doing so, and consider reasonable alternatives that Walgreens may advance.  Theranos further agrees to discuss with Walgreens the inclusion of Walgreens in-store and employer worksite clinics in the national roll-out, as may be appropriate.

e. Definitions.

   i. "Geo-access" shall include, but not be limited to, access to a store location within an acceptable mileage from every person in the relevant State (e.g., for urban markets, 5 miles from every household) and ability for individual stores and at a market level to handle the volume of patients.  Further the parties shall work together in order to determine what other factors need to be considered in order to

3

determine what saturation level of sample collection locations are necessary to satisfy a market's particular needs.

ii.   "Branding Acceptability" shall include, but not be limited to, (i) the in-store patient experience and percentage of Gold, Silver and Bronze locations (with such designations being generally consistent with the parties discussions to date, and final commitments to be agreed upon in writing as part of the New Market Entry Plan) built out by Walgreens in the relevant State, (ii) prominent display of the Theranos wordmark, and the Theranos space within Walgreens locations. The parties shall take reasonable steps to work together in order to come to agreement in writing on these details/terms.

3.   **Innovation Fee**.   As detailed in Section 6 of Schedule B of the Agreement, Walgreens is to make an Innovation Fee payment of up to $100 million to Theranos. The parties acknowledge that in order to be better prepared for national roll-out of Theranos laboratory testing, there is a need to accelerate the Innovation Fee payment schedule. To that end (and subject to Section 7 below), the parties have agreed that Walgreens shall accelerate payment of the Innovation Fee so that $75M of the pre-purchase will become immediately due and payable at the close of business on 12/31/2013, and Walgreens commits to wire immediately available funds in such amount within five (5) business days after the date hereof to an account designated by Theranos.

3.   **Service Levels/Training**. The parties agree that it is necessary to document their respective responsibilities and expectations with respect to performance and to training, among other items. In a separate document, the parties shall reduce to writing tangible performance levels with respect to all activities addressed under the Agreement as it relates to providing laboratory services to patients.

5.   **Pricing**. Schedule B, Section 11 of the Agreement provides that the Pricing for Walgreens Services shall, on average, fall within a range of $10.00-$16.00/patient/visit. Walgreens has conducted a fair market value assessment of the Walgreens Services and the parties agree that the Pricing shall be $10.00/patient/visit during the Pilot. The parties shall further discuss and agree upon Pricing beyond the Pilot as part of the New Market Entry Plan.

6.   With respect to Schedule F of the Agreement, the parties agree to the following terms with respect to the Pilot:

i.    The "Pilot Stores" mean the stores mutually agreed upon by the parties as pilot locations.

ii.   The parties soft launched the Pilot by first offering Tests at three (3) stores, with two in the Phoenix market and one in Palo Alto. The Pilot will run for a period of ninety (90) days after the last of the 20 Walgreens stores is actively collecting samples for commercial patients.

iii.     Notwithstanding anything to the contrary, should the parties agree that the Pilot is successful prior to the end of the ninety (90) day period, the parties may move onto the national roll-out launch planning phase as detailed in Schedule F and end the Pilot early.

7.     **Additional Equity Rights**.  The parties agree that $50M of the $75M payment made by Walgreens pursuant to Section 3 above may be converted, at Walgreens option, into equity on such terms as are made available to investors in Theranos' planned equity financing in the first quarter of 2014.  The parties also agree that upon signing this Agreement, Walgreens will receive an option to purchase up to $50M in Theranos equity on the terms made available to investors who invested in the prior equity financing (e.g., $15/share).  Paperwork associated with these additional equity rights will be drafted by Theranos and delivered to Walgreens within 30 days of the date of this Agreement.

8.     **Good Faith Efforts**. The parties shall use good faith efforts to ensure that the intentions stated above are realized.  In order to enable the parties to open new markets as efficiently as possible, the parties agree that their teams will, within 90 days of the date of this Agreement, develop a short-form agreement that will include all terms required to convert a New Market Entry Plan into a binding agreement between the parties, and the terms governing exclusivity within the relevant State.  For the same reasons, as well as to provide as much certainty to the parties as possible regarding their expectations, these teams will define in writing what constitutes acceptable Geo-access and Branding Acceptability and Walgreens performance objectives before December 31, 2014.

9.     All other provisions of said Agreement shall remain in full force and effect.

Please indicate your agreement with the above by signing and returning one fully executed counterpart of this letter agreement to Greg Kunstman. If you have any questions, Mr. Kunstman may be reached at 847.315.4118.

Very truly yours,

Agreed to and accepted this 31 day of December, 2013 by:

WALGREEN CO.

THERANOS, INC.

By: _Mark Vainisi_
Name: _Mark E. Vainisi_
Title: _Group Vice President, MA_

By: _____
Name: ____Elizabeth Holmes____
Title: ____CEO____

6