**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WALGREEN CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 16-1040-SLR |
| v. | ) | |
| | ) | |
| THERANOS, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF WALGREEN CO.'S RESPONSE**
**IN OPPOSITION TO DEFENDANT THERANOS INC.'S MOTION TO DISMISS**

OF COUNSEL:

David A. Gordon
Kristen R. Seeger
Lawrence P. Fogel
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

Dated:  February 6, 2017
1244671

Kevin R. Shannon (#3137)
Arthur L. Dent (#2491)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(312) 984-6000
kshannon@potteranderson.com
adent@potteranderson.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................3

    Theranos's Finger-Stick Technology.................................................................3

    The Master Services Agreement Between Theranos and Walgreens ...................3

    Walgreens Learns of Severe Quality Control Issues at Theranos's Labs and that
    Theranos is Not Using its Own Technology, and Subsequently Terminates
    the Agreement ....................................................................................................5

ARGUMENT ..................................................................................................................7

    I.     WALGREENS IS ENTITLED TO REPAYMENT OF THE $40 MILLION ........7

          A.     The Note is inseparable from the remainder of the MSA. ...........................7

          B.     Walgreens has standing to recover the $40 million paid for the Note.........9

          C.     Walgreens may seek recovery of all of its damages, including the $40
                million. .................................................................................................12

          D.     Walgreens stands willing to add WVC as a party, if necessary.................14

    II.    WALGREENS HAS SUFFICIENTLY ALLEGED THERANOS
          BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND
          FAIR DEALING.................................................................................................14

          A.     Walgreens was not obligated to provide notice and
                opportunity to cure for its implied covenant claim, and
                therefore termination was proper. .............................................................15

          B.     Walgreens has sufficiently alleged Theranos breached
                the implied covenant of good faith and fair dealing for
                failing to perform finger-stick blood draws. .............................................17

CONCLUSION................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Allen v. El Paso Pipeline GP Co.*,
　　113 A.3d 167 (Del. Ch. 2014)...................................................................................20

*Anderson v. Wachovia Mortg. Corp.*,
　　497 F. Supp. 2d 572 (D. Del. 2007).....................................................................13, 17

*Blaustein v. Lord Balt. Capital Corp.*,
　　84 A.3d 954 (Del. 2014) ...........................................................................................20

*Carco Grp., Inc. v. Maconachy*,
　　644 F. Supp. 2d 218 (E.D.N.Y. 2009), *rev'd on other grounds*, 383 F. App'x
　　73 (2d Cir. 2010)..................................................................................................12, 15

*Cornell Glasgow LLC v. La Grange Props., LLC*,
　　No. N11C-07-160-JRS CCLD, 2012 WL 6840625 (Del. Sup. Ct. Dec. 7,
　　2012) .........................................................................................................................16

*Dunlap v. State Farm Fire & Cas. Co.*,
　　878 A.2d 434 (Del. 2005) ..........................................................................................20

*Gerbitz v. ING Bank, FSB*,
　　967 F. Supp. 2d 1072 (D. Del. 2013)........................................................................19

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
　　817 A.2d 160 (Del. 2002) .....................................................................................15, 16

*Insituform of N. Am., Inc. v. Chandler*,
　　534 A.2d 257 (Del. Ch. 1987)...................................................................................10

*Kroblin Refrigerated Xpress, Inc. v. Pitterich*,
　　805 F.2d 96 (3d Cir. 1986)......................................................................................8, 9

*Lola Cars, Int'l Ltd. v. Krohn Racing, LLC*,
　　No. 4479-VCN, 2010 WL 3314484 (Del. Ch. Aug. 2, 2010)..................................16

*Mobil Oil Expl. & Producing Southeast, Inc. v. United States*,
　　530 U.S. 604 (2000)...................................................................................................13

*Nemec v. Shrader*,
　　991 A.2d 1120 (Del. 2010) ........................................................................................20

*In re Philip Servs. (Del.), Inc.*,
　　284 B.R. 541 (Bankr. D. Del. 2002) .......................................................................8, 9

*In re Resorts Int'l, Inc.*,
   199 B.R. 113 (Bankr. D. N.J. 1996) ......................................................................8

*Segovia v. Equities First Holdings, LLC*,
   No. 06C-09-149-JRS, 2008 WL 2251218 (Del. Sup. Ct. May 30, 2008)..............................13

*Simon v. Navellier Series Fund*,
   No. 17734, 2000 WL 1597890 (Del. Ch. Oct. 19, 2000)...........................................9

*U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*,
   No. Civ.A. 112-N, 2004 WL 1699057 (Del. Ch. July 29, 2004)...........................................16

*UD Tech. Corp. v. Phenomenex, Inc.*,
   No. 05-842-GMS, 2007 WL 28295 (D. Del. Jan. 4, 2007) ...................................................10

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
   901 A.2d 106 (Del. 2006) ....................................................................................17

**Other Authorities**

17 C.F.R. § 230.501(a)(3) ................................................................................11

17 Am. Jur. 2d Contracts § 706 (2d ed.) .....................................................................13

11 Williston on Contracts § 30:26 (4th ed.) .................................................................9

## INTRODUCTION

Plaintiff Walgreen Co. ("Walgreens") and Defendant Theranos, Inc. ("Theranos") made a deal for Theranos to provide "disruptive" blood testing in select Walgreens stores. That deal was memorialized in an Amended and Restated Theranos Master Services Agreement (the "Agreement" or "MSA"), attached as Exhibit A to the Complaint (D.I. 2, "Complaint" or "Cmplt."). The MSA, considered in its entirety, fully supports each of Walgreens' claims.

The Agreement begins with a single page, which makes clear that it is "comprised of" several schedules, which collectively define the rights and obligations of the parties. It includes Schedule A, a Program Overview that describes the purpose of the Agreement, including for Theranos to "[m]ake testing less invasive, faster and far more accessible, effective, and actionable by introducing a more cost-effective, blood testing service at Walgreens stores . . . ." MSA, Sch. A ¶ 2(a). It includes Schedule B, a set of Service Terms and Conditions, which, among other things, obligates Theranos to provide its services in accordance with "that level of care and skill ordinarily exercised by other professional companies or [sic] a similar size and in similar circumstances" *and* "in compliance in all material respects with all applicable laws." *Id.*, Sch. B ¶ 19(c). It includes Schedules H-1 and H-2, which provide Walgreens (or its wholly-owned subsidiary, WVC Investments, LLC) the right to purchase a $40 million promissory note (the "Note"). *Id.*, Schs. H-1, H-2. And although it never specifies the precise percentage of blood tests that will be performed using "finger-stick technology," it reflects the baseline proposition that *some* use of such technology is part of the deal. *See*, *e.g.*, *id.*, Sch. A ¶ 3; Sch. B ¶¶ 15, 16, 18. Walgreens paid Theranos $140 million for Theranos to abide by its obligations.[1]

---

[1] In the Opening Brief in Support of Theranos, Inc's Motion to Dismiss (D.I. 12, "Motion" or "Mot."), Theranos defines the "MSA" to mean *only* Schedule B. Mot. at 1 n.1. But as stated

As has been well-publicized, Theranos failed to meet its obligations.  Theranos's regulator found that deficient quality controls at one of Theranos's labs posed immediate jeopardy to patient health and safety.  Theranos admitted that it was not performing blood draws using its own technology.  Theranos voided or corrected tens of thousands of blood test reports provided to Walgreens' customers.  Theranos's regulator banned its CEO from operating a laboratory.  And Theranos withdrew from the practice of blood-testing altogether.  *See* Cmplt. ¶¶ 51-140.  Walgreens claims that Theranos breached certain express provisions of the MSA through this conduct.  Theranos's Motion challenges none of this.

Instead, Theranos makes two limited arguments.  Neither has merit.  *First*, Theranos asserts that Walgreens is not entitled to repayment of the $40 million paid for the Note because the Note was signed by WVC, and not Walgreens.  But this argument depends on the pretense that the Note and the Agreement are separate, standalone documents.  They are not:  a breach of the Agreement is a breach of the Note.  *Second*, Theranos seeks to dismiss Count III, wherein Walgreens alleges that Theranos breached the implied covenant of good faith and fair dealing by failing to be able to perform blood tests using its "disruptive" finger-stick technology.  Theranos does not dispute that it was not performing blood tests using its finger-stick technology at the time of termination.  Theranos does not dispute that it no longer performs blood tests at all.  Yet despite its inability to deliver on the cornerstone of its promises, Theranos argues that Walgreens should have given it a chance to "cure."  No such obligation exists, and any attempt to cure would be futile in any event.  In the end, Theranos retreats to the argument that its blood-testing technology just wasn't that important to its deal with Walgreens.  Although that argument may be a proper subject for discovery, the answer is quite plain:  it was.

_____

expressly in the Agreement, Schedule B is only *one part* of that Agreement.  Accordingly, any references to the MSA in this Response are to the entire Agreement.

## BACKGROUND

**Theranos's Finger-Stick Technology**

In 2003, Elizabeth Holmes founded Theranos with a vision of developing a proprietary finger-stick blood-testing technology capable of processing a wide range of diagnostic tests from a few drops of blood.  Cmplt. ¶ 13.  If Theranos were to succeed, it would revolutionize the blood-testing industry.  By the time Walgreens and Theranos began discussions in 2010, Theranos claimed that its technology could perform nearly all of the most commonly ordered diagnostic tests using only a few drops of blood.  *Id*. ¶ 20.  Using its proprietary finger-stick technology, the blood would be collected in a very small vial and then tested on a Theranos System, which would be capable of producing test results in a matter of hours.  *Id*. ¶¶ 22-23, 38.

Of paramount importance, Theranos assured Walgreens that its innovative blood-testing technology would be safe and its operations would be of high quality.  To perform laboratory blood testing, Theranos is required to comply with all of the requirements under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA").  *Id*. ¶ 34.  Theranos assured Walgreens that it would operate CLIA-certified laboratories, providing "more comprehensive oversight than a traditional central lab." *Id*.  Theranos would be the "world's first finger-stick based CLIA-certified lab," offering the "highest quality testing from a finger-stick." *Id*. ¶ 37.

**The Master Services Agreement Between Theranos and Walgreens**

On June 5, 2012, Theranos and Walgreens entered into the Amended and Restated Theranos Master Services Agreement.  The Agreement itself is a large document "comprised of" numerous "Schedules," including the Note.  *See* MSA at 1 & Schs. H-1, H-2.  As stated on the first page of the Agreement, "[t]he parties"—*i.e.*, Theranos and Walgreens—"agree[d] to the terms set forth in this Agreement, including each attached Schedule, each of which is fully incorporated herein by reference."  MSA at 1.

The Agreement provided a framework pursuant to which "Theranos Wellness Centers" could operate inside Walgreens stores.  MSA, Sch. A.  Although the Agreement did not identify a specific percentage of tests that needed to be performed using Theranos's finger-stick technology, it expressly contemplated the technology's use.  *See, e.g., id.*, Sch. A ¶ 3 (noting "it is the parties' intention" for blood collection to include "finger-stick technology"); MSA, Sch. B ¶¶ 15, 16, 18(a).  Once collected, the blood would be sent to a Theranos CLIA-certified lab for testing,[2] and the results sent to the requesting physician, who then would communicate them directly to the patients.  Cmplt. ¶ 39.  Although the parties introduced Theranos services in 41 Walgreens stores through a "Pilot" Program, *see* MSA, Sch. F, and hoped to expand these services to other Walgreens stores, the parties never reached an agreement on that expansion, a fact which Theranos does not dispute.  Cmplt. ¶¶ 47, 50.  Critically, there was no binding obligation to expand prior to the entry of some subsequent agreement.  *See generally* MSA.[3]

The Agreement included important provisions to safeguard the health of Walgreens' customers and protect Walgreens' reputation as a trusted provider in the communities it serves.  Theranos promised that it would perform its obligations under the Agreement "(ii) in conformance with that level of care and skill ordinarily exercised by other professional companies or [sic] a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws."  MSA, Sch. B ¶ 19(c).

Under the Agreement, Walgreens provided $140 million to Theranos.  First, Walgreens agreed to pay Theranos a $100 million "Innovation Fee."  Cmplt. ¶ 41; *see also* MSA, Sch. B

---

[2] During the relevant time period, Theranos operated two then-CLIA-certified laboratories:  one in Newark, California, and one in Phoenix, Arizona.  Cmplt. ¶ 40.

[3] Theranos inaccurately asserts that it gave Walgreens complete exclusivity in the use of its blood-testing services.  Mot. at 1, 3.  Walgreens' "exclusivity" was subject to several limitations that allowed Theranos to partner with other companies (which it did).  *See* Cmplt., Ex. D ¶ 2.

¶ 6(a).  Theranos does not dispute that, if Walgreens prevails on its claims, Theranos must return the Innovation Fee.  Second, and "[i]n partial consideration for Walgreens' commitments set forth in th[e] Agreement," Walgreens received the right to purchase, or cause WVC Investments, LLC ("WVC") to purchase, the $40 million Note.  *Id.*, Sch. B ¶ 21.  As Theranos knows, WVC is not some entirely separate entity; it is a wholly-owned subsidiary of Walgreens.[4]  The Note is expressly incorporated into the Agreement.  *Id.* at 1.  And on the same day that it signed the Agreement, Walgreens, though its wholly-owned subsidiary, WVC, exercised its right to purchase the Note.  *See id.* at 1 & Sch. H-2 ("On this 5th day of June, 2012, Walgreens hereby elects to purchase the Convertible Note pursuant to the terms of the Agreement, and tenders herewith the full purchase price of the Convertible Note.").  Although signed by WVC, the election and Note refer to WVC and Walgreens interchangeably throughout.

If Theranos were to breach the Agreement, the Agreement provided an express Termination for Cause provision.  *See id*, Sch. B ¶ 24(c).  That provision requires Walgreens to follow a notice and cure period before *Termination*.  *See id.*  Importantly, the Termination for Cause provision nowhere is deemed to be an exclusive remedy for a breach of the contract.  *See generally* MSA.

**Walgreens Learns of Severe Quality Control Issues at Theranos's Labs and that Theranos is Not Using its Own Technology, and Subsequently Terminates the Agreement**

Beginning in October 2015, reports began to surface in the media that raised questions concerning the accuracy of some of Theranos's blood tests, and whether Theranos was using its own proprietary technology.  Cmplt. ¶¶ 51-54.  Theranos denied these reports, both publicly, as an attack on people who will "change the world," *id.* ¶ 55, and in private, as "misleading," "inaccurate," and "unfair," *id.* ¶ 64.

---

[4] *See* Walgreen Co. Form 10-K for the fiscal year ended 8/31/12, filed 10/19/12 (2012 Form 10-K), Ex. 21 at 1 (excerpts attached hereto as Ex. A).

Unfortunately, Walgreens would learn otherwise. *See id.* ¶¶ 58-140.  In particular, in late January 2016, Walgreens learned (through the media, and not Theranos), that CMS had conducted an inspection of Theranos's Newark laboratory and found that Theranos's quality controls were so deficient that they posed an immediate risk to patient health and safety.  *Id.* ¶¶ 67-71.  The very next day, in accordance with the relevant contractual provisions, Walgreens issued a notice of breach to Theranos; several months later, on June 12, 2016, Walgreens terminated the Agreement.  *Id.* ¶¶ 74-75, 114.[5]  On July 7, 2016, CMS issued its final sanctions against Theranos, which included shutting down Theranos's Newark laboratory and banning Ms. Holmes from owning or operating a lab for at least two years.  *Id.* ¶ 128.  Then, on October 5, 2016, Ms. Holmes announced that Theranos would close all of its laboratories and blood-drawing centers, effectively ceasing the performance of any blood-testing services at all, let alone finger-sticks.  *Id.* ¶¶ 138-40.

Although Walgreens did not know it then, Theranos's *Arizona* lab also failed a CMS inspection—on September 29, 2016.  Theranos did not disclose the results of that inspection. Moreover, Theranos emphasizes in its Motion that this case involves a "regulatory matter regarding one of Theranos' laboratories" and suggests that "moving all testing to another Theranos laboratory" was somehow a solution.  Mot. at 1-2.  Of course, these arguments were advanced in January 2017— *after* Theranos knew about the failed Arizona inspection but *before*

---

[5] Theranos asserts that Walgreens "precipitously and unjustifiably terminated the contract, greatly damaging Theranos' business."  Mot. at 1, 3.  As detailed in the Complaint, Walgreens' termination was hardly "precipitous."  For example, in the months preceding Walgreens' termination, Theranos acknowledged that it was not using finger-stick technology, Cmplt. ¶ 58; Theranos admitted that inspections at both of its labs had identified quality issues, *id.* ¶¶ 63, 76; CMS rejected remediation attempts at one lab and issued proposed sanctions, *id.* ¶¶ 96-97; Ms. Holmes admitted that she was "devastated" and that Theranos would need to "rebuild [its] entire laboratory from scratch so that we can ensure it never happens again," *id.* ¶ 100; Theranos voided and/or corrected every test performed using a finger-stick from 2014 to 2015, *id.* ¶ 104; and ultimately admitted that 31,000 Walgreens customers had received voided reports, *id.* ¶ 113.

Walgreens (or this Court) knew about it.  Plainly, the "solution" Theranos proposes was not actually available here.[6]

## ARGUMENT

In its partial motion to dismiss, Theranos asks this Court to exert its judicial resources on a motion that challenges only one of four counts, and only a fraction of the damages Walgreens seeks.  Inevitably, this Court will have to revisit the same issues after the same discovery occurs.  In any case, Theranos's present arguments are without merit.  As discussed below, Walgreens has alleged far more than a "sheer possibility" of a claim here, *see* Mot. at 4, and Theranos's Motion should be denied in its entirety.

## I.     WALGREENS IS ENTITLED TO REPAYMENT OF THE $40 MILLION.

Theranos first challenges Walgreens' right to recover the $40 million paid for the Note.  The Note is an inseparable part of the MSA, and Walgreens is entitled to be made whole as a result of Theranos's breach of that MSA.

### A.     The Note is inseparable from the remainder of the MSA.

Theranos states in its brief that the Note is "*an exhibit to the Complaint*," *see* Mot. at 5 (emphasis in original), but fails to mention that it is attached not as a stand-alone document, but rather as an integral part of the MSA.  The provisions of the MSA, including the Note, are a single agreement.  The first page of the MSA states, in no uncertain terms, that it is comprised of all schedules, including Schedule H-1, *i.e.,* the Note.  *See* MSA at 1 (stating that "This Agreement is comprised of," then listing all schedules including "Schedule H-1: Convertible Promissory Note").  The MSA then states that "[t]he parties agree to the terms set forth in this Agreement, *including each attached Schedule*, each of which *is fully incorporated herein by*

---

[6] *See* Christopher Weaver and John Carreyrou, *Second Theranos Lab Failed U.S. Inspection*, WALL ST. J., Jan. 17, 2017.

*reference*." *Id.* (emphasis added).  The MSA further states that "[t]his Agreement may be signed in counterparts … and [that] together [they] shall constitute one and the same Agreement." *Id.* These statements are in no way ambiguous and make explicit that the parties intended for the Note, contained in Schedule H-1, to be incorporated into and considered part of the MSA.  *See In re Philip Servs. (Del.), Inc.*, 284 B.R. 541, 546 (Bankr. D. Del. 2002) (finding that note attached as schedule and "deemed a part of this Agreement" was "inseparable part" of that Agreement).

Moreover, there is extensive cross-referencing among the schedules of the MSA, including the Note, further demonstrating the parties' intent for the MSA to be viewed as a single agreement.  *See In re Resorts Int'l, Inc.*, 199 B.R. 113, 122 (Bankr. D. N.J. 1996) ("[W]here it appears that several instruments contain cross-references . . . those instruments must be construed together as a single agreement." (citing *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 108 (3d Cir. 1986))).  For example, the MSA states that Walgreens was given the right to purchase, or cause its affiliate WVC to purchase, the Note "[i]n partial consideration for Walgreens' commitments set forth in th[e] Agreement."  *See* MSA, Sch. B ¶ 21.  In other words, the purchase of the $40 million Note was dependent on other provisions of the MSA.  *See Kroblin*, 805 F.2d at 108 (agreements to be construed together where one "agreement was considered a *sine qua non* of entering into the [other] agreement").  And this is only one of the many cross-references between the two documents.  *See*, *e.g.*, MSA, Sch. B ¶ 21 (laying out specific terms for the Note, including the principal amount and applicable interest rate); *id.*, Sch. H-1 (Note was "issued pursuant to that certain [MSA]"); *id.* ¶ 1(b)(iii) (Note referring to the MSA when defining its maturity date); *id.* ¶ 2(a) (allowing for optional conversion if services are being offered at a specific number of Walgreens locations, "as contemplated in the Agreement"). These repeated cross-references reflect a clear intent by the parties to link the Note to the other

parts of the Agreement.  *See Philip Servs.*, 284 B.R. at 546-47 ("interrelatedness" of note and agreement meant they "cannot be separated").

In addition, although Theranos asserts that "the Note was signed by Wade Miquelon on behalf of WVC," *see* Mot. at 5, it fails to mention that this same Mr. Miquelon also was the CFO of Walgreens, and contemporaneously signed the Agreement in that capacity, *see* MSA at 1; *id.*, Sch. H-2.  *See also Kroblin*, 805 F.2d at 107 ("It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole . . . ."); 11 Williston on Contracts §30:26 (4th ed.) ("[I]nstruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument . . . .  The rule applies even when the parties to the instruments are not the same, as long as the writings form part of a single transaction and are designed to effectuate the same purpose.") (cited approvingly by Delaware courts, *see*, *e.g.*, *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *7 n.33 (Del. Ch. Oct. 19, 2000)).  Accordingly, as an instrument attached to, expressly incorporated into, cross-referenced throughout, and executed in connection with the rest of the MSA, the Note is properly considered an inseparable component of the overall Agreement between Walgreens and Theranos.

**B.      Walgreens has standing to recover the $40 million paid for the Note.**

Notwithstanding the above, Theranos argues that Walgreens is not the proper party to bring a claim for repayment of the Note because the Note was purchased and signed by WVC, and not by Walgreens.  *See* Mot. at 5.  But Theranos's argument misses the mark for several reasons.  *First*, as previously explained, the Note and the MSA comprise a single agreement, to which Walgreens was clearly a party.  *See* MSA at 1.  Parties to an agreement plainly have

standing to assert claims under that agreement. *See UD Tech. Corp. v. Phenomenex, Inc.*, 2007 WL 28295, at *6 (D. Del. Jan. 4, 2007) (cited in Mot. at 5).

*Second,* the MSA makes clear that the right to purchase the Note was granted to Walgreens itself. *See* MSA, Sch. B ¶ 21; *see also id.*, Sch. H-2, Certificate Evidencing Right to Purchase Convertible Promissory Note ("[T]his Certificate evidences the right granted to *Walgreens* under the Agreement to purchase [the Note]." (emphasis added)). That Walgreens caused WVC to sign the Note does not make it the kind of third-party "stranger" to the contract that cannot seek recourse. *See UD Tech.*, 2007 WL 28295, at *6 (those who are "strangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party" (citation and internal quotations omitted)).[7]

*Third*, and contrary to Theranos's attempt to portray WVC and Walgreens as unaffiliated entities, WVC is a wholly-owned subsidiary of Walgreens. *See* Ex. A, 2012 Form 10-K, Ex. 21 at 1. And, as Theranos fails to mention, the MSA expressly defines Walgreens as "Walgreen Co. and its wholly owned subsidiaries." *See* MSA, Sch. E ¶ 43. Thus, the Agreement defines Walgreens to include WVC.

*Fourth,* the Note interchangeably refers to WVC and Walgreens. Although the Note may define the term "Investor" as WVC, *see id.*, Sch. H-1 ¶ 3, the Note's terms demonstrate that the parties intended for "Investor" to refer to both WVC and Walgreens. Numerous provisions in the Note do not make sense unless the term "Investor" encompasses Walgreens, too. For example, the Note states that it is being "issued pursuant to th[e] … Amended and Restated Theranos Master Services Agreement by and between the Company *and Investor* dated

---

[7] *See also Insituform of N. Am., Inc. v. Chandler*, 534 A.2d 257, 270 (Del. Ch. 1987) (cited in Mot. at 5) (court holding that incumbent board members did not have standing to pursue claims based on voting agreement where they were not signatories to the agreement and any benefit to the board members was incidental at best and not a material part of the agreement's purpose).

10

[6/5/12]." *Id.*, Sch. H-1 (emphasis added).  The Agreement, of course, was entered into between Walgreens and Theranos.  In addition, the "Investor" may elect to convert the Note into shares "if services are being offered in at least 1,000 *Investor* locations (as contemplated in the Agreement)," or "if services are being offered in at least 2,500 locations (as contemplated in the Agreement)."  *Id.* ¶ 2(a) (emphasis added).  Again, Investor in this instance can only be referring to Walgreens, not WVC (which does not have its own "locations").  Indeed, the Note's maturity date relies upon terms of the MSA, and more specifically, "the mutually agreed-upon success criteria for the Pilot set forth in Schedule F of the Agreement."  *Id.* ¶ 1(b)(iii).  Here, too, the Note must be referring to Walgreens, as the success criteria for the Pilot Program was "mutually agreed-upon" by Walgreens and Theranos, not WVC.  All of this evidence demonstrates that the parties intended for the term "Investor" to include not only WVC, but also Walgreens.

In light of these facts, Theranos is left to rely on two snippets of irrelevant language to advance the fiction that WVC and Walgreens are two entirely separate entities that have nothing to do with one another.  Theranos first points to language in the Note that WVC "has not been formed solely for the purpose of making this investment."  Mot. at 6 (citing MSA, Sch. H-1 ¶ 4(b).  This is a red herring.  This type of language is a boilerplate legal requirement to be an "accredited investor" under the federal securities laws.  *See* SEC Reg. D, 17 C.F.R. § 230.501(a)(3) (accredited investor must be "not formed for the specific purpose of acquiring the securities offered").  All this means is that WVC had some purpose other than investing in Theranos (for example, making other investments, too).  Theranos provides no precedent for using this language to support the proposition that all accredited investors must be treated as separate entities for all purposes, much less in a breach of contract case like this one.

Theranos next emphasizes that the terms of the Note prohibit WVC from assigning any of

its rights under the Note to any entity other than a wholly-owned direct or indirect subsidiary, of which Walgreens of course is not. *See* Mot. at 6. But again, this argument misconstrues the nature of the transaction that occurred here. As noted above, this is not a situation where an unrelated third-party is claiming rights to a note, nor is it a matter of an assignment. Under the terms of the MSA, Walgreens was given the right to purchase, or cause its wholly-owned subsidiary, WVC, to purchase a $40 million convertible note as partial consideration for Walgreens entering into the Agreement. *See* MSA, Sch. B ¶ 21. Theranos cannot plausibly argue that it thought that WVC was some stand-alone company unrelated to Walgreens. The MSA and the accompanying Note stem from a single agreement between Walgreens (and its wholly-owned subsidiaries) and Theranos. From the outset, the clear intention of the parties was to allow Walgreens to purchase this Note, and that is exactly what Walgreens did, through one of its wholly-owned subsidiaries. Theranos breached. Walgreens wants its money back.

### C.    Walgreens may seek recovery of all of its damages, including the $40 million.

For the numerous reasons explained above, the plain language of the entire MSA, including the Note itself, compels the conclusion that the Note was intended to be an inseparable component of the MSA such that they must be construed as a single contractual agreement. *See supra* Section I.A. Accordingly, a material breach of one constitutes a material breach of the other. *See*, *e.g.*, *Carco Grp., Inc. v. Maconachy*, 644 F. Supp. 2d 218, 236-37 (E.D.N.Y. 2009), *rev'd on other grounds*, 383 F. App'x 73 (2d Cir. 2010) (where purchase agreement and related agreement were dependent on each other and must be construed together, breach of one constituted breach of the other).

Theranos's arguments to the contrary once again rely on the inaccurate premise that the MSA and Note are distinct agreements. Theranos first asserts that Walgreens failed to allege a breach of the terms of the MSA "relating" to the Note, or a breach of the terms of the Note itself.

12

Mot. at 7-9.  But this argument misses the point.  As explained above, the MSA and Note are part of the same agreement.  Walgreens need only allege a breach of one material provision of the Agreement to be entitled to pursue the full extent of its contractual damages, which in this case, would include any damages related to its investment in the Note.  *See Mobil Oil Expl. & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 608 (2000) (explaining that a total breach so impairs the value of the contract that the non-breaching party may recover damages based on all remaining rights); 17 Am. Jur. 2d Contracts §706 (2d ed.) (explaining that a total, material breach "gives the injured party the right to treat it as a breach of the entire contract, and to maintain an action for damages for a total breach").

This is perfectly consistent with the single case cited by Theranos on this point, *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572 (D. Del. 2007) (cited at Mot. at 7-8), in which this Court held simply that one must allege a breach of an "express contract provision" to survive a motion to dismiss.  In that case, the plaintiff had not identified any such written provision.  *Id.* at 581.  Here, Walgreens identifies several, including paragraph 19 of the MSA.  *See*, *e.g.*, Cmplt. ¶¶ 146, 160.  And *Anderson* says nothing about how to construe two different components of the same agreement.  Contrary to Theranos's contention, Walgreens need not allege a breach of a provision specifically "related to" the Note.

Theranos further misconstrues Walgreens' position when it asserts that Walgreens is seeking to accelerate the repayment of the Note.  *See* Mot. at 9.  Walgreens' claim is not one of "acceleration," but of breach of a contractual agreement.  Walgreens, accordingly, seeks its common law contract remedies.  For example, given Theranos's material breach, Walgreens may elect restitution as a remedy.  *See*, *e.g., Mobil Oil*, 530 U.S. at 624 (breaching party "must give the companies their money back"); *Segovia v. Equities First Holdings, LLC*, 2008 WL 2251218,

13

at *22 (Del. Sup. Ct. May 30, 2008) (in case of material breach, non-breaching party "is entitled

to be returned to the position *vis a vis* [the breaching party] that it occupied before it entered into

the loan transactions at issue").  That remedy, of course, would require Theranos to make

Walgreens whole, by, for instance, putting Walgreens in the same position it was in before it

entered into the Agreement—that is, by returning the $140 million promptly.[8]

Finally, Theranos separately argues that Walgreens has failed to demonstrate that it

suffered any damage stemming from its purchase of the Note or from Theranos's conduct related

to the Note.  *See* Mot. at 10.  But this is absurd.  As part of the Agreement, Walgreens gave $40

million to Theranos when it purchased the Note.  Theranos has breached that Agreement, and

Walgreens has been damaged in the amount of $40 million in connection with the Note purchase.

> **D.**     **Walgreens stands willing to add WVC as a party, if necessary.**

As demonstrated above, the Note is part of the MSA, and those documents must be

viewed as a single contractual agreement.  Theranos's breach entitles Walgreens to repayment of

everything it paid.  Theranos's arguments to the contrary are without merit.  Nonetheless, should

the Court find that WVC is a necessary (or even desirable) party to the case, it would be easy

enough to amend the Complaint to add it as a plaintiff, and Plaintiff stands willing to do so.

## II.    WALGREENS HAS SUFFICIENTLY ALLEGED THERANOS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

The only claim that Theranos seeks to dismiss in full is Count III, that Theranos breached

the implied covenant of good faith and fair dealing because it stopped using its proprietary

finger-stick methodology to perform any blood tests.  Theranos asserts two alternative bases for

dismissal:  first, termination for this breach was purportedly improper because Walgreens did not

---

[8] Alternatively, Walgreens may be entitled to immediate repayment of the Note if discovery proves that the Pilot was, in fact, not successful.  The Note is immediately repayable if Theranos failed the success criteria for the Pilot.  *See* MSA, Sch. H-1 ¶ 1(b)(iii).  Discovery may reveal evidence that calls into doubt whether the Pilot did, in fact, meet the success criteria.

provide notice and opportunity to cure; and second, Walgreens purportedly failed to allege a breach of the implied covenant. Neither argument has merit and both should be rejected.

A.   **Walgreens was not obligated to provide notice and opportunity to cure for its implied covenant claim, and therefore termination was proper.**

Theranos argues that, before bringing any claim under the "Termination for Cause" standard of paragraph 24(c), a party first must comply with the notice and cure provisions under this paragraph. *See* Mot. at 11-12. That's true, and Walgreens did exactly that; Walgreens properly followed the notice and cure procedure to terminate the Agreement for breach of the warranty provision. Cmplt. ¶¶ 154, 171. Theranos does not now challenge the grounds for this termination. Thus, there is no dispute before the Court that Walgreens' termination was proper.

The question then, is whether, as Theranos argues, the Termination for Cause provision is the *exclusive* way for Walgreens to allege breach of contract, and therefore Walgreens was required to have provided notice of *all* of its claims in its initial letter. The answer is no. *See Carco*, 644 F. Supp. 2d at 232 (distinguishing damages "in all instances where a defendant has breached a contract" from suspension of performance when "defendants' breach was material" (citing *Williston*)). Theranos points to no express limitation in the Agreement providing that the notice and cure procedure under paragraph 24(c) is the exclusive remedy for material breaches. None exists. In fact, the Agreement elsewhere identifies other means to terminate and seek damages without following this notice and cure procedure. *See, e.g.*, MSA, Sch. B ¶¶ 24(b), 26(c). Paragraph 24(c)'s notice and cure procedure is the process a party must follow to terminate with cause, which termination confers certain benefits, for example by providing for liquidated damages in the form of the return of the $100 million Innovation Fee, pursuant to paragraph 24(d). This does not, however, preclude Walgreens from alleging a material breach of the Agreement, and suing for damages. *See, e.g., Gotham Partners, L.P. v. Hallwood Realty*

15

*Partners, L.P.*, 817 A.2d 160, 176 (Del. 2002) ("[C]ourts will not construe a contract as taking away a common law remedy unless that result is imperatively required. . . . [E]ven if a contract specifies a remedy for breach of that contract, a contractual remedy cannot be read as exclusive of all other remedies if it lacks the requisite expression of exclusivity." (citation omitted)); *Lola Cars, Int'l Ltd. v. Krohn Racing, LLC*, 2010 WL 3314484, at \*21 (Del. Ch. Aug. 2, 2010) (no obligation to follow notice and cure procedure under termination provision where provision was "permissive" and did not preclude the filing of a suit for breach of contract). This is in contrast to the case law cited by Theranos, where the termination provision was, in fact, exclusive.[9]

In addition, providing any additional notice period with respect to Theranos's use of finger-stick technology would have been futile. Theranos does not even attempt to argue that it would have been able to cure its breach of the implied covenant, and for good reason: it plainly could not. As explained above, CMS has forbidden Ms. Holmes from providing lab services, and Theranos itself has admitted it no longer will perform blood testing at all (much less finger-stick testing). *See* Cmplt. ¶¶ 128, 138-40. Yet, under Theranos's distorted logic, it would require Walgreens to engage in the useless gesture of following the notice and cure procedure for breaches that cannot possibly be rectified. Delaware case law—including that cited in Theranos's own Motion—is clear that "the law does not require a futile act." *See Cornell Glasgow LLC v. La Grange Props., LLC*, 2012 WL 6840625, at \*13 (Del. Sup. Ct. Dec. 7, 2012) (finding a party's obligation to comply with the contract's notice and cure provision was excused by futility; "The contractual obligation to provide pre-suit notice and opportunity to cure may be excused where such notice would be futile in achieving its intended purpose . . . [including]

---

[9] *See*, *e.g.*, *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 1699057, at \*3 (Del. Ch. July 29, 2004) ("The relevant remedy provisions clearly evidence an intent that litigation be pursued only after notice and an opportunity to cure."). No such limitation can be found in the Agreement.

where the actions of the defaulting party have rendered future performance of the contract by the non-defaulting party impractical or impossible.'" (citations omitted)) (cited in Mot. at 13). Accordingly, Walgreens had no obligation to follow the notice and cure procedure for its implied covenant claim, and its termination was proper.

### B.   Walgreens has sufficiently alleged Theranos breached the implied covenant of good faith and fair dealing for failing to perform finger-stick blood draws.

Theranos cannot dispute that it had ceased performing any finger-stick blood draws at the time Walgreens terminated the Agreement.  Instead, Theranos makes the astonishing assertion that it never had to do so—that, notwithstanding how central the finger-stick technology was to its sales pitch, to the purpose of the relationship with Walgreens, and to the Agreement itself, Theranos was not required to perform *any* finger-stick tests under the Agreement.  *See* Mot. at 13-16.  This argument is contrary to the parties' reasonable expectations and entirely without merit.  At a minimum, it should be the subject of further discovery as to the parties' intentions.

Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract.  *See Anderson*, 497 F. Supp. 2d at 581.  The duty exists to ensure the "'parties' reasonable expectations are fulfilled.'"  *Id.* (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006)).  If it is clear from the contract that the parties would have agreed to proscribe the act later complained of, then such an act constitutes a breach of the duty. *Id.*  To plead a breach of an implied covenant of good faith and fair dealing, the plaintiff thus must allege what the specific implied contractual obligation is, a breach of that obligation by the defendant, and resulting damage to the plaintiff.  *See Anderson*, 497 F. Supp. 2d at 581-82.

Walgreens easily meets these requirements.  Although there is no express provision in the Agreement setting forth a precise percentage of finger-stick blood draws that must be performed, that absence was for good reason:  it gave the parties the flexibility to grow into their business

relationship as Theranos developed more finger-stick blood tests and the parties considered

expansion.  But there can be no dispute that it was *both* parties' "reasonable expectation" that

Theranos had an obligation to perform *some* blood draws using its proprietary finger-stick

technology.  This is abundantly clear from the express terms of the Agreement, which Theranos

concedes contains multiple references to the use of finger-stick technology.  *See* Mot. at 14.

Indeed, Theranos's own Motion cites Schedule A of the Agreement, which expressly

states that "it is the parties' intention for Walgreens to act as a patient service center and collect

blood samples *via finger-stick technology*, small samples of urine, saliva, feces, or swabs . . . ."

(emphasis added).  *Id*. (citing MSA, Sch. A ¶ 3).  Theranos appears to argue that the references

to "urine, saliva, feces, or swabs" means that the parties "*expressly contemplated other forms of*

*specimen collection . . . .*"  Mot. at 14 (emphasis in original).  But those "other forms" do not

involve *blood* collection; the parties expected that to be done through "finger-sticks."  This was

the central premise for Theranos's existence:  "to offer nearly the full range of diagnostic tests

from only a *few drops of blood*."  Cmplt. ¶ 13 (emphasis added).

The importance of finger-stick technology is reiterated throughout the Agreement,

similarly demonstrating that the parties contemplated at least some amount of Theranos's blood

draws to be performed by finger-stick.  *See, e.g.*, MSA, Sch. B ¶ 15 (providing that technicians

"will draw blood using the finger stick technique"); *id.* ¶ 16 ("Theranos shall deliver sample

tubes, lancets/blood collecting devices (*finger stick devices*), bandages and all other necessary

supplies to Walgreens locations . . . ." (emphasis added)).  This is to say nothing of Theranos's

repeated representations to Walgreens touting its finger-stick testing capabilities in the months

and years leading up to the Agreement.  *See, e.g.*, Cmplt. ¶¶ 18-38.  Thus, at the time of

contracting, neither party anticipated that Theranos would not be able to perform *any* finger-stick

18

testing, as was the case at the time that Walgreens terminated the Agreement.

Theranos's arguments to the contrary are unpersuasive. First, to the extent that Theranos argues that the Agreement did not require finger-stick testing "to be used to the exclusion of other methods for drawing blood," *see* Mot. at 14-15, this is a straw man. Walgreens does not argue that, at the time of contracting, it was expected that Theranos would perform *only* finger-stick blood draws. Rather, the parties expected that Theranos would perform at least *some* amount of finger-stick blood draws, which Theranos stopped doing.

Theranos next argues that there was no expectation that it would perform finger-stick blood draws *at all*, *see* Mot. at 14, but this argument attempts to rewrite the entire Agreement, if not history. Not only is this contradicted by the numerous express provisions in the Agreement referenced above, it is also nonsensical: Walgreens never would have agreed to give $140 million to Theranos (including a $100 million "*Innovation* Fee") to perform standard blood tests, or not to perform blood testing at all. Indeed, the whole premise of "disruptive technology"—as Theranos presented its offering, *see* MSA, Sch. A ¶ 3—is something other than traditional venous draws. *See also* Cmplt. ¶¶ 20-25, 37-38 (describing Theranos's representations).[10]

Theranos's argument that finger-stick blood draws were not the "overarching purpose" of the Agreement, *see* Mot. at 14-15, fails for similar reasons. As discussed above, Theranos's purportedly disruptive blood-testing technology, which was premised on the use of a finger-stick, was the overarching purpose of the Agreement. Theranos's assertion that it was not presents, at most, a question of fact that cannot be resolved now. *See Gerbitz v. ING Bank, FSB*, 967 F. Supp. 2d 1072, 1081 (D. Del. 2013) (finding defendant's fact-based defense on implied covenant

---

[10] Theranos points to a heavily excerpted portion of the "Exclusivity" provision in the MSA. *See* Mot. at 14 (citing MSA, Sch. B ¶ 3(c)). However, as Theranos notes, this provision only applied to "certain tests" (specifically Routine and Specialty Tests) in "certain jurisdictions." *Id*. It also has nothing to do with whether Theranos could entirely abandon its finger-stick blood draws.

claim—including relating to pre-contract marketing materials—was not appropriately resolved on motion to dismiss).  Theranos cites no case in which a court has made a factual determination of a contract's "overarching purpose" on a motion to dismiss an implied covenant claim.[11]

Lastly, Theranos argues that Walgreens' claim should fail because Walgreens did not terminate the Agreement immediately after Walgreens learned that Theranos was not performing *any* finger-stick blood draws.  *See* Mot. at 15.  In other words, while arguing that Walgreens' termination was "precipitous," Theranos also asserts that Walgreens waited too long to terminate.  Irony aside, Theranos makes no mention of any applicable statute of limitations period.  Moreover, Theranos's argument is misleading; after Walgreens learned that Theranos was not using its finger-stick technology at all, Theranos assured Walgreens that the change was only temporary as its blood-collection device "was being reviewed for FDA approval."  Cmplt. ¶ 58.  In truth, as Theranos would disclose to Walgreens months later, Theranos was aware of quality issues by September 2015 and, shortly thereafter (but without telling Walgreens), would begin issuing voided test reports for what ultimately turned out to be every single finger-stick blood draw performed from 2014 to 2015.  *Id.* ¶¶ 104, 113.  This is yet another example of Theranos providing assurances to Walgreens that later events have called into question.

Discovery, of course, will reveal what Theranos knew and when Theranos knew it.

## CONCLUSION

Walgreens respectfully requests that Theranos's motion to dismiss be denied.

---

[11] *See* Mot. at 14-15 (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (remanding to allow plaintiff to add implied covenant claim); *Blaustein v. Lord Balt. Capital Corp.*, 84 A.3d 954, 959 (Del. 2014) (affirming denial of leave to amend complaint after lower court had granted summary judgment); *Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 182-93 (Del. Ch. 2014) (assessing implied covenant claim on summary judgment)).  *Cf. Nemec v. Shrader*, 991 A.2d 1120, 1125-1128 (Del. 2010) (cited in Mot. at 11, 14) (affirming dismissal of implied covenant claim where conduct was authorized by "express, contractual language").  The Agreement here contains no such language.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

David A. Gordon                         By:   */s/ Kevin R. Shannon*
Kristen R. Seeger                              Kevin R. Shannon (#3137)
Lawrence P. Fogel                              Arthur L. Dent (#2491)
SIDLEY AUSTIN LLP                              Hercules Plaza
One South Dearborn Street                      P.O. Box 951
Chicago, Illinois  60603                       Wilmington, DE 19899
(312) 853-7000                                 (302) 984-6000
                                               kshannon@potteranderson.com
Dated: February 6, 2017                        adent@potteranderson.com
1244671

                                        *Attorneys for Plaintiff*

21