## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WALGREEN, CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No.  16-1040-RGA-MPT |
| | ) |
| THERANOS, INC., | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Walgreen Co. ("Walgreens") filed its complaint against Theranos, Inc.

("Theranos") on November 8, 2016 alleging breach of the Amended and Restated

Theranos Master Service Agreement ("MSA").[1]  Walgreens alleges that, pursuant to the

MSA, Theranos must refund the money obtained under the agreement and pay for

damages.[2]  Specifically, Walgreens asserts that Theranos must repay a $100 million

dollar Innovation Fee, and the purchase of a $40 million dollar convertible note (Counts

I and II).[3]  Walgreens also claims Theranos breached the implied covenant of good faith

and fair dealing (Count III).[4]  Theranos argues Walgreens lacks "sufficient justification

for accelerated repayment" of the convertible note, and there is no basis for

Walgreens's claim for alleged breach of the implied covenant of good faith and fair

dealing.[5]

Currently before the court is Theranos's motion to dismiss Counts I and II, insofar

---

[1] D.I. 2 at ¶ 1.
[2] *Id.*
[3] *Id.* at ¶ 3.
[4] *Id.* at ¶¶ 174-185.
[5] D.I. 12 at 2.

as they relate to the convertible note, and Count III in its entirety pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief can be granted.[6]

## II.    BACKGROUND

Walgreens is an Illinois corporation.[7]  It provides pharmacy, health, and well-being services by way of its more than 8,000 stores in the United States.[8]

Theranos is a Delaware corporation, which was founded in 2003 as a next generation healthcare system built on the premise of using proprietary, patented technology to offer a range of diagnostic tests from only a few droplets of blood.[9]

Commercial blood testing traditionally involves the venipuncture methodology of drawing blood, referred to as venous draws, using needles and large vials.[10]  When Theranos approached Walgreens in 2010 with an innovative technology to revolutionize blood testing, it stated it had developed "small point-of-care devices that, for the first time, can run any blood test in real-time for less than half the cost of central lab tests."[11] Theranos confirmed it could offer "in-store blood testing from a single finger-stick," which was purportedly capable of detecting viruses, such as STDs and H1N1, or the "earliest appearance of cancers and other diseases."[12]  In a subsequent meeting on March 22, 2010, Theranos represented that this proprietary technology had been "comprehensively validated" by "ten of the fifteen largest pharmaceutical companies,"

---

[6] D.I. 11.
[7] D.I. 2 at ¶ 12.
[8] *Id.* at ¶ 2.
[9] *Id.* at ¶¶ 13-15.
[10] *Id.* at ¶ 19.
[11] *Id.* at ¶¶ 19-20.
[12] *Id.* at ¶ 20.

and had been used by numerous current and past clients, including research institutions and U.S. and foreign government health and military organizations.[13]  Based on Theranos's representations, Walgreens continued to perform additional due diligence.[14]

On May 7, 2010, Theranos sent a Regulatory Summary to Walgreens stating the finger-stick technology had received approval to be launched in clinical studies, and that Theranos was positioned to receive approval to introduce the technology outside of the clinical field.[15]  The Regulatory Summary also stated Theranos intended to open two laboratories for collecting and analyzing the clinical data.[16]  Based on Theranos's representations, and information obtained through Walgreens's due diligence, the two parties entered into an initial Master Services Agreement on July 30, 2010.[17]

For any laboratory to perform testing, it is required to comply with the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), and be state certified, as well as by the Centers for Medicare and Medicaid Services ("CMS").[18]  The CLIA certification requires labs to perform proficiency testing three times annually on sets of blind samples for every test which the lab offers, beginning at the time of CLIA certification.[19]

In a January 2012 presentation, Theranos assured Walgreens that its CLIA-certified labs would offer "the highest quality testing from a finger-stick," and that they would be the "world's first finger-stick based CLIA-certified labs."[20]  During the same

---

[13] *Id.* at ¶ 24.
[14] *Id.* at ¶ 28.
[15] *Id.* at ¶¶ 31-32.
[16] *Id.* at ¶ 31.
[17] *Id.* at ¶¶ 32-33.
[18] *Id.* at ¶ 34.
[19] *Id.*
[20] *Id.* at ¶ 37.

presentation, Theranos claimed its technology would require 99.9% less blood while having a "state of the art result turnaround," thus making it "the nation's lowest cost and highest quality laboratory provider."[21]

On June 5, 2012, Walgreens and Theranos entered into the MSA.[22]  The MSA provided a framework under which "Theranos Wellness Centers" could operate inside Walgreens stores, where technicians would collect blood samples.[23]  It was the parties' intention and expectation that blood would be collected using Theranos's finger-stick technology, that would be tested at one of two CLIA-certified labs owned and operated by Theranos.[24]  The blood results would then be sent directly from Theranos's labs to the requesting physician, who would provide the information to the patient.[25]

Under the terms of the MSA, Walgreens agreed to pay Theranos an Innovation Fee of up to $100 million dollars.[26]  Walgreens ultimately ended up paying Theranos the full $100 million dollars pursuant to a December 2013 amendment to the MSA.[27] Additionally, the MSA required Walgreens to provide $40 million dollars in exchange for a $40 million dollar convertible note, which is convertible into equity under certain circumstances.[28]  The MSA gave both parties the right to terminate the relationship for cause.[29]  In the event that Walgreens terminated the relationship, Theranos would be

---

[21] *Id.* at ¶ 38.
[22] *Id.* at ¶ 39; D.I. 2-1 at 1.
[23] D.I. 2 at ¶ 39.
[24] *Id.*
[25] *Id.*
[26] *Id.* at ¶ 41.
[27] *Id.*; *see also* D.I. 2-1 at Ex. D.
[28] D.I. 2 at ¶ 42; D.I. 2-1, Ex. A at ¶ 21; D.I. 2-1, Ex. A at 28-33.
[29] D.I. 2 at ¶ 44; D.I. 2-1, Ex. A at ¶ 24(c).

obligated to refund the Innovation Fee within 180 calendar days of the termination date.[30]

Pursuant to the MSA, the parties agreed to introduce the Theranos Wellness Centers in a select number of Walgreens stores through a pilot program.[31]  The pilot program would allow the parties to assess the business and operating models and determine how best to expand the services to other Walgreens stores.[32]  The pilot program did not require expansion to a specific number of stores, nor did it set any particular time frame for doing so.[33]  The pilot program began on March 20, 2013 at a single store in Phoenix, Arizona.[34]  By the fall of 2015, there were a total of 41 Theranos Wellness Centers.[35]

Thereafter, Walgreens learned, through numerous news reports, that there were multiple problems associated with Theranos's finger-stick technology and its two CLIA-certified labs.  On October 15, 2015, *The Wall Street Journal* published an article reporting, *inter alia*, that because Theranos collected only a small amount of blood, it had to increase those samples's volume through dilution, which could dramatically increase the chances of erroneous results, and this dilution process was generally considered a poor laboratory practice when frequently done.[36]  The article specifically stated that "some of the potassium results at Theranos were so high that patients would

---

[30] D.I. 2 at ¶ 44; D.I. 2-1, Ex. A at ¶ 24(d)(i)(1).
[31] D.I. 2 at ¶ 46; D.I. 2-1, Ex. A at 25.
[32] *Id.* at ¶ 46.
[33] *Id.* at ¶ 47.
[34] *Id.* at ¶ 48.
[35] *Id.* at ¶ 49.
[36] *Id.* at ¶¶ 52, 54.

have to be dead for the results to be correct."[37]

On January 25, 2016, CMS issued a letter to Theranos concluding that the Newark, California lab was not in compliance with CLIA requirements.[38]  Theranos was required to submit to CMS a proposed plan of correction by confirming the violations were resolved and action was taken to correct all deficiencies identified by CMS.[39]  When asked about this report, Theranos assured Walgreens that the issues had been addressed, and it was in the process of "updating [its] quality assurance/control processes to a more automated system."[40]  Walgreens subsequently learned from a January 27, 2016 *Wall Street Journal* article, that a CMS audit uncovered a number of quality assurance issues at Theranos's Arizona lab in April 2015.[41]

The next day, January 28, 2016, Walgreens issued a notice of breach of the MSA to Theranos.[42]  Walgreens stated in the letter that Theranos was in breach of its obligations under the MSA due to the deficiencies found by CMS at its Newark laboratory.[43]  The two parties agreed to stop sending any clinical laboratory tests to

---

[37] *Id.* at ¶ 54.

[38] *Id.* at ¶ 68 ("Specifically, CMS identified Condition-level deficiencies in the following areas:  (1) inadequate operating procedures and Quality Control in the Hematology area; (2) inadequate operating procedures, corrective actions, and equipment preventative maintenance across the lab's analytic system; (3) inadequate Laboratory Director qualifications and management protocols, including failure to ensure Quality Control and Quality Assurance programs were established and maintained; (4) inadequate Laboratory Technical Supervision qualifications for high complexity testing; and (5) insufficient number of personnel qualified to perform testing functions of the volume and complexity performed in the laboratory.").

[39] *Id.* at ¶ 70.

[40] *Id.* at ¶¶ 65-66.

[41] *Id.* at ¶ 63.

[42] *Id.* at ¶ 74.

[43] *Id.* at ¶ 75; D.I. 2-1, Ex. A at ¶ 19(c) ("Each party will perform its obligations under this Agreement:  (i) in a timely and professional manner; (ii) in conformance with

Theranos's Newark, California lab.[44]

On February 4, 2016, Theranos responded to Walgreens's notice of breach.[45] Theranos represented that many of the violations identified by CMS "have already been corrected, and the CMS Letter is not reflective of the current state of our Newark lab."[46] Theranos continued "the CMS Letter indentifie[d] curable deficiencies in our Newark lab" and "provide[d] an express mechanism for Theranos to remedy those deficiencies" via submission of a proposed plan of correction.[47]  Theranos also accused Walgreens of breaching the MSA for closing the sole Theranos Wellness Center in California, due to the revelations of the January 27, 2016 *Wall Street Journal* article, before the applicable cure period had expired.[48]

In a February 25, 2016 letter, Theranos stated that it "has been steadfast in its commitment to patient safety," and "has worked comprehensively over the past months to ensure best-in-class systems are in place in its Newark lab before resuming those tests, including hiring new leadership."[49]

A March 18, 2016 letter to Theranos from CMS revealed that Theranos's proposed plan of correction had been rejected.[50]  The letter also detailed proposed sanctions against Theranos, including revoking the Newark, California lab's CLIA

---

that level of care and skill ordinarily exercised by other professional companies [of] a similar size and in similar circumstances; and (iii) in compliance in all material respects with all applicable laws.").

[44] D.I. 2 at ¶ 74.
[45] *Id.* at ¶ 76.
[46] *Id.*
[47] *Id.*
[48] *Id.* at ¶ 78.
[49] *Id.* at ¶ 81.
[50] *Id.* at ¶ 96.

certification, and banning Theranos's CEO and COO from owning or operating any other lab for at least two years.[51]  Walgreens did not learn of this fact until April 13, 2016 when it was reported by the press.[52]

On May 18, 2016, *The Wall Street Journal* reported Theranos had issued "tens of thousands" of corrected blood test reports to doctors and patients.[53]  The corrected reports included every test conducted in 2014 and 2015 using Theranos's proprietary technology.[54]  Furthermore, the corrected reports included test results from both of Theranos's laboratories.[55]  Dr. Kingshuk Das, Theranos's replacement Newark lab director, confirmed *The Wall Street Journal's* report and estimated that the corrected reports numbered 50,000.[56]  Theranos later confirmed it had known of quality issues related to the tests since September 2015, but claimed the total of voided or corrected tests was 31,000.[57]

Walgreens sent a letter to Theranos terminating the MSA for cause on June 12, 2016.[58]  Like the January 28, 2016 letter, Walgreens stated Theranos failed to perform its obligations under the warranty clause of the MSA.[59]  Thereafter, Walgreens accordingly closed all Theranos Wellness Centers.[60]

Subsequently, on July 7, 2016, CMS set forth its final determination regarding

---

[51] *Id.* at ¶ 97.
[52] *Id.* at ¶ 98.
[53] *Id.* at ¶ 104.
[54] *Id.*
[55] *Id.*
[56] *Id.* at ¶ 105.
[57] *Id.* at ¶ 113.
[58] *Id.* at ¶ 114.
[59] *Id.*; *See* 2-1, Ex. A at ¶ 19(c).
[60] *Id.* at ¶ 114.

Theranos's Newark lab.[61]  In the letter, CMS explained that after it had rejected

Theranos's initial proposed plan of corrections, it received a total of five collective

submissions for corrections from Theranos.[62]  CMS ultimately rejected all proposals.[63]

The letter also imposed sanctions against Theranos, including revocation of the Newark

lab's CLIA certification, and prohibited Theranos's CEO and COO from owning,

operating, or directing a laboratory for at least two years.[64]

## III.    GOVERNING LAW

### A.    Motion to Dismiss Under 12(b)(6)

In analyzing a motion to dismiss under FED. R. CIV. P. 12(b)(6), a review of

Rule 8(a)(2) is necessary.  It requires that a pleading contain a "short and plain

statement of the claim showing that the pleader is entitled to relief."  That standard

"does not require 'detailed factual allegations,' but . . . demands more than an

unadorned, the-defendant-unlawfully-harmed me accusation."[65]  Thus, to survive a

motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual

---

[61] *Id.* at ¶ 125.

[62] *Id.* at ¶ 126.

[63] *Id.* at ¶ 127 ("After careful review, [CMS has] determined that the laboratory's [collective] submission again does not constitute a credible allegation of compliance and acceptable evidence of correct for the deficiencies cited during the CLIA recertification and complaint survey completed on December 23, 2015, and does not demonstrate that the laboratory has come into Condition-level compliance and abated the immediate jeopardy.").

[64] *Id.* at ¶ 128 ("Other sanctions include:  limitation of the laboratory's CLIA certificate for the specialty of hematology; a civil money penalty; a Directed Portion of a Plan Correction; suspension of the laboratory's approval to receive Medicare and Medicaid payments for any services performed for the specialty of hematology; cancellation of the laboratory's approval to receive Medicare and Medicaid payments for all laboratory services.").

[65] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[66]  The

purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint,

not to resolve disputed facts or decide the merits of the case.[67]  Evaluating a motion to

dismiss under Rule 12(b)(6) requires the court to accept as true all material allegations

of the complaint.[68]  "The issue is not whether a plaintiff will ultimately prevail, but

whether the claimant is entitled to offer evidence to support the claims."[69]  A motion to

dismiss may be granted only if, after, "accepting all well-pleaded allegations in the

complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is

not entitled to relief."[70]

       To survive a motion to dismiss under Rule 12(b)(6), the factual allegations must

be sufficient to "raise a right to relief above the speculative level, on the assumption that

all the allegations in the complaint are true (even if doubtful in fact)."[71]  A plaintiff is

obliged "to provide the 'grounds' of his entitle[ment] to relief'" beyond "labels and

conclusions."[72]  Heightened fact pleading is not required:  rather "enough facts to state a

claim to relief that is plausible on its face" must be alleged.[73]  Rejected are unsupported

---

[66] *Id.* (quoting *Twombly*, 550 U.S. at 570); *see* FED. R. CIV. P. 12(b)(6).

[67] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[68] *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).

[69] *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks and citations omitted).

[70] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks and citations omitted).

[71] *Twombly*, 550 U.S. at 555; *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007).

[72] *Twombly*, 550 U.S. at 555.

[73] *Id.* at 570.

allegations, "bald assertions," or "legal conclusions."[74]  Further, "the tenet that a court

must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions."[75]  The analysis is a "context-specific task that requires the reviewing court

to draw on its judicial experience and common sense."[76]  Well-pled facts which only

infer the "mere possibility of misconduct" do not show that "the pleader is entitled to

relief" under Rule 8(a)(2).[77]  "When there are well-pleaded factual allegations, a court

should assume their veracity and then determine whether they plausibly give rise to an

entitlement of relief."[78]

### B.    Breach of Contract

To survive a motion to dismiss for failure to state a breach of contract claim, a

plaintiff must demonstrate the existence of the contract (whether express or implied),

the breach of an obligation imposed by that contract, and the resultant damage to the

plaintiff.[79]  "Clear and unambiguous language found in a contract is to be given its

ordinary and usual meaning."[80]  Furthermore, under Delaware contract law, "the parties

---

[74] *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.") (citations omitted); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) ("unsupported conclusions and unwarranted inferences" are insufficient); *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996) (allegations that are "self-evidently false" are not accepted).

[75] *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (A court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

[76] *Iqbal*, 556 U.S. at 679.

[77] *Id.*

[78] *Id.*

[79] *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007) (citing *WLIW Tech., LLC. v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[80] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

intentions determine whether two separately executed documents are in reality one agreement."[81]

### C. Good Faith and Fair Dealing

"Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract."[82] "When used with the implied covenant, the term 'good faith' contemplates '*faithfulness to the scope, purpose, and terms of the parties' contract.*'"[83] "In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[84]

> This doctrine, however, does not provide a Delaware court with the authority to rewrite or supply omitted provisions to a written contract. Rather, a court should be cautious when implying a contractual obligation and do so only where obligations which can be understood from the text of the written agreement have nevertheless been omitted from the agreement in the literal sense.[85]

A court should focus on "the parties' reasonable expectations at the time of contracting."[86] However, the express terms of the contract, and not an implied covenant

---

[81] *In re Phillip Servs. (Del.), Inc.*, 284 B.R. 541, 546 (Bankr. D. Del. 2002), *aff'd*, 303 B.R. 574 (D. Del. 2003).

[82] *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007).

[83] *Allen v. El Paso Pipeline GP Co., LLC*, 113 A.3d 167 (Del. Ch. 2014) (citing *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418 (Del. 2013)) (emphasis in original).

[84] *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581-82 (D. Del. 2007) (citing *Fitzgerald v. Cantor*, C.A. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).

[85] *Fitzgerald v. Cantor*, C.A. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998) (citing *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998)).

[86] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (citing *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del. Ch. 2000)).

of good faith and fair dealing, will govern the parties' relations when the terms expressly address the issue.[87]  "[T]he plaintiff must advance provisions of the agreement that support this finding in order to allege sufficiently a specific implied contractual obligation."[88]

"When presented with an implied covenant claim, a court first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[89]  If a gap exists, the court must determine "whether the implied covenant should be used to supply a term to fill the gap."[90]  Delaware courts will only imply contract terms when "the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."[91]  "Thus, parties are liable . . . when their conduct frustrates the 'overarching purpose' of the contract. . . ."[92]

## IV.    DISCUSSION

### A.    Convertible Note (Counts I and II)

#### 1.    Lack of Standing

Walgreens asserts it is entitled to "immediate repayment of its purchase of the convertible note."[93]  Theranos responds that Walgreens does not own the note and

---

[87] *Fitzgerald*, 1998 WL 842316, at *1 (citing *Sanders v. Devine*, CIV. A. 14679, 1997 WL 599539, at *6 (Del. Ch. Sept. 24, 1997)).

[88] *Id.*

[89] *Allen v. El Paso Pipeline GP Co., LLC*, 113 A.3d 167, 183 (Del. Ch. 2014).

[90] *Id.*

[91] *Nemec*, 991 A.2d at 1126 (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)).

[92] *Dunlap*, 878 A.2d at 442.

[93] D.I. 2 at ¶ 155.

fails to show any basis that it is the proper party to claim repayment.[94]  Theranos argues

that because the note was purchased and signed by WVC Investments ("WVC"),

Theranos owes an obligation to WVC, not Walgreens.[95]  Walgreens raises four

counterarguments:  (1) the note and the MSA comprise a single agreement; (2) the

MSA grants Walgreens the right to purchase the note; (3) WVC is a wholly-owned

subsidiary of Walgreens and the MSA expressly defines "Walgreens" as "Walgreen Co.

and its wholly owned subsidiaries;" and (4) the note interchangeably refers to both WVC

and Walgreens.[96]

It is evident from the language in the MSA and the note that the two are

inextricably linked.  A general rule of contract law states "where two writings are

executed at the same time and are intertwined with the same subject matter, they

should be construed together and interpreted as a whole, each one contributing to the

ascertainment of the true intent of the parties."[97]  Both documents were executed on

June 5, 2012.[98]  Furthermore, the two writings are interrelated.  Paragraph 21 of the

MSA concerns the convertible note.  It states in pertinent part:

> In *partial consideration* for Walgreens' commitments set forth in this
> Agreement . . . Walgreens shall have the right to purchase, or cause its
> affiliate [WVC] to purchase, [the note]. . . .  To exercise its right to
> purchase the [note] . . . Walgreens shall execute and deliver to [Theranos]

---

[94] D.I. 12 at 5; D.I. 16 at 1-4.

[95] D.I. 12 at 5.

[96] D.I. 15 at 9-10.

[97] *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986)
(citing *Von Lange v. Morrison-Knudsen Co.*, 460 F. Supp. 643, 647–48 (M.D. Pa.1978),
*aff'd*, 609 F.2d 504 (3d Cir.1979)).

[98] *See* D.I. 2-1, Ex. A, Schedule H-1; *id.*, Ex. A at 1.

14

a certificate in the form set forth on Schedule H-2.[99]

Schedule H-2, the certificate evidencing the right to purchase the note, also explicitly refers to Paragraph 21 of the MSA.[100]  It is evident the note is incorporated by reference into the MSA by language in either instrument.  This supports the conclusion that the note is enforceable by Walgreens.

The MSA defines "Walgreens," which is used throughout the document and the note, as "Walgreen Co. and its wholly-owned subsidiaries."[101]  Paragraph 21 allows Walgreens to exercise its right to purchase the note by executing and delivering to Theranos a certificate as set forth on Schedule H-2, which occurred through the signature of Wade Miquelon, President of WVC, a wholly-owned subsidiary of Walgreen Co., on the appropriate documents.[102]

Moreover, the certificate evidencing the right to purchase the note explicitly refers to Walgreen Co.[103]  It provides ". . . this certificate evidences the right granted to [Walgreen Co.] under the [MSA] to purchase [the note] . . . in substantially the form set forth in Schedules H-1 of the [MSA]. . . ."[104]

The note also references the term "investor," which includes both Walgreens and WVC.[105]  This term clearly includes both companies as evidenced by Paragraph 2(a) of

---

[99] *Id.*, Ex. A, Schedule B at ¶ 21 (emphasis added); *see id.*, Ex. A, Schedule H-1; *id.*, Ex. A, Schedule H-2.
[100] *Id.*, Ex. A, Schedule H-2 ("Pursuant to Section 21 of that certain Amended and Restated Theranos Master Service Agreement. . . .").
[101] *Id.*,Ex. A, Schedule E at ¶ 43.
[102]  *Id.*, Ex. A, Schedule B at ¶ 21 (emphasis added); *see id.*, Ex. A, Schedule H-2; D.I. 15 at 9.
[103] D.I. 2-1, Ex. A, Schedule H-2.
[104] *Id.*
[105] *See generally id.*, Ex. A, Schedule H1; *id.*, Ex. A, Schedule H-2.

the note which states:

> At any time prior to repayment by [Theranos] of the Note, *if services are being offered in at least 1,000 investor locations. . . .* At any time prior to repayment by [Theranos] of the Note, *if services are being offered in at least 2,500 investor locations. . . .*[106]

Although "investor" is defined in the note as "the Person specified in the introductory paragraph of this Note or any Person who shall at the time be the registered holder of this Note," it does not make sense for "investor" to refer only to WVC in this context.[107] WVC is the investment division of Walgreens and therefore does not have locations in which blood testing services could be offered.[108]

Therefore, Walgreens has standing to bring a claim for repayment of the note because the note and the MSA are inexorably related.

### 2.    Deficient Pleading

Theranos argues Walgreens fails to allege a breach of any obligation under the MSA pertaining to the note; "a breach of any obligation created by the note itself;" or any harm suffered as a result of any breach.[109] Walgreens responds, and this court agrees, that the note was intended to be *sine qua non* of the MSA and therefore "a material breach of one constitutes a material breach of the other."[110] Accordingly, Walgreens has pled adequate factual allegations which are sufficient to

---

[106] *Id.*, Ex. A, Schedule H-1 at ¶ 2(a) (emphasis added).
[107] *Id.* at ¶ 3.
[108] D.I. 15 at 10; *see generally* D.I. 15-1.
[109] D.I. 12 at 6.
[110] D.I. 15 at 12; Restatement (Second) of Contracts § 236 (1981); *see, e.g.*, *Carco Grp., Inc. v. Maconachy*, 644 F. Supp. 2d 218, 236-37 (E.D.N.Y. 2009), *rev'd on other grounds*, 383 F. App'x 73 (2d Cir. 2010) (Where two separate agreements were dependent on each other and must be construed together, a breach of one constitutes a breach of the other).

raise a right to relief above the speculative level.

### 3.    Restitution and Damages

Theranos contends Walgreens, having argued it is entitled to damages in its complaint, and subsequently having asserted it is entitled to restitution in its reply, is not entitled to both.[111]  Theranos is correct, but misinterprets Walgreens's argument.  In its response, Walgreens states "Walgreens, accordingly, seeks it common law contract remedies.  *For example*, given Theranos's material breach, Walgreens *may* elect restitution as a remedy."[112]  Walgreens then continues by relying on case law and noting "*[a]lternatively*, Walgreens may be entitled to immediate repayment of the Note if . . . the Pilot was, in fact, not successful."[113]  Clearly Walgreens is asserting remedies in the alternative.  Furthermore, Walgreens has adequately pled it is entitled to damages as a result of Theranos's alleged breach of the warranty provision of the MSA.[114]

### B.    Good Faith and Fair Dealing (Claim III)

Theranos argues Walgreens's claim for breach of the implied covenant of good faith and fair dealing should be dismissed because it ignores the parties agreed upon obligations and seeks to impose additional obligations on Theranos.[115]  Specifically, Theranos asserts Walgreens failed to provide notice and opportunity to cure for its alleged default, and to plead Theranos acted "arbitrarily or unreasonably in a way that frustrated the overarching purpose of the parties agreement."[116]  Walgreens

---

[111] D.I. 16 at 5-6.
[112] D.I. 15 at 13 (emphasis added).
[113] *Id.* at 14 n.8 (emphasis added).
[114] *See* D.I. 2 at ¶¶ 155-56, 172-73.
[115] D.I. 12 at 11.
[116] *Id.*

responds that it was never obligated to provide notice and opportunity for its implied covenant claim and, that it has pled sufficient facts in accordance with FED. R. CIV. P. 12(b)(6).[117]

### 1.    Overarching Purpose

Under the MSA, both parties had reasonable expectations that the blood testing and analysis would be accomplished via Theranos's finger-stick technology and "Edison machine."[118]

Paragraph 2(a) of the MSA implies Theranos's finger-stick and "Edison" devices will be used to "make testing less invasive, faster and far more accessible, effective, and actionable. . . ."[119]  Although this paragraph does not reference or limit the mode of technology to be used, the MSA explicitly mentions blood testing.[120]  The last sentence notes "[o]ther types of specimens collected will be nasal and throat swabs as well as urine samples."[121]  The separate references of blood samples from other specimens in Paragraph 2(a) suggests that blood testing and Theranos's proprietary technology are the primary concern of the MSA.

In further support, Paragraph 2(e) reads "*it is the parties' intention* for Walgreens to act as a patient service center and *collect blood samples via finger-stick technology,* small samples of urine, saliva, feces, or swabs with *laboratory testing* to be *performed by Theranos at a CLIA certified offsite laboratory. . . .*"[122]  Paragraph 15, which

---

[117] D.I. 15 at 15-17.
[118] D.I. 2-1, Ex. A, Schedule C at 1.
[119] *Id.*, Ex. A at ¶ 2(a).
[120] *Id.*
[121] *Id.*
[122] *Id.*, Ex. A at ¶ 2(e) (emphasis added).

addresses the type of services Walgreens is to perform under the MSA, unequivocally states "Walgreen[s] technicians will draw blood using the finger-stick technique. . . ."[123] Additionally, Paragraph 16 requires Theranos to "deliver . . . lancets/blood collecting devices (finger stick devices) . . . to Walgreens locations on an as needed basis."[124]

In its complaint, Walgreens alleges Theranos approached it in "early 2010 with the promise of an innovative technology that would revolutionize blood testing."[125] Walgreens also avers a Theranos representative contacted it via email in January 2010 representing Theranos could offer "in-store blood testing from a single finger-stick."[126]

Although, as Theranos points out, the MSA does not either define "device(s)" as finger-stick technology or require Theranos to exclusively use the finger-stick devices, the unequivocal purpose of the MSA was to implement and employ the finger-stick and "Edison" devices in Walgreens's pharmacies.[127]

### 2.    Arbitrarily and Unreasonably

Theranos denies ever frustrating the overarching purpose of the MSA by acting arbitrarily and unreasonably because the MSA did not require it to use either its finger-stick technology or its own laboratories (under certain circumstances).[128] It argues Delaware courts are not permitted to impose new terms into a contract that could have been bargained for but were not.[129]  As previously discussed, Walgreens

---

[123] *Id.*, Ex. A at ¶ 15.
[124] *Id.*, Ex. A at ¶ 16.
[125] D.I. 2 at ¶ 18.
[126] *Id.* at ¶ 20.
[127] D.I. 12 at 14-15; *see generally* D.I. 2-1 at Ex. A.
[128] D.I. 12 at 14-15.
[129] *Id.* at 15.

had a reasonable expectation that the blood testing to be performed at its stores would be accomplished through the use of Theranos's finger-stick technology.

Walgreens contends that in a March 22, 2010 meeting, Theranos touted that it had "developed a 'proprietary, patented technology' capable of running 'comprehensive blood tests from a single finger-stick, in real-time at the point of care, outside of traditional lab settings.'"[130] Theranos assured Walgreens that the technology was "viable and consumer-ready," and would be available to the general public as early as "later that year."[131]

Shortly thereafter, on May 7, 2010, Theranos represented that its proprietary technology was approved by the Food and Drug Administration ("FDA") for clinical trials and its technology was positioned to receive approval for use outside of the clinical field.[132] Theranos's technology eventually received FDA approval, but it is unclear when this occurred.

During a January 2012 presentation, Theranos similarly assured Walgreens that its labs would become the "world's first finger-stick based . . . labs" offering the "highest quality testing from a finger-stick. . . ."[133] It also "highlighted purported advancements" of its blood testing services, and claimed its finger-stick technology required "99.9% less blood," with the testing results available within 4 to 24 hours.[134]

These representations by Theranos pertain solely to its finger-stick technology

---

[130] D.I. 2 at ¶ 22.
[131] *Id.* at ¶¶ 24-25.
[132] *Id.* at ¶¶ 31-32.
[133] *Id.* at ¶ 37.
[134] *Id.* at ¶ 38.

and its device for analyzing blood samples.  Although the MSA allowed Theranos to use

third party laboratories in its absence of obtaining CLIA certification, its representations

and assurances led Walgreens to reasonably expect at the time of contracting, that

Theranos would use its finger-stick technology, *at least* a majority of the time, to collect

blood samples.  As evident from the complaint, Theranos's decision to stop using its

finger-stick technology was an unexpected occurrence.

### 3.    Notice and Opportunity to Cure

Theranos argues Walgreens did not adhere to the notice and

opportunity to cure requirements of Paragraph 24 of the MSA before terminating the

agreement, and therefore, does not have a valid claim for repayment of the Innovation

Fee.[135]  Theranos also argues Walgreens is attempting to insert additional terms into the

MSA through its claim for breach of the implied covenant of good faith and fair

dealing.[136]  Walgreens responds that it was neither required to provide notice nor an

opportunity to cure the alleged breach.[137]

As previously discussed, the court finds that the overarching purpose of the MSA

was to use and develop Theranos's proprietary finger-stick technology in Walgreens's

stores.  Therefore, Theranos's argument that Walgreens is attempting to insert new

terms into the MSA falls short.

Under the MSA, Walgreens is not necessarily required to provide notice

---

[135] D.I. 12 at 11-13; D.I. 16 at 9-10.
[136] D.I. 12 at 13-16; D.I. 16 at 6-8 (Theranos argues the MSA does not contemplate a specific instrument for drawing blood, nor does it require Theranos to use its own laboratories if they are not CLIA certified, and therefore by attempting to insert these terms into the MSA, Walgreens's claim is invalid.).
[137] D.I. 15 at 15-16.

and an opportunity to cure an alleged breach of the implied covenant of good faith and fair dealing.

Paragraph 24 of the MSA outlines the procedures for terminating the agreement for cause based on a breach of a material provision within the contract.[138]  Notably, it only refers to "termination due to unsatisfactory pilot or inability to realize pricing" and "termination for cause."[139]  These two provisions, as well as Paragraph 24 in its entirety, do not require Walgreens to provide notice and an opportunity to cure in regards to a claim of purported breach of the implied covenant of good faith and fair dealing. Paragraph 24(b) does not apply because the pilot program was never implemented, thus there was no inability to realize pricing.[140]  Paragraph 24(c) is also inapplicable because Walgreens's claim for breach of the implied covenant of good faith and fair dealing is not the reason it terminated the MSA, and because Paragraph 24(c) pertains to "material provisions" within the MSA.[141]  Under Delaware law, the implied covenant of good faith and fair dealing attaches to every contract and is not a "material provision" within the meaning of Paragraph 24(c).[142]  In fact, Walgreens unequivocally states it terminated the MSA for cause due to Theranos's alleged breaches of the express warranties in Paragraph 19(c) of the MSA.[143]  It would be impossible for Walgreens to give adequate notice and opportunity to cure an alleged breach of the implied covenant

---

[138] *See* D.I. 2-1, Ex. A at ¶ 24(c) ("If either party breaches a *material provision* of this Agreement. . . .") (emphasis added).

[139] *Id.*

[140] *See generally* D.I. 2.

[141] *Id.; see also* D.I. 2-1, Ex. A at ¶ 24(c).

[142] *See Pedrick v. Roten*, 70 F. Supp. 3d 638, 649 (D. Del. 2014).

[143] *Compare* D.I. 2 at ¶¶ 146-47, 154-55, 160-61 *with* D.I. 2 at ¶¶ 176-85; D.I. 15 at 14-20.

of good faith and fair dealing after having properly terminated the MSA for cause.[144]
This point is reinforced by Theranos's argument that the overarching purpose of the
MSA was not to implement and employ the finger-stick and "Edison" devices in
Walgreens's stores.[145]

Moreover, construing the facts in a light most favorable to the non-moving party,
it is evident Theranos knew of problems pertaining to its proprietary technology, as well
as its two CLIA-certified labs, and unsuccessfully attempted to cure those deficiencies
before Walgreens noticed.[146]  Had Walgreens been required to provide notice and
opportunity to cure those issues, the facts show Theranos would still have been in
default, even if Paragraph 24(c) were applicable.[147]

Thus, Walgreens need not comply with the notice and opportunity to cure
requirements in order to bring a claim for alleged breach of the implied covenant of
good faith and fair dealing.  However, Paragraph 24(d) of the MSA does not allow
recovery of the Innovation Fee based on a breach of the implied covenant of good faith
and fair dealing.[148]  Yet, Walgreens has pled sufficient facts to raise a right to relief
above the speculative level.[149]  Accordingly, the court need not address Walgreens's

---

[144] D.I. 15 at 15-16 (Walgreens argues it terminated the contract for cause based
on Theranos's alleged breaches of the warranties under Paragraph 19(c) of the MSA,
and added its claim for breach of the implied covenant of good faith and fair dealing *only
after* terminating the contract in accordance with the requirements in Paragraph 24(c).).
[145] D.I. 12 at 13-15; D.I. 16 at 6-9.
[146] *See* D.I. 2 at ¶¶ 51-73, 76, 85-91, 95-97, 104-107, 113-15, 125-130, 142.
[147] *See* D.I. 2-1, Ex. A at ¶ 24; D.I. 2 at ¶ 142; *see generally* D.I. 2 at ¶¶ 51-142.
[148] D.I. 2-1, Ex. A at ¶ 24(d)(i)(1) ("In the event Walgreens terminates this
Agreement pursuant to Sections 24.b or 24.c . . . then within one hundred eighty (180)
days of the termination date Theranos will refund the Innovation Fee. . . .").
[149] *See* D.I. 2 at ¶¶ 184-85 (In addition to arguing it is entitled to repayment of the
Innovation Fee and convertible note, Walgreens asserts it has suffered further damages

futility argument.[150]

## V.   CONCLUSION

For the reasons contained herein, it is recommended that:

(1) Theranos's motion to dismiss counts I and II (D.I. 11), as they relate to the convertible note, and count III in its entirety pursuant to FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief can be granted be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served a copy of this Report and Recommendation.  Objections and responses are limited to ten (10) pages each.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Dated: July 27, 2017                    /s/ Mary Pat Thynge
                                         UNITED STATES MAGISTRATE JUDGE

---

to be proven.); *see generally id.* at ¶¶ 174-85.
   [150] *See* D.I. 15 at 16-17.

24